UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| UNITED STATES OF AMERICA )<br><br>v. )<br><br>ERIC TABARO NSHIMIYE,<br>  a/k/a  Eric Tabaro Nshimiyimana,<br><br><br>          Defendant | Criminal No. 1:24-cr- 10071<br><br>Violations:<br><br><u>Counts One through Four:</u> Perjury<br>(18 U.S.C. § 1623(a))<br><br><u>Count Five:</u> Obstruction of Justice; Aiding and Abetting<br>(18 U.S.C. §§ 1503 and 2)<br><br><u>Count Six:</u> Falsifying, Concealing, and Covering Up a Material Fact<br>(18 U.S.C. § 1001(a)(1)) |

## INDICTMENT

At all times relevant to this Indictment:

### The Defendant

1.　　The defendant, Eric Tabaro Nshimiye, also known as Eric Tabaro Nshimiyimana ("NSHIMIYE"), was born and raised in the Republic of Rwanda ("Rwanda"). NSHIMIYE identified as a Hutu, a member of the majority ethnic group in the country, and was raised and obtained his early education in northern Rwanda in and about Ruhengeri. NSHIMIYE attended the University of Rwanda in Butare (the "University") beginning in or about 1991 as an undergraduate medical student. NSHIMIYE was still enrolled at the University in April 1994 when the Rwandan genocide began. NSHIMIYE fled Rwanda in 1994.

1

2.      NSHIMIYE applied to become a refugee to the United States in 1995 while he was living in Kenya.  His refugee application was granted that year, and he was admitted to the United States as a refugee in or about December 1995.  He became a lawful permanent resident of the United States in 1998.  He became a naturalized United States citizen in 2003.

3.      In April 2019, NSHIMIYE was called by the defense to testify at the federal criminal trial of his former University classmate and friend, Jean Paul Teganya.  He testified under oath as a witness before a federal jury sitting in Boston in *United States v. Jean Leonard Teganya*, 1:17-cr-10292-FDS on or about April 2, 2019.

4.      As set forth below, NSHIMIYE committed perjury and obstructed justice while testifying under oath in *United States v. Jean Leonard Teganya*, 1:17-cr-10292-FDS.  Moreover, NSHIMIYE's perjury and obstruction of justice were part of a decades-long scheme to falsify and conceal information about himself.  That scheme commenced with his application for refuge in the United States, continued through his applications for lawful permanent residence and United States citizenship, persisted through his false and misleading testimony at Jean Leonard Teganya's federal trial, and culminated in his false and misleading information to agents with the Department of Homeland Security in March 2024.

<u>General Allegations</u>

5.      At all times material to this Indictment, Rwanda was a small country in Central Africa with a population of approximately 8 million people.  It was populated primarily by two main ethnic groups, the Hutu and the Tutsi.  Hutus accounted for approximately 85 percent of the population.  Tutsis accounted for about 14 percent of the population.  Following Rwanda's

2

independence from Belgium in 1962, the Hutu majority gained control of the government, and engaged in acts, including discrimination and acts of violence, against Tutsis.  As a result, numerous Tutsis fled Rwanda and some formed a rebel guerilla army, known as the Rwandan Patriotic Front ("RPF").

6.      In or about the early 1990s, the RPF invaded Rwanda.  Thereafter, Hutu President Juvenal Habyarimana executed agreements that called for Hutus and Tutsis to share power. These agreements, which were negotiated between on or about July 1992 and August 1993, were signed in Arusha, Tanzania, and came to be known as the "Arusha Accords."  Pursuant to the Arusha Accords, Habyarimana's party, the Mouvement Revolutionaire National pour le Developpement ("MRND"), agreed to share power with several other parties, including those that represented Tutsis in the RPF.

7.      On or about April 6, 1994, the plane which was carrying President Habyarimana and Burundi's new President, was shot down as it approached the airport in Kigali, Rwanda's capital city.  President Habyarimana was killed in the crash.  This assassination precipitated a period of political and ethnic violence in Rwanda.  In particular, Hutu extremists with positions of power in an interim government formed after Habyarimana's assassination, called for the killing of prominent opposition figures, including Tutsis and moderate Hutu politicians. Included among those killed were government ministers opposed to the extremists.

8.      The killings spread throughout the country as Hutu soldiers, civilians, and militia -- including the youth militia of the MRND, known as the Interahamwe -- armed with machetes, clubs, guns and grenades, began killing Tutsi civilians.  At the time, most Rwandans carried

3

identification cards specifying their ethnic background, a practice left over from the colonial

period. These identification cards, known as "cartes d'identite," or "identity cards," which

included information about the bearer, including whether they were classified as a Hutu or a

Tutsi, now meant the difference between life and death. Roadblocks where identity cards were

checked were set up all over the country to intercept Tutsis, and Tutsis were attacked and killed

wherever they fled and congregated, including at hospitals, churches, and schools.

9.      Hutu extremists engaged in genocidal mania using machetes and clubs to beat and

hack to death thousands of Tutsis wherever they were found. A Rwandan radio station,

controlled by Hutu extremists, further encouraged the killings by broadcasting non-stop hate

propaganda, and, at times, pinpointed the locations of Tutsis in hiding.

10.     The killings only ended after armed Tutsi RPF rebels managed to defeat the Hutu

extremists and halt the genocide in or about July 1994. By then, approximately 800,000 men,

women, and children had been killed.

11.     The prefecture of Butare, now known as Huye, located in the south of Rwanda,

was the intellectual and cultural center of the country at the time of the genocide. As compared

to national demographics, Butare had a high percentage of Tutsis and a strong moderate and

multi-ethnic political presence. On or about April 17, 1994, the interim extremist Rwandan

government removed the Tutsi governor in Butare. Two days later, the date of the installation of

the new governor, the acting President of Rwanda, Theodore Sindikubwabo, delivered a speech

in Butare urging Hutus in that part of the country, in well-understood coded terms, to

exterminate Tutsis. The day after, April 20, 1994, the killings accelerated in Butare with the use

4

of roadblocks and other means to capture and kill Tutsis.  Members of the military, the Interahamwe, and others aligned with them, also sought out Tutsis in locations where Tutsis sought refuge, including medical facilities and government offices.  These measures resulted in the killing of scores Tutsis, and the rape of many Tutsi women.

12.     As the intellectual capital of Rwanda, Butare was  the site not only of the University and its medical school, but also the Butare University Hospital ("the Hospital") affiliated with the University.  Tutsi students were killed at the University during the genocide in Butare. Because many Tutsis sought refuge on the Hospital grounds, and also sought care for their injuries there, the Hospital itself became the site of many atrocities.  Tutsi patients were removed from the Hospital and then beaten or hacked to death.  Hospital nurses and other staff who were Tutsi were also killed.  Tutsi women were often raped before they were killed.

<u>The Defendant's Membership in the MRND & Role in the Violence</u>

13.     While a student at the medical school of the University in Butare, NSHIMIYE was an active member in the MRND and the Interahamwe.   Among other things, NSHIMIYE wore a hat and clothing marked with MRND insignias and colors, and he participated in MRND rallies and other MRND political gatherings. NSHIMIYE also regularly associated with MRND members, including Jean Leonard Teganya, who became a student leader of the MRND in Butare.  Prior to the 1994 genocide, NSHIMIYE also participated in weapons training in the forest adjacent to the university campus alongside other members of the MRND and Interahamwe.

5

14.     After the genocide started in Butare, NSHIMIYE played an active role in the direct and indirect persecution of Tutsis.  Among other things, NSHIMIYE assisted in the identification of Tutsis among hospital patients and personnel; he searched for, and exposed, Tutsis sheltering at the hospital and other locations at the University and in Butare; and he assisted in the forcible removal of Tutsis from the hospital grounds, from locations at the University, and from other locations in Butare.

15.     NSHIMIYE also guarded several the roadblocks in Butare where he assisted in the identification and killing of Tutsis.  During much of this time, NSHIMIYE was armed with a wooden club spiked with nails and a machete.  At times, he was also armed with a hatchet and grenades.

16.     During the genocide, NSHIMIYE was also directly involved in the murder of Tutsis, including women and children, as well as the disposal of their dead bodies.  NSHIMIYE also encouraged, and aided and abetted, the rape of Tutsi women.

### NSHIMIYE's Flight from Rwanda and Fraudulent Refugee Application

17.     NSHIMIYE fled from Rwanda in 1994.  He claimed in his 1995 refugee application that he fled from Rwanda to Tanzania and then to Kenya.  By contrast, in his 2019 trial testimony, he claimed that he fled to "the DRC, Congo," and then to Kenya.  On or about May 10 and May 18, 1995, NSHIMIYE applied to become a refugee to the United States while he was in Nairobi, Kenya.

18.     A person outside the United States may seek admission to the United States as a refugee by demonstrating that he or she is unable or unwilling to return home because of past

6

persecution, or a well-founded fear of future persecution, on account of their race, religion, nationality, membership in a particular social group, or political opinion.  By contrast, any person who has ordered, incited, assisted, or otherwise participated (directly or indirectly) in the persecution of any person on account of race, religion, nationality, membership in a particular social group, or political opinion is prohibited from qualifying as a refugee to the United States. At all times material to this Indictment, applicants seeking refuge in the United States had to complete a Registration for Classification as Refugee (Form I-590), and other related forms. Applicants were required to sign and certify the truthful contents of those forms.  Approval to enter the United States as a refugee was granted only after a review of those completed forms and an interview by a United States immigration officer.

19.     On or about May 10 and May 18, 1995, in connection with his application for classification as a refugee to the United States, NSHIMIYE completed and signed a Form I-590. In this and other related forms, NSHIMIYE falsely claimed, "I fled my country because I was threatened with my family to be killed by the militias INTERAHAMWE as they have killed my father during the massacres against the minority ethnic TUTSI."  NSHIMIYE also falsely claimed: 1) his place of birth was Kigali, Rwanda; 2) he left Rwanda on 4/15/1994; 3) he attended Lycée de Kigali from 1985-1991; and 4) he had not been in a "political, professional, or social organization" at any time prior to his refugee application.

20.     On or about May 18, 1995, NSHIMIYE also completed and signed a "Sworn Statement of Refugee Applying for Entry into the United States" (Form G-646T).  In that form, NSHIMIYE falsely swore that he had never committed a crime involving moral turpitude, and

that he had "never ordered, assisted or otherwise participated in the persecution of any person because of race, religion or political opinion."

21.    On or about May 18, 1995, NSHIMIYE was asked a series of questions during an interview with a United States immigration official in Nairobi, Kenya.  In response to those questions, he falsely stated that he had not had "any involvement in the killing or injury to other persons since April 1, 1994," and that he did not, "in any way encourage others to participate in such killing or injury." He also falsely stated that his father was killed during the genocide.

22.    At the conclusion of the interview on or about May 18, 1995, and after a review of NSHIMIYE's completed Forms I-590 and G-646T, the immigration officer approved NSHIMIYE's application as a refugee.  In so doing, the immigration officer relied on NSHIMIYE's written and oral false statements.

23.    On or about December 1, 1995, NSHIMIYE was granted admission to the United States as a refugee and was also authorized to work in the United States.  NSHIMIYE entered the country at New York and took up residence in Ohio.

### NSHIMIYE's Fraudulent Application for Permanent Residency

24.    On or about March 15, 1997, NSHIMIYE sought to become a lawful permanent resident of the United States.  After a person has been admitted to the United States as a refugee, he or she may apply for lawful permanent residence in the United States.  At all times material to this Indictment, an applicant was required to complete and file an Application to Register Permanent Residence or Adjust Status (Form I-485).  On that form, the applicant must certify, under penalty of perjury, that the application and information submitted with the application are

8

true and correct.  If the Form I-485 is approved, the person's refugee status is adjusted to that of a lawful permanent resident, commonly referred to as a "green card holder."  A lawful permanent resident is entitled to live and work in the United States indefinitely and, after a period of time, apply for United States citizenship if they so desire.

26.   On or about March 15, 1997, NSHIMIYE executed a Form I-485 in support of his application for lawful permanent residence.  In that Form I-485, NSHIMIYE falsely claimed under penalty of perjury that: he had never "knowingly committed any crime of moral turpitude . . . for which [he had] not been arrested"; and that he had never "engaged in genocide, or otherwise ordered, incited, assisted or otherwise participated in the killing of any person because of race, religion, nationality, ethnic origin, or political opinion."  NSHIMIYE also concealed the fact that he had been a member of the MRND and the Interahamwe when asked to list, "present and past membership in or affiliation with every political organization, association . . party, club, society or similar group. . . since your 16th birthday."

26.   NSHIMIYE's application for lawful permanent residence was approved on or about May 7, 1998, based in part on his false statements, and his continued concealment of his role during the Rwandan genocide. NSHIMIYE's lawful permanent residence status was applied retroactively to his original admission date of December 1, 1995.

<u>NSHIMIYE's Fraudulent Application for U.S. Citizenship</u>

27.   On or about September 11, 2001, NSHIMIYE sought to become a United States citizen.  Individuals are permitted to apply for United States citizenship five years after acquiring their lawful permanent residency. The process then requires them to file an Application for

Naturalization (Form N-400).  On that form the applicant must certify, under penalty of perjury, that the application and information submitted with the application are true and correct.  As part of that application process, anyone applying for citizenship is interviewed by an officer of the U.S. Citizenship and Immigration Services (formerly the Immigration and Naturalization Service) regarding their Application for Naturalization.

28.     On or about September 11, 2001, NSHIMIYE executed a Form N-400.  On that form, NSHIMIYE falsely declared under penalty of perjury that: he had never persecuted (either directly or indirectly) any person because of race, religion, national origin, membership in a particular social group, or political opinion (No.11);  he had never committed a crime or offense for which he had not been arrested (No.15);  he had never given false or misleading information to any U.S. government official while applying for any immigration benefit or to prevent his exclusion from the United States (No.23);  and he had never lied to any U.S. government official to gain entry or admission into the United States (No.24).  He also concealed his membership in the MRND and in the Interahamwe when asked if he had ever been a member of or associated with any organization, association, party, club, or similar group (No.8).

29.     On or about December 12, 2002, NSHIMIYE appeared before a United States immigration officer, and again swore to the contents of the Form N-400, including those false statements set forth in the previous paragraph.  Based in part on NSHIMIYE's false statements and his continued concealment of his role during the Rwandan genocide, NSHIMIYE's Application for Naturalization was approved on December 13, 2002.  NSHIMIYE was

naturalized as a United States citizen on or about April 18, 2003, and was issued a Department of

Homeland Security Certificate of Naturalization (No. ** *** 786).

NSHIMIYE's Perjury and Obstruction of Justice at a Federal Criminal Trial

30.     On or about September 27, 2017, a Grand Jury of the United States District Court

for the District of Massachusetts indicted NSHIMIYE's former University classmate and

roommate, Jean Leonard Teganya, in a five count indictment.  Teganya was charged with fraud

and misuse of visas, permits, and other documents in violation of 18 U.S.C. § 1546(a), and with

perjury in violation of 18 U.S.C. §§ 1621(1) and (2).  The indictment alleged that, in seeking

asylum in the United States, Teganya had failed to disclose that he was a member of the MRND,

and also falsely stated that he had never participated in causing harm to another person because

of that person's race, religion, nationality, membership in a particular social group, or belief in a

particular political opinion.  It also alleged that Teganya had testified falsely during an

immigration custody hearing, claiming he had not been a member of the MRND, and he had

never witnessed any atrocities occur at the Hospital during the genocide.

31.     In or about March and April 2019, Teganya was tried before a jury in the United

States District Court for the District of Massachusetts.  His case was captioned *United States v.*

*Jean Leonard Teganya*, 1:17-cr-10292-FDS.  NSHIMIYE, who had been one of Teganya's

closest friends and associates at the University before and during the genocide in 1994, was

called by Teganya to testify on Teganya's behalf.  NSHIMIYE testified before the jury on or

about April 2, 2019.

32.     As set forth below, after swearing an oath to tell the truth, NSHIMIYE testified falsely about Teganya's association with the MRND, seeking to falsely exculpate Teganya. NSHIMIYE also testified falsely about his own membership in the MRND and the Interahamwe, and his participation in the Rwandan genocide, among other things.

<u>NSHIMIYE's False Statements of Federal Agents</u>

33.     On March 11, 2024, agents from the Department of Homeland Security interviewed NSHIMIYE at his place of work in Akron, Ohio.  In response to questions put to him by agents, NSHIMIYE falsely claimed: to have not been a member of a political party prior to the genocide; to have not been a member of the MRND; to not have been a member of the Interahamwe; to have not attended any political rallies; to have not been at the University in Butare during the genocide; and to have not participated in the rape or killing of any person.

<u>COUNT ONE</u>
Perjury
(18 U.S.C. § 1623(a))

The Grand Jury charges:

34.     The Grand Jury re-alleges and incorporates by reference paragraphs 1-3, 5-12,

and 30-31 of this Indictment.

35.     On or about April 2, 2019, in the District of Massachusetts, the defendant,

ERIC TABARO NSHIMIYE,
a/k/a "Eric Tabaro Nshimiyimana,"

having taken an oath to testify truthfully in a proceeding before the United States District Court

for the District of Massachusetts, knowingly made a false material declaration, that is, during his

trial testimony in *United States v. Jean Leonard Teganya*, 1:17-cr-10292-FDS, he knowingly gave

the following underlined false testimony under oath:

Q.     I'm going to approach and show you a couple of items, just ask if
       you recognize them. First, I'm showing you a hat marked Exhibit 12.
       I ask you to look at that and tell me if you recognize that style of hat.

A.     <u>I don't remember this type of hat.</u>

Q.     I'm also going to show you another item that's been marked
       Exhibit 15. It's a scarf. Do you recognize what this is?

A:     <u>No.</u>

. . .

Q.     Did you ever see a hat like that being worn by Mr. Teganya?

A.     <u>No.</u>

Q.     Did you ever see a scarf like that being worn by Mr. Teganya?

13

A.    <u>No.</u>

Q.    Did Mr. Teganya have a hat or a scarf like that in the room that you shared?

A.    <u>No.</u>

Q.    Did Mr. Teganya have any sort of flag displayed in his room?

A.    No.

Q.    To the best of your knowledge, did Mr. Teganya go to any political meetings or rallies?

A.    <u>Not that I know of</u>.

All in violation of Title 18, United States Code, Section 1623(a).

<u>COUNT TWO</u>
Perjury
(18 U.S.C. § 1623(a))

The Grand Jury further charges:

36.     The Grand Jury re-alleges and incorporates by reference paragraphs 1-3, 5-12, and 30-31 of this Indictment.

37.     On or about April 2, 2019, in the District of Massachusetts, the defendant,

ERIC TABARO NSHIMIYE,
a/k/a "Eric Tabaro Nshimiyimana,"

having taken an oath to testify truthfully in a proceeding before the United States District Court for the District of Massachusetts, knowingly made a false material declaration, that is during his trial testimony in *United States v. Jean Leonard Teganya*, 1:17-cr-10292-FDS, he gave the following underlined false testimony under oath:

Q.     Were you able to go back to Butare after the president's plane was shot down?

A.     No.

Q.     Did you spend any time in Butare during the genocide?

A.     <u>No</u>.

. . .

Q.     And then you were there at the Kiza dorm with Mr. Teganya when four Tutsi students were taken out and killed?

A.     No, <u>I was not in Butare</u>.

Q.     And you participated in that killing of those students?

15

A.      No, <u>I was not in Butare</u>.

Q.      Sir, I remind you you're under oath for these answers.

A.      I was in Kigali, then I managed to get back to Ruhengeri.

All in violation of Title 18, United States Code, Section 1623(a).

## COUNT THREE
Perjury
(18 U.S.C. § 1623(a))

The Grand Jury further charges:

38.     The Grand Jury re-alleges and incorporates by reference paragraphs 1-3, 5-12, 30-31 of this Indictment.

39.     On or about April 2, 2019, in the District of Massachusetts, the defendant,

ERIC TABARO NSHIMIYE,
a/k/a "Eric Tabaro Nshimiyimana,"

having taken an oath to testify truthfully in a proceeding before the United States District Court for the District of Massachusetts, knowingly made a false material declaration, that is during his trial testimony in *United States v. Jean Leonard Teganya*, 1:17-cr-10292-FDS, he gave the following underlined false testimony under oath:

Q.     Were you yourself a member of a political party as a university student?

A.     <u>Never</u>.                                     .

. . .

Q.     In fact, you were a member of MRND; isn't that correct?

A.     <u>No</u>.

Q.     You wore that hat?

A.     <u>No</u>.

Q.     You wore that scarf?

A.     <u>No</u>.

17

Q.      You testified on direct you don't even remember it, but, in fact, you wore it; isn't that correct?

A.      <u>No</u>.

Q.      You wore the pins as well?

A.      <u>No</u>.

Q.      You attended rallies and parties and meetings?

A.      <u>No, never</u>.

Q.      And you were a member of the Interahamwe?

A.      <u>No</u>.

Q.      You attended trainings with Mr. Teganya at the gym and in the forest?

A.      <u>No; hell, no</u>.


All in violation of Title 18, United States Code, Section 1623(a).

<u>COUNT FOUR</u>
Perjury
(18 U.S.C. § 1623(a))

The Grand Jury further charges:

40.     The Grand Jury re-alleges and incorporates by reference paragraphs 1-3, 5-12, 30-31 of this Indictment.

41.     On or about April 2, 2019, in the District of Massachusetts, the defendant,

ERIC TABARO NSHIMIYE,
a/k/a "Eric Tabaro Nshimiyimana,"

having taken an oath to testify truthfully in a proceeding before the United States District Court for the District of Massachusetts, knowingly made a false material declaration, that is during his trial testimony in *United States v. Jean Leonard Teganya*, 1:17-cr-10292-FDS, he gave the following underlined false testimony under oath:

Q.     Sir, I remind you you're under oath for these answers.

A.     I was in Kigali, then I managed to get back to Ruhengeri.

Q.     So your answer is no, that you didn't participate in the genocide?

A.     <u>No</u>.

Q.     Is there any context you'd like to add to that?

A.     No.

All in violation of Title 18, United States Code, Section 1623(a).

19

<u>COUNT FIVE</u>
Obstruction of Justice; Aiding and Abetting
(18 U.S.C. §§ 1503 and 2)

The Grand Jury further charges:

42.     The Grand Jury re-alleges and incorporates by reference paragraphs 1-3, 5-15,

and 30-32, of this Indictment.

43.     On or about April 2, 2019, in the District of Massachusetts, the defendant,

ERIC TABARO NSHIMIYE,
a/k/a "Eric Tabaro Nshimiyimana,"

did corruptly influence, obstruct and impede, and endeavor to influence, obstruct and impede the

due administration of justice in *United States v. Jean Leonard Teganya*, 1:17-cr-10292-FDS, in

the United States District Court for the District of Massachusetts, and did aid and abet Jean

Leonard Teganya in the commission of such a crime, in that ERIC NSHIMIYE testified falsely,

concealed material evidence, and answered questions in a manner which foreclosed inquiry into

material subjects, including: testifying falsely about the Jean Leonard Teganya's association in the

MRND; testifying falsely about his own association with the MRND and the Interahamwe;

testifying falsely about his own participation in the genocide; concealing his knowledge of Jean

Leonard Teganya's associations and activities during the genocide; and concealing his own

criminal activities during the genocide.

All in violation of Title 18, United States Code, Sections 1503 and 2.

20

## COUNT SIX
### Falsifying, Concealing, and Covering Up a
### Material Fact by Trick, Scheme, and Device
### (18 U.S.C. § 1001(a)(1))

The Grand Jury further charges:

44.     The Grand Jury re-alleges and incorporates by reference paragraphs 1-33, of this Indictment.

45.     Beginning in or about May 10, 1995, and continuing through on or about March 11, 2024, in the Republic of Kenya, the District of Massachusetts, and elsewhere, the defendant,

### ERIC TABARO NSHIMIYE,
### a/k/a "Eric Tabaro Nshimiyimana,"

did knowingly and willfully falsify, conceal, and cover up by trick, scheme, and device one or more material facts in a matter within the jurisdiction of the executive and judicial branches of the Government of the United States, in that the defendant – as an applicant for refuge and admission into the United States, as an applicant for permanent residence in the United States, as an applicant for United States citizenship, in response to questions under oath before the United States District Court for the District of Massachusetts in *United States v. Jean Leonard Teganya*, 1:17-cr-10292-FDS, and in response to questions posed to him by Special Agents from the Department of Homeland Security – concealed the following material facts: 1) the defendant had been a member of the MRND before and during the Rwandan genocide in 1994; 2) the defendant was present in Butare (a/k/a Huye), Rwanda during a portion of the genocide and witnessed genocidal acts by persons known to him; and 3) the defendant participated in the direct and

21

indirect persecution of one or more persons because of race, religion, national origin,

membership in a particular social group, and political opinion prior to seeking refuge in the

United States.

All in violation of Title 18, United States Code, Section 1001(a)(l).

A TRUE BILL

_____
FOREPERSON

_____
JOHN T. McNEIL
AMANDA BECK
ASSISTANT UNITED STATES ATTORNEYS
DISTRICT OF MASSACHUSETTS


District of Massachusetts: March 26, 2024
Returned into the District Court by the Grand Jurors and filed.

_____
DEPUTY CLERK

23