1

```
 1                     UNITED STATES DISTRICT COURT
                        NORTHERN DISTRICT OF OHIO
 2                          EASTERN DIVISION

 3

 4    UNITED STATES OF AMERICA,
                                        Case No. 4:24MJ6106
 5              Plaintiff,              Youngstown, Ohio
                                        Friday, March 29, 2024
 6         vs.                          3:13 p.m.

 7    ERIC TABARO NSHIMIYE,

 8              Defendant.

 9        TRANSCRIPT OF INITIAL APPEARANCE AND DETENTION HEARING
             BEFORE THE HONORABLE CARMEN E. HENDERSON
10                  UNITED STATES MAGISTRATE JUDGE

11
      APPEARANCES:
12
      For the Government:   David M. Toepfer
13                          Office of the U.S. Attorney-Youngstown
                            325 City Center One
14                          100 East Federal Plaza
                            Youngstown, Ohio 44503
15                          (330) 740-6986

16    For the Defendant:    David E. Johnson
                            Office of the Federal Public Defender
17                          Skylight Office Tower, Suite 750
                            1660 West Second Street
18                          Cleveland, Ohio 44113
                            (216) 522-4856
19
      Court Reporter:       Caroline Mahnke, RMR, CRR, CRC
20                          Federal Building & U.S. Courthouse
                            2 South Main Street, Suite 568
21                          Akron, Ohio 44308
                            (330) 252-6021
22

23

24    Proceedings recorded by ECRO; transcript produced by
      computer-aided transcription.
25
```

1          <u>Friday, March 29, 2024</u>

2          THE DEPUTY CLERK:  All rise.

3     Court calls Case Number 4:24MJ6106, United States of

4     America versus Eric Nshimiye, the Honorable Carmen E.

5     Henderson presiding.

6          THE COURT:  Please be seated, everyone.

7          All right.  Good afternoon, everyone.  We are here

8     today for an initial appearance and a detention hearing.

9          Before we get started with that, can I start by having

10    counsel please identify themselves for purposes of the

11    record.

12         If I could start with counsel for the government.

13         MR. TOEPFER:  Good afternoon, Your Honor.  Dave

14    Toepfer for the United States, along with Special Agent Adam

15    Gallegos from Homeland Security.

16         THE COURT:  Thank you.  Good afternoon.

17         And on behalf of the defendant today.

18         MR. JOHNSON:  Good afternoon, Your Honor.  David

19    Johnson on behalf of Mr. Nshimiye.  Mr. Nshimiye is present.

20    He is seated at counsel table.

21         THE COURT:  Thank you.  Good afternoon.

22         And on behalf of the pretrial services.

23         THE PRETRIAL SERVICES OFFICER:  Good afternoon,

24    Your Honor.  Nick Ayers with pretrial.

25         THE COURT:  All right.  Thank you.

1          All right.  Mr. Nshimiye, we are here today for your

2    detention hearing.  However, since we have last -- since you

3    were last in front of me, it's come to my attention that you

4    were indicted on some charges in the District of

5    Massachusetts.  So you're also here today for an initial

6    appearance, an initial appearance on those charges.

7          The purpose of that portion of the hearing is to make

8    you aware of the charges in the indictment that you have

9    been charged with, to also go over your constitutional

10   rights regarding that.

11         Once we do all of that today, we will then move on to

12   the other hearings that we have talked about regarding your

13   right to an identity hearing and then the right to a

14   detention hearing.

15         Regarding the preliminary hearing, that issue has now

16   become moot because since there is an indictment that has

17   been returned, that means that there is a finding of

18   probable cause.  And so therefore that preliminary hearing

19   is moot.

20         But we will move forward with talking about those

21   other hearings.

22         I'm going to start by having the assistant United

23   States attorney go over the charges in that indictment.

24         Mr. Toepfer.

25              MR. TOEPFER:  Your Honor, this indictment was

1    issued by a grand jury sitting in United States District

2    Court for the District of Massachusetts, Case Number

3    1:24CR10071.

4          The counts before the Court are perjury, violation of

5    Title 18, United States Code, Section 1623(a); Count 5,

6    obstruction of justice, aiding and abetting, violation of

7    Title 18, United States Code, Sections 1503 and 2; Count 6

8    is falsifying, concealing, and covering up a material fact,

9    in violation of Title 18, United States Code, Section

10   1001(a)(1).

11               THE COURT:  Thank you.

12         Mr. Nshimiye, do you have a copy of the indictment?

13               THE DEFENDANT:  Yes, Your Honor.

14               THE COURT:  And have you had the opportunity to

15   review it with your attorney?

16               THE DEFENDANT:  Yes, Your Honor.

17               THE COURT:  All right.  Thank you.

18         I'm going to start by advising you of your right to

19   counsel.  You have a constitutional right to be represented

20   by an attorney at every stage of these proceedings.  You

21   have the right to retain the counsel of your choosing.

22   However, if you cannot afford counsel, the Court will

23   appoint counsel to represent you.

24         Do you understand your right to counsel?

25               THE DEFENDANT:  Yes, Your Honor.

1        THE COURT:  All right.  And the Court has

2    previously appointed the Office of the Federal Public

3    Defender to represent you.  And specifically Mr. Johnson

4    from that office is here to represent you today.

5        Do you understand that he's here to represent you

6    today?

7              THE DEFENDANT:  Yes, Your Honor.

8              THE COURT:  All right.  Thank you.

9        Additionally, you have the right to remain silent.

10   You are not required to make a statement.  Anything you say

11   can be used against you.  If you start to make a statement,

12   you may stop at any time.  You may also speak with your

13   attorney at any time.

14       Do you understand your right to remain silent?

15             THE DEFENDANT:  Yes, Your Honor.

16             THE COURT:  Thank you.

17       All right.  Mr. Nshimiye, because the indictment that

18   was returned against you was returned in a district other

19   than this one, because it was returned in the District of

20   Massachusetts, you also have other rights.

21       One of those -- some of those rights are rights that

22   we previously talked about.

23       You have the right to waive removal and to voluntarily

24   return to the District of Massachusetts where the charges

25   against you are pending.

1       You also have the right to an identity hearing to

2  determine whether or not you are the person named in the

3  indictment that brought about your arrest.

4       I have in front of me a form -- or you have the right

5  to waive the identity hearing.

6       I have in front of me a form titled Waiver of Rule 5

7  and 5.1 Hearings.  And it purports -- and it says, "I agree

8  to waive my right to an identity hearing and production of

9  the warrant."

10       It purports to be signed by you and signed by your

11  attorney, and it has today's date.

12       Did you have the opportunity to go over this with your

13  attorney prior to signing it?

14           THE DEFENDANT:  Yes, Your Honor.

15           THE COURT:  All right.  And do you understand

16  that by signing this agreement and waiver you're giving up

17  your right to an identity hearing in this district and

18  you're agreeing to be transferred to the District of

19  Massachusetts?

20           THE DEFENDANT:  Yes.

21           THE COURT:  Do you also understand that by

22  signing this you are admitting that you are the person named

23  in the indictment?

24           THE DEFENDANT:  Yes, Your Honor.

25           THE COURT:  All right.  Thank you.

1          And I accept the waiver of removal and the agreement

2     to voluntarily transfer back to the District of

3     Massachusetts and the waiver of the identity hearing.

4          Can you please state your full name and your age for

5     the record?

6               THE DEFENDANT:  My name is Eric Nshimiye, and I

7     was born in 19 -- oh, so 53 years old.

8               THE COURT:  All right.  Thank you.

9          All right.  So now that we are done with that portion

10    of the proceeding, you have already indicated to the Court

11    that you would like to have a detention hearing.  You also

12    have a right to a detention hearing, so we will proceed with

13    the detention hearing at this time.

14         Detention hearing is pursuant to Title 18, United

15    States Code, Section 3142.  This is on the government's

16    motion for detention.

17         The issue before the Court is whether there are

18    conditions that will reasonably assure the safety of other

19    persons and the community as well as your appearance.

20         We've already gone over the indictment and the

21    charges.  My understanding, based on the charges in the

22    indictment, is that there is not a presumption of detention.

23         Is that correct, Mr. Toepfer?

24               MR. TOEPFER:  Yes.

25               THE COURT:  Do you also agree with that, Mr.

1    Johnson?

2             MR. JOHNSON:  I do, Your Honor.

3             THE COURT:  Okay.  Thank you.

4        All right.  And have both parties had an adequate

5    opportunity to prepare for the hearing?

6        Mr. Toepfer.

7             MR. TOEPFER:  Yes, Your Honor.

8             THE COURT:  Mr. Johnson.

9             MR. JOHNSON:  Yes, Your Honor.

10            THE COURT:  And have both parties received the

11   pretrial services report?

12       Mr. Toepfer.

13            MR. TOEPFER:  Yes.

14            MR. JOHNSON:  Yes.

15            THE COURT:  All right.  Thank you.

16       All right.  The way we'll proceed is we will proceed

17   with the detention hearing.  The evidence here will be

18   limited to the issue of detention.

19       We will proceed by first having the government present

20   any evidence it has on the issue of detention.  I will then

21   switch over to Mr. Johnson to put any evidence he has on

22   your behalf regarding the issue of detention.  I will then

23   hear argument from both parties before making my decision.

24       Regarding putting on evidence, both parties may

25   proceed in whole or in part by proffering in evidence to the

1    record, or parties can call witnesses if they choose to do

2    so.

3         If the government does call witnesses, then you would

4    have an opportunity to cross-examine those witnesses and

5    vice versa if you were to call witnesses.

6         With that, is there -- and, oh, sorry.  I will also go

7    over the issue before the Court, again, is whether there are

8    conditions that will reasonably assure the safety of other

9    persons and the community or the appearance of the

10   defendant.

11        The government has the burden today.  It must either

12   prove by clear and convincing evidence that no condition

13   will reasonably assure the safety of other persons and the

14   community or by a preponderance of the evidence that no

15   condition will reasonably assure your appearance.

16        With that, is the government ready to proceed, Mr.

17   Toepfer?

18             MR. TOEPFER:  Yes, Your Honor.

19             THE COURT:  All right.  You may proceed.

20             MR. TOEPFER:  Your Honor, I will not be calling

21   witnesses today.  Instead I would like to proffer the

22   following items in for the record:

23        First, I would like to proffer for the Court's

24   consideration the affidavit submitted in support of the

25   criminal complaint that was originally filed, and I will

1   also proffer the indictment which contains a number of

2   specific factual allegations that were found by probable

3   cause by a grand jury in Massachusetts.

4           In addition to that, I can represent to the Court that

5   according to the Massachusetts assistant U.S. attorney

6   assigned to the case, if convicted, the defendant would face

7   removal to Rwanda, face charges related to his involved in

8   murder, rape, and other activities related to Rwanda

9   genocide in early the 1990's.

10          In addition, they have represented to me that many of

11  the witnesses against the defendant have previously

12  testified in an international court for Rwanda sitting in

13  Tanzania.  They were previously tested by cross-examination,

14  previously found credible by fact-finding bodies there.

15          Furthermore, the affidavit in this case refers to a

16  trial of a defendant by the name of Jean Teganya and

17  testimony the defendant provided at trial suggesting Mr.

18  Teganya was not involved in the Rwanda genocide and not

19  involved in various organizations tied to that genocide.

20          Ultimately, a jury found that Mr. Teganya was guilty

21  of the offenses in that case.  Specifically he was found

22  guilty of two counts of making false statements in

23  applications required by immigration laws and guilty of

24  three counts of perjury.

25          That was in Case Number 1:17CR292 in the District

1   Court of Massachusetts on April 5, 2019.

2          And in that case Mr. Teganya faced charges very

3   similar to those that are filed here against this defendant.

4          Furthermore, according to the assistant U.S. attorney,

5   during that trial that the defendant testified, he admitted

6   under oath to providing several false statements to U.S.

7   authorities while seeking asylum here in the United States.

8          Specifically, he lied to U.S. authorities about where

9   he was born.  He lied about the time and place of his

10  father's death.  And he also lied about where he had gone to

11  school.

12         Those were relevant because many of the most extreme

13  Hutus who were the driving force behind the Rwandan genocide

14  were from the defendant's home of Ruhengeri.

15         Those are all the facts I have to proffer at this

16  time, so I'll reserve any further comments for the argument

17  portion.

18              THE COURT:  Thank you.

19         Mr. Johnson.

20              MR. JOHNSON:  Thank you, Your Honor.

21         As it relates to my factual proffer -- I do not have

22  any witnesses and I would proceed by proffer.

23         As it relates to my factual proffer, I would first

24  reference the packet that I e-mailed to your chambers

25  entitled Notice of Submission of Letters in Support.

1       That submission contained, by my Count, 70,

2    approximately 70 letters, from Mr. Nshimiye's family,

3    friends, friends of family, community members, coworkers,

4    people who have known Mr. Nshimiye a long time and know him

5    well, as well as information relating to the nonprofit

6    organization that he founded.  That's also contained in that

7    packet.

8       So I would submit that exhibit in its totality for

9    this Court's consideration.

10       As it relates to facts, I will start by proffering as

11    well the pretrial services report and the addendum to the

12    pretrial services report that was submitted.

13       I will note for the record that Mr. Nshimiye has been

14    married to his wife since 2001.  They have four kids

15    together, ages 13 to 21.

16       He has been -- a lot of this information is contained

17    in the pretrial services report, but he was -- he has lived

18    in the Ohio area since 1995.  He resided in the Dayton area

19    from 1995 through approximately 2000.  In 2000, he moved to

20    the Akron area.

21       He graduated from the University of Dayton in May of

22    2000.  Then, immediately after that, in June of 2000 he

23    started working at Goodyear where he has been employed ever

24    since.  He is coming up upon his 24-year anniversary at

25    Goodyear.

1          He started at Goodyear as, for lack of a better term,

2     an apprentice engineer.  He was promoted numerous times, and

3     he is now serving in the role of a principal engineer.

4          Mr. Nshimiye, as a result of being in custody for the

5     past week, is currently on leave from that job, but he still

6     does have that job.  He has not been terminated.  He is on

7     leave from Goodyear while he has been in custody.

8          I'll note for the record that Mr. Nshimiye has -- and

9     I think this goes towards both -- I will proffer the

10    support, community support that Mr. Nshimiye has.

11         The community support that Mr. Nshimiye has can be

12    seen from my exhibit that I submitted with the approximately

13    70 letters.

14         I'll also note the support that he has here in the

15    courtroom today.  We are, for the record, record capacity.

16    From my understanding, there are people who are not able to

17    enter the courtroom because we do not have room for them.

18    As many people that can fit into your courtroom are here to

19    support Mr. Nshimiye.

20         He is well respected as a member of the Rwanda

21    American community.  He is well respected in the Ohio

22    community and in the national community.  There are people

23    here present today from all over the nation, including New

24    York, Texas, there is even an individual from Canada.  He is

25    very well respected throughout the Rwanda American

1    community.

2           I would like to focus a little bit on Mr. Nshimiye's

3    family.  I've been in frequent contact with his nephew, Mr.

4    Hiba Izanami.  He is present.  He is seated in the front,

5    closest to Your Honor.

6           He has been in communication with me quite frequently,

7    and he is a strong supporter of Mr. Nshimiye and a strong

8    organizer of the community in support of Mr. Nshimiye.  He

9    is willing to serve as a third-party custodian if necessary.

10          I've also been in communication with Mr. Nshimiye's

11   wife.  She is seated right next to the individual who I just

12   identified.

13          As I said earlier, they have been married since 2001,

14   Your Honor.  They have four kids.

15          I would like to focus a little bit on their children.

16          Their oldest son was going to Harvard.  He decided

17   to -- to not go to Harvard anymore.  Instead, he wanted to

18   join the religious order, and he is now pursuing that career

19   path in the religious order in Texas.  He is 21 years old.

20          Their next child is a 20-year-old son.  He is a

21   college student at Duke University.

22          Their next child is a daughter.  She is 18.  She is a

23   senior in high school.  She is a member of the National

24   Honors Society as well as many other extracurricular

25   activities.  She is anticipating to graduate from high

1   school in the spring summa cum laude.  She is anticipating

2   going to Ohio State and participating in their honors

3   program.

4       Their youngest child is Destiny.  She is 13 years old.

5   She is a member of the Junior National Honors Society.  This

6   past year she placed second place in the Civics Bee for the

7   State of Ohio, the entire state competition.  She

8   participates in Speech and Debate.  She does plan to go to

9   law school.

10      Mr. Nshimiye's wife, as we identified earlier, she is

11  also willing to serve as a third-party custodian if this

12  Court believes that is necessary.

13      I touched upon earlier the mentorship program and the

14  charitable organization that Mr. Nshimiye founded.  That is

15  found at the very end of the exhibit that I had submitted.

16  The website for that organization is there.

17      I just want to highlight that and proffer that

18  information.  He is the president, treasurer, and founder of

19  that organization.  I will refer to it as NFF.  He is highly

20  involved in that obviously as the founder.  And he mentors

21  children as a part -- he mentors youth.  He provides a whole

22  bunch of other services as detailed in the exhibit that I've

23  submitted.

24      I would just proffer that information relating to that

25  charitable organization.

1     Your Honor, I think those are all the facts that I

2     have to proffer, and I do have extensive argument.  Thank

3     you.

4          THE COURT:  All right.  Thank you.

5          All right.  With that, we will proceed with argument.

6          Mr. Toepfer.

7          MR. TOEPFER:  Your Honor, as it relates to the

8     danger the defendant presents to the community, the

9     affidavit in support of the complaint goes into great detail

10    about the defendant's involvement with the MRND party which

11    was the driving force at the time of the genocide in Rwanda

12    during the 1990's.

13         Specifically, he helped identify and persecute Tutsis

14    at hospitals, universities, forcibly removing them in some

15    instances.

16         He also guarded roadblocks with arms with a number of

17    weapons, some more crude than others, and was identified by

18    both survivors of the genocide as well as other perpetrators

19    of the genocide as one of the most vicious MRND members at

20    the university when all of this was happening.

21         Some of the details of the things in which he engaged

22    more specifically were the murder of a woman and her

23    14-year-old son, another instance where he was involved in

24    helping to murder dozens of Tutsis before burying the bodies

25    in a forest, another instance where he encouraged the rape

1    of several women, and then after the rape was finished,

2    randomly selecting one of the women, only to murder her and

3    then go about dismembering her following that.

4         It also details incidents where he murdered a tailor

5    who was simply involved in making lab coats for doctors at

6    the university, before murdering him in a particularly

7    brutal fashion and also trying to dismember him as well.

8         Finally, there is a witness who has identified this

9    defendant as being personally responsible for raping her

10   during the genocide.

11        As I mentioned, a number of these witnesses have been

12   previously called to testify in international courts and

13   found to be credible.

14        There is also details about the number of statements

15   he made in efforts to gain admission to the United States

16   that are directly contradicted by all of these witnesses and

17   detail the things that he did during the genocide.

18        Furthermore, he also testified falsely under oath in

19   an effort to exonerate another associate who was engaged in

20   similar behavior and faced similar charges in the District

21   of Massachusetts.

22        Ultimately a jury found his testimony to be completely

23   incredible, finding that associate guilty of the various

24   crimes that I detailed earlier.

25        Now, I readily recognize that these violent offenses

1    occurred in Rwanda now 30-some years ago.  But it would make

2    sense that somebody who is trying to hide in plain sight

3    would not be engaged in violent activity, but when suddenly

4    faced with the prospect of being incarcerated by federal

5    authorities and then facing extradition to Rwanda to face

6    those charges related to the participation in the genocide,

7    we can't predict what would happen in the future, especially

8    now that he has nothing to lose.

9         More concerning is the risk of flight that this

10   defendant presents.

11        I talked extensively already about the false

12   statements that he made in an effort to obtain admission to

13   the United States and in an effort to exonerate his prior

14   associate.

15        The biggest problem this Court faces is that if you

16   choose to release him, the guarantee of him showing up in

17   Massachusetts is largely dependent on him giving you his

18   word that he will do what he has promised to do.

19        But what we have here is a scenario where we have

20   decades of deception committed by this defendant in an

21   effort to avoid being held accountable for what he has done

22   in the past.

23        And there is no reason to think that he would change

24   that behavior when he gives you his word that he will show

25   up when he has so much at stake.

1 He also has the financial resources to avoid being

2 held accountable for what he's done.

3 So ultimately, Your Honor, the circumstances of this

4 case show the defendant would be a danger to the community

5 if allowed to remain in the community.

6 There is also a preponderance of the evidence here to

7 show that he poses a severe risk of flight if he were

8 released on bond.

9 So I would ask the Court to order that detention be

10 continued while this matter is pending.

11 If, however, the Court disagrees and you choose

12 ultimately to release him on bond, there are some things

13 specifically I would ask for.

14 Specifically, rather than releasing him on an

15 unsecured bond as recommended by pretrial services, the

16 Court should order that it be a secured bond.  He owns a

17 house.  He has a healthy income.  Certainly has the

18 resources to put up a guarantee that he would appear if he

19 promises to do so.

20 I would also ask that you order that he have no

21 contact with any of the victims or witnesses in this case,

22 that he surrender his passport and any other passports that

23 he might have, and that any travel be restricted to the

24 Northern District of Ohio or the District of Massachusetts.

25 However, I don't think that's necessary because, as I

1   mentioned, the evidence in this case shows that he should be

2   detained while this matter is pending.

3          THE COURT:  Thank you, Mr. Toepfer.

4      Mr. Johnson.

5          MR. JOHNSON:  Thank you, Your Honor.

6      Your Honor began the hearing by correctly identifying

7   what is at issue in this hearing.  The Court has to decide

8   if there are a combination of conditions that would

9   reasonably assure the appearance of Mr. Nshimiye as required

10  in the District of Massachusetts.  And it also has to decide

11  if there is a combination of conditions that would

12  reasonably assure the safety of the community.

13     And I believe when this Court looks at the

14  overwhelming record of Mr. Nshimiye and his background and

15  his past, that this Court can answer that easily in the

16  affirmative, that there are a combination of conditions that

17  can be imposed in this case.

18     There is not a presumption in this case.  And so, in

19  effect, what that means is that there is really a

20  presumption in favor of release.  Under the Bail Reform Act,

21  the Court must start with the idea that there are a

22  combination of conditions unless the government has

23  satisfied its burden on those two factors.

24     And so there is in effect a presumption in favor of

25  release and a presumption in favor of bond.

1          And I ask this Court to do exactly that, to grant Mr.

2     Nshimiye a bond, so that way he can address these charges on

3     his own, in the community, because there certainly are a

4     combination of conditions that can reasonably assure his

5     appearance as required in Massachusetts and the safety of

6     the community.

7          Mr. Nshimiye has had an overwhelming history of good

8     behavior in this country.  The letters that were submitted

9     on his behalf demonstrate that from a wide variety of

10    sources.

11         Mr. Nshimiye's family has spoken on his behalf.  Mr.

12    Nshimiye's friends have spoken on his behalf.  His neighbors

13    have spoken on his behalf.  Friends of family have spoken on

14    his behalf.  Coworkers have spoken on Mr. Nshimiye's behalf,

15    speaking about the person that they know Mr. Nshimiye to be.

16         I think that one of the observations made by one of

17    the individuals who wrote to Your Honor is important.  They

18    comment:  It must be difficult for you to make decisions

19    like this when you don't actually know the person.  And then

20    they went on to say that they would like the Court to

21    understand that Eric is the kind of person around whom

22    people rally.

23         And this Court has to consider the factors that are

24    listed in 3142 that guides this Court.  And I think that

25    when you look at those factors, when you look at all of

1    those factors, they point to bond being granted in this

2    case.  They point to the availability of conditions.

3         The first factor is the nature and circumstances of

4    the offense charged, including whether it is a crime of

5    violence, it is not; a violation of Section 1591, it is not;

6    a federal crime of terrorism, it is not; involves a minor, a

7    controlled substance, firearm, or explosive or destructive

8    device, it does not.

9         The weight of the evidence against the person.  The

10   weight of the evidence against the person, that factor goes

11   towards the dangerousness and risk of nonappearance factors.

12   It does not go towards the weight against the person as it

13   relates to the evidence in the case.  It's, what is the

14   weight of the evidence relating to dangerousness and

15   nonappearance?

16        And here, if there is any evidence of dangerousness or

17   risk of nonappearance, it is minimal.  It is small.  And in

18   the overwhelming history of Mr. Nshimiye's conduct while in

19   the United States, it has been demonstrated repeatedly and

20   it has been attested to repeatedly by people, as I said,

21   from a wide variety of sources.

22        So the weight of the evidence weighs in his favor as

23   it relates to dangerousness and appearing in court.

24        The next factor is his history and characteristics,

25   including Mr. Nshimiye's character.  And this Court has

1    ample evidence, extraordinary amount of evidence, as it

2    relates to Mr. Nshimiye's character.  The letters speak on

3    that.

4         His physical and mental condition.  I don't believe

5    that weighs one way or the other.

6         I will note that while he has been in custody he was

7    not receiving medication that he needed, although he did

8    receive it finally this morning.

9         His family ties.  His family ties weigh in favor of

10   granting release.  His family ties are extensive, both his

11   immediate family with his wife who he has been married to

12   for over two decades, and his four children who are

13   supportive.  We have letters from them.

14        His family ties weigh in favor of release.

15        His employment.  As I described during my proffer, he

16   has been employed at one position since the year 2000.  He's

17   coming up on his 24-year anniversary.  That is rare in these

18   times, in these days, for a person to have one job and not

19   be moving around from place to place, because he has worked

20   himself up.  He has worked himself up and been promoted at

21   one job, started in June of 2000, and he's still there now.

22   And they didn't even -- from his understanding, he's still

23   employed by them even though he's been in custody for over a

24   week.

25        His employment weighs in favor of release.

1          Financial resources.  It weighs in favor of release.

2          His length of residence in the community.  Again,

3    weighs in favor of release.  Mr. Nshimiye has been a

4    resident of Ohio since 1995.  He has been a resident of

5    Northeast Ohio since 2000.  He hasn't lived anywhere else.

6          His community ties are extensive.  They're almost as

7    much community -- they're more community ties than I have

8    ever seen.  The community ties range from -- run the gamut

9    from his dentist, who has submitted letters on his behalf,

10   to people who went to school with his children who have

11   submitted letters on his behalf, to people who have

12   participated in his nonprofit organization that he started,

13   and that whose kids went to and were mentored by Mr.

14   Nshimiye, went to the nonprofit organization that he

15   started.

16         His community ties are extensive.  And in fact he is a

17   contributor to the community.  Not only does he have ties to

18   the community, but he builds the community.

19         His history relating to drug and alcohol abuse is

20   zero.  None.  Weighs in favor of release.

21         His criminal history is none.  Zero.  That weighs in

22   favor of release.

23         His record concerning appearance at court.  He has no

24   record of appearing in court because he's never needed to

25   appear in court.  That weighs in favor of release.

1    He was not on supervision at the time.  That weighs in

2    favor of release.

3    And last -- and there was -- I will come back to two

4    other factors.

5    But the nature and circumstances -- the nature and

6    seriousness of danger to people in the community if he were

7    to be released.  I submit that there is no danger to members

8    of the community if Mr. Nshimiye were to be released.

9    Mr. Nshimiye is an upstanding member of the community

10   who has had zero acts of violence, who has had zero evidence

11   of even losing his temper in public in the last -- that

12   anybody can ever recollect -- recall.  That weighs in favor

13   of his release.

14   I would like to highlight a few of the points that

15   were submitted in the letters that were contained in the

16   exhibit.

17   Well, let me come back to that.

18   As it relates to the factor of his conduct, and as it

19   relates to the nature and circumstances of the offense, the

20   underlying allegations about what somebody did in Rwanda in

21   1994 are horrendous.  They're violent.  Nobody is going to

22   dispute that.

23   The issue in this case, the issue in this hearing, is

24   not whether Mr. Nshimiye did those things.  The issue is

25   whether bond can be granted, and I submit that it can.

1          But as it relates to those underlying allegations, Mr.

2     Nshimiye is presumed innocent.  And not only is he presumed

3     innocent, but I'm here to tell you that he maintains his

4     innocence vehemently.

5          His family had submitted a statement that was

6     submitted in the exhibits, and it's not only on the family's

7     behalf but it's also on Mr. Nshimiye's behalf.  And he

8     vehemently denies all allegations brought against him and he

9     asserts his complete innocence.

10         They went on to explain that he is a beloved and

11    active figure in the community, a devoted husband and

12    father, a man of deep faith, as evident in every aspect of

13    his life.  We attest to his moral integrity and dismiss the

14    charges against him as incompatible with his character and

15    beliefs as those who know him would agree.

16         Mr. Nshimiye is presumed innocent of those very

17    violent and horrific acts that allegedly occurred in 1994,

18    that somebody may have committed in 1984 -- 1994.

19         And that is the only aspect, that is the only

20    allegation of any type of wrongdoing in Mr. Nshimiye's

21    history.

22         And since being in the United States, there has been

23    not a single allegation of anything violent or losing his

24    temper.

25         Now, getting back to some of the highlights of some

1    the things that some of the individuals have talked about.

2         One of the letters talked about how he is one of the

3    most upstanding, most respectful and respected men that we

4    know.  I have never known him to be a violent person or even

5    lose his temper one time in an uncontrolled manner.

6         There was -- I think, as I reviewed the letters, there

7    were two people who both said the same thing, but they

8    were -- they can't even recall a negative comment of anybody

9    making about Mr. Nshimiye.  I think one of those persons was

10   a coworker.  And then there was another person who was a

11   community member.

12        I mean, how many -- think about that.  That is not a

13   statement that very many of us can make about a lot of

14   people, if any.  They can't even recall somebody saying

15   something negative about Mr. Nshimiye, let alone them having

16   any experience with anything negative about Mr. Nshimiye.

17        His coworker said it would have been surprising to

18   even hear someone claim unfair treatment or comments by

19   Eric, let alone violence.

20        His elderly neighbors who live next to him, he has

21   helped them out.  And not just the neighbors who live next

22   to him, but neighbors who live all over the street.  The

23   people who see him every day have attested to his character,

24   have attested to his behavior, who have known him for years,

25   since 2003 and beyond.

1         In fact, even people who fled Rwanda in 1994 as a

2    result of the genocide are aware of the allegations against

3    Mr. Nshimiye, and they support Mr. Nshimiye.

4         Now, what the government has argued is the conduct in

5    1994 and this -- and alleged falsities about that conduct.

6         But again, he is presumed innocent of that.  And I ask

7    the Court to remember that he is presumed innocent of that.

8         And in addition to that, I think -- you might wonder,

9    what does a letter from a dentist have anything to do about

10   granting bond in a case?

11        And I think it shows the inner workings of Mr.

12   Nshimiye and his true character because in that letter, what

13   it talked about was how he put the dental needs of his wife

14   and children above his own.  He elected to forgo his own

15   dental needs at a time to take care of his wife and kids'

16   needs when they had to choose between the two.

17        And I submit to this Court what that shows is that Mr.

18   Nshimiye is not somebody who is hiding, Mr. Nshimiye is not

19   somebody who is being somebody that he is not, who is acting

20   in the community in all of these ways, no, because when

21   you're in the dentist chair, you can easily say, you know

22   what, let's schedule me first.  He didn't do that.

23        That's what I'm saying.  It's a little thing.  It's a

24   little glimpse into his life.  It's a little glimpse into

25   who Mr. Nshimiye is.

1           And so when you wonder, and sit there and you think,

2     what does a dentist have to do with it?  That little glimpse

3     just shows you who he is because he is sitting there, he

4     could have easily decided to put his needs above others, and

5     he didn't.  And that shows you that he's not acting.  It

6     shows you who he is.

7           We have people who have a Doctorate in

8     Humanitarianism, who have studied international studies in

9     human rights who support Mr. Nshimiye.

10          And as I said earlier, he is an upstanding member of

11    the Rwanda American community throughout Ohio, from Dayton,

12    Columbus.  And as I said earlier, we have people from all

13    parts of the United States who are in this very packed

14    courtroom and people out in the hall to support him.

15          So ultimately, Your Honor, when we come down to the

16    issue of is Mr. Nshimiye a risk of not appearing in court, I

17    submit absolutely not.

18          Mr. Nshimiye is not running from the courthouse.  He

19    is running to the courthouse to clear his name.  He wants to

20    appear in court in Massachusetts to clear his name because

21    these are horrendous allegations, very violent allegations,

22    and they are a blemish on the person who Mr. Nshimiye has

23    been since 19 -- for his whole live, frankly, but even the

24    government can say since 1995, with the exception of their

25    allegation about lying about 1994.

1          But the point is, he wants to clear his name.  He is

2     looking forward to his day in court.  The government is

3     going to get their day in court in Massachusetts, and Mr.

4     Nshimiye at the same time is also going to get his day in

5     court.  And he looks forward to the day that he gets to

6     clear his name.

7          As the family letters ended:  His good name will be

8     cleared and his integrity restored.

9          And so that is why he is not a risk of nonappearance.

10    This Court, I ask, I submit, cannot make the finding by a

11    preponderance of the evidence that he is a risk of

12    nonappearance.

13         And if the Court has a concern about that, there are

14    certainly conditions that the Court can impose to overcome

15    any of those concerns.

16         The pretrial services report has not recommended

17    location monitoring or anything of that sort to see where he

18    is.  I don't think that it's necessary, frankly.

19         And I don't know where Your Honor is at, where your

20    thought process is, but if for some reason you felt that

21    there is a concern that he might go somewhere else, then

22    that is a condition that could be imposed, so that way we

23    can ensure that he is in the Northern District of Ohio as he

24    is required to unless he gets permission to go elsewhere and

25    things of that sort.

1          But there are conditions that can be imposed to

2    address any concerns about risk of nonappearance in court,

3    but there should be none, is the bottom line, in the way

4    that I see it.

5          As it relates to the safety of other persons and the

6    community, in short, this Court, I submit, cannot find by

7    clear and convincing evidence, a heightened burden, a

8    heightened standard, this Court cannot find by clearing and

9    convincing evidence that Mr. Nshimiye is a danger to the

10   community.

11         Mr. Nshimiye is not a danger to the community.  He

12   enhances the community.  He makes the community more safe by

13   his role that he does in his mentorship program, by his

14   nonprofit organization, by his work, by his family, by

15   supporting his kids, by supporting his wife.

16         By everybody's -- by the accounts of everybody that

17   we've heard from, he is not a danger to the community.  He

18   makes the community safer by his role, by being out in it.

19         So by clear and convincing evidence, can this Court

20   make that finding?  I submit the answer is a resounding no.

21         And again, any concern that the Court has about danger

22   to the community, which, again, I emphasize should be zero,

23   but if there is one, a combination of conditions can be

24   imposed.

25         So let me talk about some conditions.

1     The pretrial services report discusses that he -- that

2   they -- they do recommend bond, for the record.  They

3   recommend that bond be imposed.  They have him at a score of

4   1, which is the lowest that it can be.  They recommend an

5   unsecured bond.

6     Now, the government has suggested a secured bond.  I

7   would ask for an unsecured bond.

8     Mr. Nshimiye understands that if he were to fail to

9   appear, or anything of that sort, that the unsecured bond

10  would be forfeited and he would owe that amount of money,

11  which would be a significant burden on his family.

12    So I believe an unsecured bond is a condition that is

13  enough to address any concerns that the Court has.  I don't

14  believe that a secured bond is necessary.

15    The pretrial services report also recommends that he

16  has no contact with victims or witnesses.  Mr. Nshimiye

17  would have no problem with that.

18    It recommends that he surrender his passport and not

19  obtain any travel documents.  We have no problem with that.

20  We would have no objection to that.

21    His travel would be restricted to the Northern

22  District of Ohio.  We would have no problem with that, with

23  the exception of, of course, the standard condition -- the

24  standard language of that condition is that he can obtain

25  permission to leave the Northern District of Ohio if he

1    needs it.

2        And we would suggest that he go through that normal

3    process, if he needs to leave the Northern District of Ohio,

4    he seek permission from the Court, which of course would be

5    the District of Massachusetts, to do so.

6        But he asks for that condition to be imposed, and he

7    would abide by it and comply with it.

8        I believe that the conditions that are recommend in

9    the pretrial services report are sufficient.

10        If the Court has additional conditions that it

11    believes that might be warranted, as I mentioned earlier,

12    third-party custodians, they are available.

13        Take a look.  I'm sure any of them would be willing

14    to.  I've suggested two.  He has his nephew who has been

15    coordinating with the family, and he has his wife who he

16    lives with.

17        If the Court is concerned about location, there is a

18    location monitoring condition that the Court could impose.

19    I, again, I don't believe that's necessary, but I'm just

20    making sure that the Court -- to emphasize that before the

21    Court resorts to detaining Mr. Nshimiye, all of those

22    options are exhausted because that is what the statute

23    requires.

24        And I think at the end of the day when the Court

25    considers all of those options that are available to it and

1    the conditions that might be imposed, Mr. Nshimiye will

2    abide by any condition that this Court imposes because he

3    will be in Massachusetts.  He will get himself to

4    Massachusetts.  He will appear in court as required.  And he

5    is not a danger to anybody.

6         So I ask that you grant him bond.

7         Thank you, Your Honor.

8              THE COURT:  Thank you.

9         All right.  The issue before the Court today is

10   whether there are conditions that will reasonably assure the

11   safety of the persons in the community and the appearance of

12   the defendant.

13        The Court must look at the 3142(g) factors to

14   determine whether or not there are conditions today.

15        The first of those is the nature and circumstances of

16   the offense.  The Court notes that Mr. Johnson went over

17   these factors in his argument and talked about the nature

18   and circumstances of the offense.

19        And when he talked about the nature and circumstances

20   of the offense, he talked about how the offenses that Mr.

21   Nshimiye is charged with are not certain offenses that he

22   named.  And these offenses appear to be offenses where there

23   are presumptions of detention, which the Court notes and the

24   government agrees that there is not a presumption of

25   detention in this case for the charges that he is charged

1    with, the charges of perjury, obstruction of justice, and

2    falsifying, concealing, and covering up a material fact by

3    trick, scheme, or device.

4         However, that is not the only thing that the Court

5    looks at when it looks at the nature and circumstances of

6    the offense.  The Court does not just look at whether or not

7    it has a presumption.

8         If that were the end of the inquiry, then there would

9    never be a need for a detention hearing when there is not a

10   presumption of detention.

11        Rather, the Court has to actually look at the nature

12   and circumstances of the offense.

13        Looking at that here, these offenses don't have a

14   presumption of detention.  However, the Court has to look at

15   how they were committed.

16        And here, when we look at how they are alleged to have

17   been committed, these offenses are alleged to have been

18   committed for the purpose of being able to illegally enter

19   the United States, to illegally falsify documents regarding

20   where one came from, asylum paperwork, and all of those

21   types of things.

22        And when the Court looks at why a person would do

23   something like that, if it were to happen, the purpose of

24   that would be to hide something and to enter the United

25   States illegally.

1          And someone who is willing to do that and would do

2     that has a reason they want to be here, something they want

3     to leave behind.  They have a motive to do it.

4          So when the Court looks at the nature and

5     circumstances of the offense here, the Court finds that this

6     is not the typical case where the Court sees someone charged

7     with perjury or obstruction of justice or falsifying or a

8     concealing a record.  This is a different type of case.

9     There is a different motive.

10          And when the Court looks at the nature and the

11     circumstances surrounding these allegations, the Court does

12     find that that factor weighs in favor of detention.

13          Next, the Court will look at the history and

14     characteristics of the defendant.

15          Looking at the history and characteristics of the

16     defendant here is tricky.  What the Court sees is

17     allegations relating to two totally separate men.

18          When you look at the indictment and the complaint, you

19     see one thing.  But the outpouring of the 80 or 70 -- 102

20     pages of documents is what I received in support of him.

21     And when I look at that outpouring and when I look at the

22     outpouring that I see in this courtroom today, it tells a

23     much different story than what I see there.

24          Looking at the different factors regarding his history

25     and characteristics, the Court agrees that his family ties,

1    his employment history, the length of his time at his

2    residence and in the community, his ties to the community,

3    his lack of criminal history, and his no records of

4    nonappearance, certainly weigh in favor of release.

5         When the Court looks at his character and his past

6    conduct, it's hard for the Court to say.  The Court can't

7    put that in either box because on one hand I see someone who

8    has the character that you all represent and that you all

9    share with me today and that you put in all of these

10   letters.

11        On the other hand, there is also the allegations that

12   sit in front of the Court that have not been proven true at

13   this point but are allegations nonetheless.

14        And so when the Court looks at those and considers

15   them as a whole, the history and characteristics don't point

16   the Court in either direction.  The history and

17   characteristics seem to be equal on both sides, equal on the

18   side of release and equal on the side of detention based on

19   what the Court sees in front of it.

20        Next, going to the nature and seriousness of the

21   danger that would be posed to any person or the community if

22   the defendant is released.

23        The Court does note the government's argument

24   regarding the defendant.  And as everyone I think will

25   agree, the allegations that are in the complaint and in the

1    indictment are troubling.

2         But the Court does note that the man that sits in

3    front of the Court today is innocent, innocent until proven

4    guilty, and those things that are sitting in the indictment

5    and also in the complaint are simply allegations.

6         Additionally, they are allegations that at this point

7    are stale.  They're allegations of things that happened in

8    the '90s.  And the record in front of the Court is that he

9    has done none of those things in the United States.

10        And it's important to note the burdens that are in

11   front of the Court today.

12        Regarding whether or not the Court can assure by

13   conditions that he is -- the safety of other persons in the

14   community is a clear and convincing standard, which is

15   higher than that of the standard for his nonappearance.

16        So looking at what is in front of the Court, the Court

17   cannot say by clear and convincing evidence that there is no

18   condition that will reasonably assure the safety of other

19   persons in the community.

20        And so therefore looking at the nature and seriousness

21   of the danger posed to the community if the defendant is

22   released, the Court finds that that factor weighs in favor

23   of release.

24        Next, the Court has to look at the weight of the

25   evidence against the defendant.  And it's here that the

1    Court will also look at the risk of flight that is posed

2    here.

3          It's important to note that in getting to this

4    hearing, because this was not -- these are not offenses that

5    allow for a detention hearing, the government had to make a

6    showing regarding a risk of flight.

7          And it's important to note that a risk of flight is

8    different than the standard that is in front of the Court

9    now as to whether or not there are conditions that will

10   reasonably assure his appearance.

11         Reasonably assure his appearance is whether or not

12   he'll come to court as instructed versus risk of flight is

13   whether or not he will actually flee the jurisdiction.

14         In looking at that, the Court has gone through all of

15   the letters, listened to everything that's heard, but the

16   one thing they do not address is the risk of nonappearance

17   or the risk of flight, which is the Court's main concern in

18   this case.

19         They do not address that.  They don't address whether

20   or not that should be something the Court is concerned

21   about, how the Court should deal with that.

22         The Court notes that in the government's proffer it

23   offered that if Mr. Nshimiye were convicted, he would face

24   removal to Rwanda.  And once there, he would face charges on

25   the conduct that is described in the indictment and in the

1    complaint.

2         That is a serious consequence. And that serious

3    consequence gives him a motive and a reason to flee. While

4    he may have a motive and a reason to also clear his good

5    name, that extreme consequence is the thing that, if these

6    allegations are taken as true, he's been running from his

7    entire life.

8         And if he has run from that thing his entire life, it

9    is hard for the Court to say that he will not continue

10   running from it, if given the opportunity.

11        While the Court understands that everything in the

12   indictment and in the complaint are allegations, the Court

13   also notes that the government proffered that at the time

14   that he took the stand to testify on behalf of his friend,

15   he admitted to some false statements.

16        These false statements were about where he was born,

17   his father's death, and where he went to school. These

18   seemingly minor things disturb the Court as to why someone

19   would lie about things that are seemingly minor but also

20   things that you would never forget.

21        And it leads to a conclusion that you lied about them

22   to hide something. And if he would lie about these things

23   to hide them to get here, it is hard for the Court to say

24   that he would not do similar acts of deception and lying and

25   fleeing to keep himself from going back to the place that he

1    worked hard to run away from.

2         Here, based on that, the Court finds that the nature

3    of the evidence regarding a -- regarding nonappearance, or

4    regarding a risk of flight particularly, is high.  And

5    therefore the Court finds that that factor weighs in favor

6    of detention.

7         Now, this does not end the inquiry because the

8    Court -- it's not simply a question of whether or not he is

9    a risk of flight or whether or not he is a risk of

10   nonappearance, but whether or not the government has

11   demonstrated by a preponderance of the evidence that no

12   conditions will reasonably assure his appearance.  And so

13   that's where the Court must now look at whether or not there

14   are such conditions.

15        And the Court has looked over the conditions that have

16   been recommended by pretrial services.

17        Reporting for supervision certainly helps.

18        Surrendering his passport certainly helps.

19        Not being able to obtain a passport certainly helps.

20        These are all things that help with travel.

21        And travel restrictions help.

22        But the fact of the matter -- and then also, they

23   don't put it on here, but the Court has considered, could it

24   give GPS monitoring as a condition and would that then

25   show -- would that then take away the risk of nonappearance

1    or the risk of flight?

2        But the fact of the matter is that if the Court were

3    to put him on an ankle monitor, all that does is tell the

4    Court and the probation officer where he is.  It does not

5    stop him from fleeing.

6        And particularly in a case like this where the case is

7    not here in the Northern District of Ohio but the case is in

8    the District of Massachusetts, he has to travel to

9    Massachusetts.

10        So every time he's traveling there, that presents a

11   risk that instead of going to Massachusetts he could flee to

12   somewhere else.  And by the time anyone would notice, he

13   would be gone.

14        So while a GPS monitor would help, it does not solve

15   the problem.  It doesn't take away -- it doesn't reasonably

16   assure his appearance.

17        Based on that, the Court finds that the government has

18   met its burden of proving by a preponderance of the evidence

19   that no condition will reasonably assure the defendant's

20   appearance.  And therefore he will be remanded to the

21   custody of the United States marshals pending further

22   proceedings in this matter.

23        Is there anything further on behalf of the government?

24            MR. TOEPFER:  No, Your Honor.

25            THE COURT:  Anything further on behalf of the

1    defendant?

2           MR. JOHNSON:  Nothing other than note our

3    objection.

4           THE COURT:  All right.  Thank you.  It is noted.

5        We are adjourned.

6           THE DEPUTY CLERK:  All rise.

7        (Proceedings concluded at 4:08 p.m.)

8

9               C E R T I F I C A T E

10

11           I certify that the forgoing is a correct

12    transcript from the record of proceedings in the

13    above-entitled matter.

14

15           S/Caroline Mahnke              4/27/2024

16           Caroline Mahnke, RMR, CRR, CRC     Date

17

18

19

20

21

22

23

24

25