UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| v. | ) Case No. 1:24-cr-10071-FDS |
| | ) |
| ERIC TABARO NSHIMIYE, | ) |
| | ) |
| Defendant. | ) |

## APPEAL OF MAGISTRATE JUDGE'S PRETRIAL DETENTION ORDER

On March 29, 2024, Magistrate Judge Carmen E. Henderson of the Northern District of Ohio ordered Mr. Nshimiye detained before trial. Dkt. 14 and Exhibit 1 (March 29, 2024, Transcript). On May 17, 2024, Chief Magistrate Judge Donald L. Cabell rejected Mr. Nshimiye's request to reopen the detention hearing to add five properties owned by family and friends as collateral to secure a potential bond. Dkt. 30.[1] Mr. Nishimiye now respectfully moves this Honorable Court, pursuant to 18 U.S.C. § 3145(b), for *de novo* review and revocation of the March 29, 2024, detention order. *See United States v. Tortora*, 922 F.2d 880, 883 n.4 (1st Cir. 1990).

The defense respectfully requests this Honorable Court to release Mr. Nshimiye on the least restrictive conditions sufficient to reasonably assure his appearance because (1) Mr. Nshimiye does not present a serious risk of flight that cannot be mitigated by less restrictive measures than pretrial detention and (2) pretrial detention will impede Mr. Nshimiye's and the defense's ability to prepare for trial in this complicated, largely international matter.

---

[1] Chief Magistrate Judge Cabell did not rule on the merits of Mr. Nshimiye's application for bail. *See* Dkt. 30 at 10-11 ("This court's finding that information exists that was known to the defendant within the meaning of section 3142(f) pre-terminates this inquiry into the merits").

## I. PRELIMINARY STATEMENT

Eric Nshimiye's charges stem from testimony more than five years ago before this Honorable Court in *United States v. Jean Leonard Teganya*, 17-cr-10292-FDS, and his allegedly fraudulent statements to the government in connection with immigration applications decades ago. The legal presumption in this case is that Mr. Nshimiye should be released. To detain him before trial, the government must prove and this Honorable Court must find that no conditions exist sufficient to *reasonably assure* his appearance at future court proceedings.[2]

Importantly, none of the charges against Mr. Nshimiye carry a mandatory minimum term of incarceration or a presumption of detention, and he strongly believes, and intends to prove at trial, that, among other things, these allegations levied by purported witnesses to conduct that occurred more than thirty years ago, are simply false. Indeed, as detailed below, unsupported allegations of genocide against innocent parties proliferated following the Rwandan civil war.

Moreover, pretrial detention is not necessary here. The government can point to no facts in the record showing that Mr. Nshimiye is prepared, or has taken any concrete steps to flee, or that he will decline to follow this Honorable Court's orders and conditions of release. All the government proffers are speculation of flight, based not on the length of incarceration that Mr. Nshimiye faces in the United States but rather what he could face if he is convicted, has his citizenship revoked, is extradited to Rwanda, and is then separately convicted and sentenced. Such speculation is insufficient to detain a U.S. citizen presumed innocent of all charges who had known about the potential for these charges for nearly five years and has done nothing to prepare for or perpetrate flight. Indeed, the government accused Mr. Nshimiye of being a member of the MRND,

---

[2] The Magistrate in the Northern District of Ohio did not find Mr. Nshimiye to be a danger to the community. The sole basis for his detention is an alleged serious risk of flight. Dkt. 14 at 3.

of attending rallies and meeting, of attending trainings, and of being involved in the killing of four Tutsi students during his testimony in *Teganya* more than five years before. Dkt. 1-1 at 17; Exhibit 2 (Nshimiye Testimony). Had the government believed that Mr. Nshimiye was a flight risk, it could have charged him following his testimony rather than wait nearly five years. The fact that Mr. Nshimiye remained in the United States after the government's accusation is evidence of his commitment to remain with his family, to contest the charges against him, and to honor his commitments to this Honorable Court. Further, any ostensible concern of flight can readily and reasonably be addressed short of detention.

This Honorable Court may impose any number of suitable conditions sufficient to secure Mr. Nshimiye future appearances, including *inter alia* (i) the posting of property by him and his family and friends in an amount determined sufficient by this Honorable Court; (ii) the surrender of his passport to the government and an agreement not to seek or obtain any new passport during the pendency of this matter;[3] (iii) home confinement with significant travel restrictions; (iv) 24/7 electronic GPS monitoring; and/or (v) any of the other conditions proposed *infra* at 17-18.

These same sorts of conditions have reasonably assured the appearance of multiple high-risk international defendants facing large sentencing exposure while allowing them to assist their attorneys with the preparation of defense. *See e.g., United States v. Sabhnani* , 493 F.3d 63 (2d Cir. 2007) (reversing district court order of detention of defendants, who were natives of Indonesia, and ordering release despite defendants' "strong motive to flee" because of serious charges and "strong" evidence of guilt, despite finding that defendants faced "lengthy term of incarceration" if convicted, despite finding defendants possessed "ample means to finance flight," despite finding

---

[3] Mr. Nshimiye's passport is in the possession of undersigned counsel and can be turned over to pretrial services at any time.

that defendants "maintained strong family ties to their native countries as well as personal and professional ties to various locations in Europe and the Middle East," and despite finding that defendants "could, with relatively little disruption, continue to operate their highly lucrative business from any number of overseas locations"); *United States v. Sidoo*, 19-cr-10080-NMG, Dkt. 13 (D. Mass) (ordering the release of defendant, a citizen of Canada charged with conspiracy to commit wire fraud, honest services fraud, and money laundering. The defendant, who had no status in the United States, was permitted to reside in his home in Canada during the pendency of his United States criminal case); *United States v. Karni*, 298 F. Supp. 2d 129 (D.D.C. 2004) (defendant was alleged to have violated the Export Administration Act and IEEPA by acquiring nuclear triggers and exporting them to Pakistan. Defendant was an Israeli national who had resided in South Africa for the eighteen years preceding his arrest and had "no ties to the United States or the Washington, D.C. area" of any kind. Indeed, he "was only in this country in order to participate in a ski vacation with his wife and daughter." Although "the weight of the evidence against Defendant is substantial," the Court found that none of the foregoing justified pretrial detention under the Bail Reform Act.) These precedents underscore the fundamental principle that, in the United States, there is a "strong presumption against detention." *United States v. Hanson*, 613 F.Supp.2d 85, 87 (D.D.C. 2009).

## II.  MAGISTRATE JUDGE HENDERSON'S DETENTION ORDER.

On March 29, 2024, Magistrate Judge Carmen E. Henderson of the Northern District of Ohio held a detention hearing and ordered Mr. Nshimiye detained before trial. Dkt. 14 and Exhibit 1. Prior to the hearing, pretrial services in the Northern District of Ohio recommended release on a $20,000 unsecured bond.

Magistrate Judge Henderson, in part, found that the "nature and the circumstances

surrounding the allegations", *i.e.,* underlying allegations of participation in a genocide, despite being "stale" and the defendant's "presumption of innocence," coupled with his alleged "false statements … about where he was born, his father's death, and where he went to school," indicated that Mr. Nshimiye "has run from [these allegation] his entire life," leading to the conclusion that he will continue to run from it "if given the opportunity" and he would engage in "similar acts of deception and lying and fleeing to keep himself from going back to the place that he worked hard to run away from." Exhibit 1 at 36-38. The court also determined that Mr. Nshimiye's "history and characteristics seem to be equal on both sides, equal on the side of release and equal on the side of detention based on what the Court sees in front of it." Exhibit 1 at 37.

Based on the above, the court determined that Mr. Nshimiye poses a serious risk of flight, and no conditions of release could reasonably mitigate it:

> Here, based on that, the Court finds that the nature of the evidence regarding a -- regarding nonappearance, or regarding a risk of flight particularly, is high. And therefore the Court finds that that factor weighs in favor of detention. Now, this does not end the inquiry because the Court -- it's not simply a question of whether or not he is a risk of flight or whether or not he is a risk of nonappearance, but whether or not the government has demonstrated by a preponderance of the evidence that no conditions will reasonably assure his appearance. And so that's where the Court must now look at whether or not there are such conditions.

> And the Court has looked over the conditions that have been recommended by pretrial services.

> Reporting for supervision certainly helps.

> Surrendering his passport certainly helps.

> Not being able to obtain a passport certainly helps.

> These are all things that help with travel.

> And travel restrictions help.

> But the fact of the matter -- and then also, they don't put it on here, but the Court has considered, could it give GPS monitoring as a condition and would that

then show -- would that then take away the risk of nonappearance or the risk of flight?

But the fact of the matter is that if the Court were to put him on an ankle monitor, all that does is tell the Court and the probation officer where he is. It does not stop him from fleeing.

And particularly in a case like this where the case is not here in the Northern District of Ohio but the case is in the District of Massachusetts, he has to travel to Massachusetts.

So every time he's traveling there, that presents a risk that instead of going to Massachusetts he could flee to somewhere else. And by the time anyone would notice, he would be gone.

So while a GPS monitor would help, it does not solve the problem. It doesn't take away - it doesn't reasonably assure his appearance.

Based on that, the Court finds that the government has met its burden of proving by a preponderance of the evidence that no condition will reasonably assure the defendant's appearance. And therefore, he will be remanded to the custody of the United States marshals pending further proceedings in this matter.

Exhibit 1, 41-42.

This Honorable Court "may reject the magistrate judge's fact finding and start the hearing anew or may accept the findings of fact made by the magistrate and hear additional facts and argument." *United States v. Oliveira*, 238 F. Supp. 3d 165, 167 (D. Mass. 2017). For the reasons below, there is good reason to reject Magistrate Judge Henderson's analyses and to start the hearing "anew". *Id.*

Based on the hearing transcript, Magistrate Judge Henderson predominantly relied upon two pieces of evidence to detain Mr. Nshimiye based on risk of flight: (1) that "if Mr. Nshimiye were convicted, he would face removal to Rwanda," Exhibit 1 at 39, where he could face life imprisonment, Dkt. 20 at 6; and (2) his purported lies about "where he was born, his father's death, and where he went to school." *Id.* at 40. The defense respectfully believes the reasoning was flawed in several respects.

6

First, as courts routinely note "more than evidence of the commission of a serious crime and the fact of a potentially long sentence [is required] to support a finding of risk of flight." *United States v. Friedman*, 837 F.2d 48, 50 (2d Cir. 1988); *see e.g., United States v. Anderson*, 384 F. Supp. 2d 32 (D.D.C. 2005) (the defendant was detained for risk of flight because he had previously used aliases and false identities when traveling abroad, and there was strong, specific evidence of his clear interest in fleeing the jurisdiction and his intent and preparation to do so, including numerous books and pamphlets seized from him describing means of creating and obtaining false identification.). There was no evidence presented that if Mr. Nshimiye is released, he will take to flight because of potentially lengthy sentences in the United States or Rwanda. Mr. Nshimiye knew about the government's allegations for approximately five years before his arrest. As a member of the American-Rwanda community and a participant in the *Teganya* trial, he knew, prior to his arrest, that if he was charged and convicted, he could be sentenced to jail time in the United States, sent back to Rwanda, and be subject to additional criminal proceedings. Yet, in the face of all these facts, he did not take to flight. The fact that Mr. Nshimiye remained in the United States and made no plans to flee knowing the government's allegations and potential charges against him, as well as the potential consequences of being convicted, should be dispositive on whether he would flee or engage in deception to keep himself out of Rwanda. In short, he had the opportunity to flee for nearly five years and took no action to remove himself from the United States.

Second, any purported lies about where Mr. Nshimiye was "born, his father's death, and where he went to school" are not material and were acknowledged and explained by him during his prior testimony. *See* Exhibit 2. The government for example claims that Mr. Nshimiye lied about attending Lycée de Kigali from 1985-1991, Dkt. 1-1 at 11. During, his testimony Mr. Nshimiye admitted to attending the school, but erroneously testified to starting in "1990". Exhibit

2 at 23 ("When did you start at the Lycee de Kigali? A. 1990. Q. I'm sorry. A. I believe in 1990.").
Similarly, Mr. Nshimiye explained that it was his stepfather that was killed rather than his father
during the violence in Rwanda. Exhibit 2 at 32 ("Q. And the context was that you said my father
was killed during the massacres, you didn't say my stepfather, did you? A. Yeah, I say my father.").
Mr. Nshimiye also testified that he was in Kigali before he left the country, Exhibit 2 at 11, and
did not deny being born in Ruhengeri. Exhibit 2 at 2. Importantly, Mr. Nshimiye did not deny there
were errors on his application during his testimony, but the errors were not material and could have
been the cause of poor translation. Indeed, at the time Mr. Nshimiye did not speak any English and
there is no evidence that someone explained or properly translated the questions or his answers.

Third, the Magistrate Judge weighted as equally supporting release and detention Mr.
Nshimiye's thirty law-abiding years filled with support for his family and community, his
countless acts of selflessness and good deeds detailed in 60+ letters, *see* Exhibit 3 (Letters of
Support), against the unproven allegations in the indictment. Certainly, the Grand Jury found
probable cause to support the charges against Mr. Nshimiye, but as the old saying goes an effective
prosecutor could convince a grand jury to indict a ham sandwich. The defense respectfully submits
that it was error to equally weight thirty years of evidence supporting release against unproven
allegations in an indictment, potentially based on biased witnesses, *see infra*, at a stage when
Mr. Nshimiye is unequivocally presumed innocent.

### III. THE DETENTION ORDER SHOULD BE REVOKED BECAUSE THERE ARE CONDITIONS SHORT OF PRETRIAL DETENTION THAT CAN REASONABLY ASSURE MR. NSHIMIYE'S FUTURE APPEARANCES IN COURT.

#### A. Rule 59(a) does not Preclude this Honorable Court from Hearing this Appeal.

The defense respectfully anticipates the government arguing that Rule 59(a) prevents this
Honorable Court from hearing any appeal to a Magistrate Judge's detention order based on

timeliness. While the interplay between Fed. R. Crim. P. 59(a) and 18 U.S.C. 3145(b) has not been addressed by the First Circuit, a detailed analysis by the Tenth Circuit rejected the same argument that the government made to Chief Magistrate Judge Cabell. *United States v. Doby*, 928 F.3d 1199, 1208 (10th Cir. 2019) ("The district court [] erred in applying Rule 59(a)'s fourteen-day time limit…")

As noted in *Doby,* "the text of the provision and the advisory committee's notes make clear that the operation of Rule 59(a) is premised upon the referral of a matter to a magistrate judge by a district judge, consistent with § 636(b)." 928 F.3d at 1207. Absent a referral by the district court under 28 U.S.C § 636(b), Rule 59(a) simply does not apply. There is no allegation that this Honorable Court made any referrals to Magistrate Judge Henderson in the Northern District of Ohio. Indeed, the only referral made by this Honorable Court was to Chief Magistrate Judge Cabel, *see* Dkt. 13 ("Order Referring Case to Magistrate Judge Donald L."), who made no material findings concerning whether Mr. Nshimiye should be detained. *See* Dkt. 30 at 10-11

Additionally as articulated in *Doby*, 18 U.S.C. § 3145(b) "has no express time limit for filing motions," *Doby*, 928 F.3d at 1207, and it would make little sense for Rule 59(a) to constrain the power of a defendant or this Honorable Court to review bail, especially in circumstances where bail was initially adjudicated by "a person other than a judge of a court having original jurisdiction."

18 U.S.C. 3145(b) provides that:

If a person is ordered detained by a magistrate judge, or by a person other than a judge of a court having original jurisdiction over the offense and other than a Federal appellate court, the person may file, with the court having original jurisdiction over the offense, a motion for revocation or amendment of the order. The motion shall be determined promptly.

Following the order of detention in the Northern District of Ohio, it took approximately 27 days for the government to transport Mr. Nshimiye from Ohio to the District of Massachusetts. During those 27 days, Mr. Nshimiye was shipped from Ohio to Pennsylvania, then to Oklahoma, then back to Pennsylvania, and finally to Rhode Island. Throughout that time, he had no consistent attorney-client privileged access to counsel and when he did arrive in this District, he, through counsel, immediately filed his request for bond. To impose the 14-day time limit pursuant to Rule 59(a) would effectively deprive Mr. Nshimiye of his Fifth and Sixth Amendment rights and his right to have bail adjudicated by "the court having original jurisdiction over the offense." For these reasons, this Honorable Court should reject the government's anticipated arguments. *See also Teganya*, 17-cr-10292-FDS, Dkt. 64 (November 26, 2018 appeal of a Magistrate Judge's detention order issued on December 7, 2017).

## B. The Applicable Legal Standard and the Presumption in Favor of Bail

Incarceration before trial "substantially impacts the quality of the[] defense" and "increase[s] the likelihood that the detainee will be convicted, imprisoned, and subjected to prolonged deprivation of liberty, privacy, and other fundamental elements of human existence." Samuel R. Wiseman, *"Pretrial Detention and the Right to be Monitored,"* 123 YALE L. J. 1344 (2014) (Wiseman). Accordingly, '[o]ur system of criminal justice embraces a strong presumption *against* detention." *United States v. Hanson*, 613 F. Supp. 2d 85, 87 (D.D.C. 2009) (emphasis added). "In our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception." *United States v. Salerno*, 481 U.S. 739, 755 (1987). Courts should refuse to release defendants on bail "[o]nly in rare circumstances," and "only for the strongest of reasons." *United States v. Motamedi*, 767 F.2d 1403, 1405, 1406 (9th Cir. 1985) (Kennedy, J.).

Any "[d]oubts regarding the propriety of release should be resolved in favor of the defendant." *Id.* at 1405.

Consistent with these principles, the presumption of innocence afforded to every defendant, and the Eighth Amendment prohibition against excessive bail, the Bail Reform Act of 1984 provides that a defendant should be released pending trial on personal recognizance or "subject to the least restrictive further conditions, or combination of conditions that . . . will reasonably assure [1] the appearance of the person as required and [2] the safety of any other person and the community." 18 U.S.C. § 3142(b) and (c)(1)(B). "In common parlance, the relevant inquiry is whether the defendant is a 'flight risk' or a 'danger to the community.'" *United States v. Vasquez-Benitez*, 919 F.3d 546, 540 (D.C. Cir. 2019).

Where the government moves for detention based on flight risk, the government must satisfy a dual burden of proof:

> First, [the government] must establish that the defendant, if released, presents an actual risk of flight. Assuming it satisfies this burden, the government must then demonstrate by a preponderance of the evidence that no condition or combination of conditions could be imposed on the defendant that would reasonably assure his presence in court.

*United States v. Sabhnani*, 493 F.3d 63, 75 (2d Cir. 2007). In other words, "[e]ven if the Court concludes the government proves by a preponderance of the evidence that release on personal recognizance will not reasonably assure the appearance of the defendant as required, the law still favors pre-trial release 'subject to the least restrictive further condition, or combination of conditions, that the court determines will reasonably assure the appearance of the person as required.'" *Sabhnani*, 493 F.3d at 75; *United States v. Berrios-Berrios*, 791 F.2d 246, 250 (2d Cir. 1986) (emphasizing that the "requirement that courts expressly consider alternative conditions is central to the Bail Reform Act").

When conducting its inquiry to ensure the "flight risk" is so serious that detention is required, the Court must consider the factors enumerated in 18 U.S.C. § 3142(g), including [1] the nature and circumstances of the offense charged, [2] the weight of evidence against the defendant, and [3] the history and characteristics of the defendant. *See* 18 U.S.C. § 3142(g); *Sabhnani*, 493 F.3d at 75. Because pretrial detention is truly a last resort, a court faced with the issue must "make explicit their findings with regard to the adequacy [or inadequacy] of possible conditions for release." *United States v. Coonan*, 826 F.2d 1180, 1186 (2d Cir. 1987). The Court applies a *de novo* standard of review to the Magistrate Judge's detention order. *See Tortora*, 922 F.2d at 883 n.4.

Mr. Nshimiye respectfully submits that an analysis of the relevant statutory factors supports pretrial release; even should this Honorable Court conclude the defendant presents an actual risk of flight, certainly some combination of conditions exist that will ***reasonably assure his appearance as required***. *See United States v. Hansen*, 108 F. App'x 331, 332 (6th Cir. 2004) ("The structure of the bail statute mandates every form of release be considered before detention may be imposed. That structure cannot be altered by building a 'guarantee' requirement atop the legal criterion erected to evaluate release conditions in individual cases") (*quoting United States v. Orta*, 760 F.2d 887, 892 (8th Cir.1985)).

### C.  Relevant Statutory Factors and Conditions of Release

### Mr. Nishimiye's History and Characteristics Strongly Support His Release

As shown in the numerous letters of support from family and friends submitted in Exhibit 3, Mr. Nishimiye is a fifty-two-year-old American citizen, who has been a beloved husband, father, and friend with an admirable history of kindness, good deeds, keeping his promises, and, notably, no criminal history since his arrival to the United States in 1995. *See* Exhibit 3. He has held the

same job as an engineer for a major tire manufacturer for decades and has no history of non-appearance. Time and time again, Mr. Nshimiye has gone to extraordinary lengths to lend a hand to friends, neighbors, and co-workers. The examples copied below illustrate who Mr. Nshimiye is as a person far better than any summary ever could:

- My father is kind and, honest, always helping those in need. He is also strong in his faith, pushing us to live a life of virtue. He has an organization built on helping children to young adults live their lives to the fullest. Letter of Destiny Nshimiye, Exhibit 3 at 13.

- My dad has taught me and my siblings how to appreciate all of the gifts in life, especially the ability to make meaningful connections with those around us. He's inspired us to live a life of service as evidenced by our genuine contributions to our community. My older brother in fact, Tresor Nshimiye, has already dedicated his life as a monk in the Carmelite Hermitage, over in Texas…As for me, I'm planning to finish my pre-med track at Duke so that I may one day become a doctor to similarly help those in need. This is no coincidence—this was the direct influence from my father who has always modeled what it means to live a selfless life. We've all always admired him for being such a cool, calm, loving leader, and all have looked to emulate him. Letter of Nestor Nshimiye, Exhibit 3 at 11-12.

- My father has continuously shown that he is a faithful and kind man. He has always been willing to put others before himself, providing for our family, as well as the Rwandan community. Through various programs such as the Ntibarwiga Family Foundation, Kinyarwanda lessons, and serving as a Eucharistic minister at our church, he has always been willing to look for opportunities to help others. Letter of Tiffany Nshimiye, Exhibit 3 at 10.

- Mr. Nshimiye [] volunteers his time to mentor youth that have an interest in engineering principles. He takes his time to make certain each person is heard and realizes the future that they can build for themselves with study and hard work. Mr. Nshimiye is the reason that I also volunteered in the same youth mentor program alongside him for the past several years. Letter of Lysandra Whiteside, Exhibit 3 at 9.

- Eric is a pillar in his community and continues to inspire us all to show up as the men and women God calls us to be. Most recently, he founded the Ntibarwiga Family Foundation, which provides assistance and mentorship to those in need. Eric himself provides the most regular mentorship sessions each month to children who range from middle school to university. He has been entrusted with this task by myself and other parents because, like any parent who sees a person who is a force for good, we hope our children will follow in his example. Letter of Dr. Albine Bizimana, Exhibit 3 at 20.

- Two of my young children are his mentees. I did get a chance to attend several of the mentoring sessions he was hosting and what a priceless worth of virtues and good values

he instilled in our children. The fact that he conceived this program to help the community's children, and that he put a lot of time, thoughtfulness, value and dedication proves that he is a person of great character. Letter of Ethel Ishimwe, Exhibit 3 at 22.

- Enjoying a rousing game of soccer in the Nshimiye's front yard was a favorite pastime for many of the neighborhood children. Often Eric served as the referee laughing alongside the children and the adults who often joined the game. Letter of Matthew and Lisa Lle, Exhibit 3 at 26.

- I have known Eric and his family for over five years when our sons began playing soccer together. I was highly active in the North Canton Soccer Boosters and Eric was always present at every game and tournament supporting the boys in any and every way. I have a special needs son who would walk over to Eric and climb up into his lap during the games. Eric always welcomed him and was kind and gentle with him. Letter of Jane Upperman, Exhibit 3 at 39.

- I am writing on behalf of Eric who is a neighbor that I have known for a while in our neighborhood. I have spoken to him personally but also know that he helps my best friend Shirley Rice and her husband Tom who live next to him. Tom has been sickly for many years and Eric has offered to help Shirley with different jobs that are needed around the house. Letter of Deb Dougherty, Exhibit 3 at 91.

In short, pretrial services rightfully recommended release on a $20,000 unsecured bond. His law-abiding history and personal characteristics militate against serious flight risk and strongly support pretrial release as both show he will abide by any conditions imposed and will appear in court as needed in this matter.

## <u>The Nature and Circumstances of the Offense Charged and Weight of the Evidence Similarly Support Mr. Nshimiye's Release.</u>

While the crimes with which Mr. Nshimiye has been accused are in fact non-violent offenses, the underlying allegations will require the government to prove Mr. Nshimiye participated in Rwandan war crimes. This case will therefore require proof as to what happened in the small Rwandan town of Butare in 1994—some thirty years ago at a time when that country was encased in a civil war.

The Court should initially note that the International Criminal Tribunal for Rwanda was specifically established for the prosecution of persons responsible for genocide and other serious

violations of international humanitarian law coming out of Rwanda in 1994. That Tribunal was established by the United Nations Security Council and has been in operation in Arusha, Tanzania prosecuting alleged war criminals from Rwanda since November of 1994. Based on the defense's research that Tribunal has never suspected, accused, or even mentioned Eric Nshimiye.

Additionally, Human Rights Watch had investigators on the ground soon after the genocide documenting who was responsible for crimes in the town of Butare. Similarly, based on the defense's research, Mr. Nshimiye was never wanted by the I.C.T.R. as a genocidaire, nor has a single HRW investigator in the area at the time named him as a suspect. Only three decades later, after Mr. Nshimiye agreed to act as a defense witness, did Rwandan accusers' step forward, which based on counsel's experience and the experience of the HRW, is the *modus operandi* for these types of cases out of Rwanda. Dare testify for the defense, and you face accusation yourself:

> In several cases documented by HRW, witnesses who have appeared for the defence at the ICTR were arrested after their return to Rwanda. In one case, the witness was detained without charge for two years and then released. In another case, in 2005, where a witness was himself falsely accused of genocide, the prosecutor general acknowledged in writing that there was no proof, although as of this writing [on January 3, 2008,] the person is still detained. Although these witnesses and others had testified as protected witnesses, many in their communities knew of their testimony and attributed their arrests to that testimony.

There is also evidence that the fear harbored by potential defense witnesses is so strong that many forego testifying on behalf of those they know to be innocent. The HRW brief illustrates one example:

> In the last two months alone, HRW has documented four cases of persons who refused, out of fear, to testify in defence of persons whom they knew to be innocent of the charges against them. In a recent case, a man who was too frightened to testify in defence of a person who had saved his life and that of more than ten family members broke down in tears while describing his shame to a HRW researcher.

15

> Ramsey Clark testified regarding the difficulty in locating persons who could testify on behalf of his clients because many feared that testifying would subject them to arrest, detention, torture, and possible death at the hands of the Rwandan government simply for testifying.

*Ndayisaba v. Holder*, 457 F. App'x 552, 559 (6th Cir. 2012). In truth, Mr. Nshimiye is not, nor has he ever been, wanted by those tasked with the job of prosecuting war criminals in Rwanda.

Moreover, there is substantial reason to doubt the testimony of alleged victims residing in Rwanda. In *Teganya*, for example, multiple witnesses who had accused Teganya of participating in rape and murder gave conflicting stories during trial. One individual testified that Teganya was a leader in the Interahamwe, but could not name any other individual involved. *See United States v. Teganya*, No. 19-1689, Appellant's Brief at 12, (1st Cir. Aug. 7, 2020). That same witness testified to training Teganya at 6pm for two hours (presumably in the same woods that Mr. Nshimiye is alleged to have participated in training), when the sun set between 5:51 and 6:22pm during that time. *Id.* Some witnesses gave contradictory physical descriptions of Teganya. *Id.* at 13, 15. Other witnesses previously testified or gave statements regarding their experiences during the genocide, but never mentioned Teganya prior to his trial. *Id.* 14-15. One witness "refused to acknowledge having met with the prosecutors during the two weeks prior to testifying, before finally agreeing that he did." *Id.* at 14. These reliability issues are not limited to the witnesses in *Teganya*. Indeed, courts frequently struggle with credibility and reliability issues stemming from testimony of Rwandan witnesses. *See e.g., Munyakazi v. Lynch*, 829 F.3d 291, 296 (4th Cir. 2016) ("Addressing the DHS investigation, the IJ found that, out of an abundance of caution, she would not credit the testimony of the convicted genocidaires."). Some falsify claims for leniency and others for financial reasons. Indeed, Rwandan witnesses stand to make substantial witness fees to travel to the United States to testify that could eclipse the $930 average annual income these witnesses stand to make in Rwanda. *See*

https://www.worlddata.info/africa/rwanda/index.php. Regardless of the cause, the current allegations against Mr. Nshimiye should be viewed with some skepticism and his presumption of innocence should outweigh currently unproven allegations.

### Bail Conditions Readily Exist That Will Deter Any Serious Flight Risk and Reasonably Assure Mr. Nshimiye's Return to Court

The defense respectfully submits that based on Mr. Nshimiye's personal history and characteristics, the below proposed conditions will more than reasonably assure his appearance at trial:

(1) home detention with the ability to leave the home only after receiving authorization from Pretrial Services and only with an approved third-party custodian;

(2) electronic monitoring with a Global Positioning System at all times;

(3) surrender his passport and agree not seek or obtain any new passport during the pendency of this matter;

(4) execute an agreement consenting to extradition to the United States from any country and waiving any rights to not be extradited to the United States;

(5) execute an agreement to forfeit his home and the below properties belonging to family and friends upon a determination by the court that he violated a condition of his release, and that forfeiture should result:

Drs. Emile Shumbusho & Diane Shumbusho: 350A Dodge Avenue, Sackets Harbor, NY 13685
(Home value $450000, Equity $180,000)

Mr. Olivier Nsenga: 2952 Pinecone Ln, Columbus, OH 43231
(Home value $350000, Equity $160000)

Mr. Loic Ndamukijumukiza 5555 Shank Rd. Dayton Ohio 43016
(Home value $171000, Equity $121000)

Mr. Philippe Bizimana 1320 St Adalbert Avenue. Dayton, OH 45404
(Home value $150000, Equity $150000)

Mr. Espérance Niyoyankunze & Josias Ndaribamare, 454 Mainsail Dr Westerville, OH 43081
(Home value: $505,000.00, Equity: $247,000.00)

17

Mr. Wilson Barangirana, 1815 Piper Lane #205 Dayton OH 45440
(Home Value: $ 200,000, Equity: $200,000)

(6) be subject to unannounced searches (of the defendant, his residence, and his visitors) by agents or officers of the FBI, Pretrial Services or by other law enforcement agencies;

(7) be required to report to Pretrial Services on any schedule the Court deems appropriate; and/or

(8) any other condition the Court deems necessary to reasonably assure his appearance at trial.

It is difficult to imagine a cognizable situation not predicated on extraordinary speculation where Mr. Nshimiye would be able to successfully engineer and execute flight while being subject to the above conditions. *See United States v. O'Brien*, 895 F.2d 810 (1st Cir. 1990) (Narcotics defendant who posed a serious risk of flight nevertheless overcame presumption against pretrial release where defendant consented to wear electronic monitoring bracelet and offered residence as security). Importantly, the inquiry of whether Mr. Nshimiye poses a serious risk of flight that cannot be reasonably abated with stringent conditions is not based on an assessment if "[Mr. Nshimiye] were as free as any law-abiding citizen, but on how much threat he would be if he were released on the most stringent conditions." *United States v. Aileman*, 165 F.R.D. 571, 580 (N.D. Cal. 1996). The Bail Reform Act does not require foolproof conditions or that the risk of flight be reduced to zero; all that is required are reasonable conditions. Any government demand that the imposed conditions be foolproof is contrary to law:

> It is true, as the Government points out, that electronic monitoring is not foolproof and that it is possible that Mr. Hassanshahi could overcome several significant obstacles to get to Iran. But those general arguments are speculative and do not focus on this defendant. The law only requires release conditions that will *reasonably* ensure a defendant's appearance, not foolproof conditions. An overall balancing of the factors favors Mr. Hassanshahi's release with conditions.

*United States v. Hassanshahi*, 989 F. Supp. 2d 110, 118 (D.D.C. 2013) (emphasis in original).

Some or all of the innovative and extensive group of conditions proposed above have reasonably assured the appearance and the safety of the community from the leader of a Mafia family, whose members committed murder and other acts of violence and who was at the time of his arrest the ongoing "boss" of an organization that would commit new offenses, *see United States v. Patriarca*, 948 F.2d 789 (1st Cir. 1991), as well as the appearances of other multiple high-risk international defendants facing large sentencing exposure, *see supra* at 3-4, and other defendants accused of lying about their participation in the Rwandan genocide. *See e.g., United States v. Gasana*, Dkt. 20-cr-00016-LM, Dkt. 1 and 18 (D.N.H) (defendant alleged of "commit[ing] numerous acts of violence, including murder, persecution, and theft[]"during the Rwandan genocide released on home detention and GPS monitoring condition); *United States v. Ngombwa*, Dkt. 14-cr-00123, Dkt. 2 at 10-11 and Dkt. 12 (N.D. Iowa) (defendant who was previously convicted of "committing genocide and inciting others to commit genocide" in "the gacaca courts in Rwanda" released on bond); *United States v. Kantengwa*, Dkt. 08-cr-10385-RGS, Dkt. 3 and 6 (D. Mass) (defendant who was an alleged MRND member, a genocide supporter, and the wife of a genocider then on trial before the ICTR was released on a $50,000 unsecured bond with travel restricted to the United States); *United States v. Kobagaya*, Dkt. 09-cr-10005-MLB, Dkt. 1 and 22 (defendant alleged to have committed arson and murder during Rwandan genocide was released on a $50,000 bond co-signed by family with travel restrictions).[4] There is no reason that much of

---

[4] The two defendants, to counsel's knowledge, that were detained pending trial are easily distinguishable from Mr. Nshimiye. *Teganya,* for example, had no legal status in the United States, crossed the border surreptitiously after being denied asylum in Canada, and had a history of fleeing jurisdictions. *Teganya*, 17-cr-10292-FDS, Dkt. 64, 65, and 76. In *United States v. Munyenyezi*, 10-cr-00085-SM (D.N.H), the defendant was detained because she had "ties to a network of Rwanda's either accused of being involved in the genocide or dedicated to the overthrow of the current regime in Rwanda [] who would be both capable of and motivated to facilitate her flight," a history

these same conditions will fail to assure Mr. Nshimiye's appearance in this case. In affirming Judge Wolf's order of release, the First Circuit found that "that Patriarca would comply because compliance was in his enlightened self-interest." *Patriarca*, 948 F.2d at 794. Mr. Nshimiye is similarly self-interested to obey this Honorable Court's conditions of release. His history shows no propensity to flee, nor violation of any court order directed to him. A violation of his proposed conditions would be dire. Not only would he expect to receive a significant increase in any potential sentence, but he would also forfeit substantial assets belonging to family and friends, be an international fugitive, and would end up living the remainder of his life in fear of apprehension. The agreement that Mr. Nshimiye, his family, and his friends will forfeit their homes and properties – who worked and saved for years to purchase them – upon a determination that he had violated his conditions of release standing alone significantly abates any risk of flight. Indeed, Mr. Nshimiye knows how hard his family and friends worked to obtain the assets that they have and knows the difficulty it will cause if he they are forfeited to the government because of his actions. The act of abandoning his commitment to this Honorable Court and those closest to him would be tremendously uncharacteristic for a person who has been so dedicated to others his entire life.[5]

The Ohio pretrial services report recommended that Mr. Nishimiye be released on bond. Primarily, that recommendation is based upon evaluation of the above factors and the fact that the defendant has been an upstanding citizen in his community. He has overwhelmingly strong family and community ties. He has worked in the same job for decades. He has no prior convictions and

---

of deceiving courts, including the ICTR during her husband's trial, and was actively assisting her husband in manipulating witness testimony. *Id.* at Dkt. 22 and 28 at 12.

[5] Prior to Mr. Nshimiye's detention he was the sole financial provider for his family. His absence has already caused a significant financial hardship for the family. Accordingly, he is motivated to return to work to provide for his family like he has done so for many years in the past. Nothing in history shows a propensity to flee and cause additional burdens to those closest to him.

no history of drug and alcohol abuse. He has no history of non-appearance in court. He was not on

probation, parole, or other pretrial release at the time these charges were brought and there is no

reliable evidence that he would be a danger to community or a flight risk if he is in fact released

on bond. The defense respectfully contends that given this history and characteristics, this

Honorable Court may readily set a bail package that will deter any serious flight risk and

reasonably assure Mr. Nshimiye's return to court.

## IV. SPECULATIVE CONCERNS REGARDING FUTURE OBSTRUCTION ARE INSUFFICIENT TO DETAIN MR. NSHIMIYE.

To the extent the government intends to rely on an unsubstantiated risk of Mr. Nshimiye

tampering with witnesses or otherwise obstructing justice – those arguments are based solely on

conjecture and surmise – and cannot be the basis for detention. In reviewing the application for

bail pending appeal by members of the American Communist Party convicted under the Smith

Act, 18 U.S.C. § 2385, Justice Jackson addressed this same concern years ago, writing:

> Grave public danger is said to result from what [the defendants] may be expected
> to do, in addition to what they have done since their conviction. If I assume that
> defendants are disposed to commit every opportune disloyal act helpful to the
> communist countries, it is still difficult to reconcile with traditional American law
> the jailing of persons by the courts because of anticipated but as yet uncommitted
> crimes, Imprisonment to protect society from predicted but unconsummated
> offenses is…unprecedented in this country and fraught with danger of excesses and
> injustice…" (Emphasis added).

*Williamson v. United States*, 95 L.Ed.2d 1379, 1382 (1950). Any argument by the government that

Mr. Nshimiye may obstruct justice or in some other way become a danger to the community, is no

more than the anticipated wrongdoing warned against in Justice Jackson's famous opinion.

Furthermore, any such risk can readily be abated with appropriate protective orders.

## V. PRETRIAL RELEASE IS NECESSARY TO SECURE THE PRIVILEGE AFFORDED BY THE SIXTH AMENDMENT.

Pretrial release is also critical to counsel's ability to provide effective assistance of counsel, as well as the defendant's ability to meaningfully contribute to his defense. The Sixth Amendment "does not provide merely that a defense shall be made for the accused; it grants to the accused personally the right to make his defense. It is the accused, not counsel, who must be 'informed of the nature and cause of the accusation,' and who must be 'confronted with the witnesses against him,' and who must be accorded 'compulsory process for obtaining witnesses in his favor'" *Faretta v. California*, 422 U.S. 806, 819 (1975).

The assistance of counsel during the period of pretrial preparation is indispensable to a defendant's ability to obtain a fair trial, as the Supreme Court has recognized: "the assistance of counsel cannot be limited to participation in a trial; to deprive a person of counsel during the period prior to trial may be more damaging than denial of counsel during the trial itself." *Maine v. Moulton*, 474 U.S. 159, 170 (1985). Indispensable too is the defendant's own ability to review discovery and participate in the preparation of his case for trial. As courts have observed, "[i]ntrinsic in an accused's right to the effective assistance of counsel is the right to assist in the preparation of his own defense." *Copeland v. Mercer Cnty. Correction Ctr.*, No. CV175780MASLHG, 2019 WL 3453273, at *5 (D.N.J. July 30, 2019), *citing Wolfish v. Levi*, 573 F.2d 118, 133 (2d Cir. 1978) ("[O]ne of the most serious deprivations suffered by a pretrial detainee is the curtailment of his ability to assist in his own defense."), *rev 'd on other grounds sub nom.*, *Bell v. Wolfish*, 441 U.S. 520 (1979) "Pretrial detention conditions may violate the Sixth Amendment when 'they unreasonably burden[ ] the inmate's opportunity to consult with his attorney and to prepare his defense,' *Benjamin v. Fraser*, 264 F.3d 175, 187 (2d Cir. 2001) (evaluating constitutionality of restrictions placed on attorneys visiting clients at Rikers Island), or

22

when they result in the 'actual or constructive denial of the assistance of counsel altogether.' *United States v. Lucas*, 873 F.2d 1279, 1280 (9th Cir.1989) (*quoting Perry v. Leeke*, 488 U.S. 272, 280 (1989)).” *United States v. Allick*, No. CRIM.A. 2011-020, 2012 WL 32630, at *2 (D.V.I. Jan. 5, 2012). Obviously, this will be a complex case with thousands of pages of discovery, much of it in a foreign language. The undersigned will need Mr. Nshimiye's assistance in digesting this discovery to prepare for trial. Mr. Nshimiye will be much more able to assist in his defense if he is in fact not housed in a prison thousands of miles away from his counsel of choice pending trial.

To be clear, Mr. Nshimiye is not asserting at this time that a Sixth Amendment violation has occurred, but he does respectfully submit that pretrial release will avoid any such issues in the future. It will also provide Mr. Nshimiye with a fundamentally fair process, ensuring that he is fully capable of preparing for trial in this matter. According to the government, Mr. Nshimiye is facing the prospect of significant jail time if convicted in this case. It would be fundamentally unfair to significantly handicap Mr. Nshimiye's ability to defend himself in a case when there are suitable conditions of release that will moderate any flight concerns.

## VI. CONCLUSION

Mr. Nshimiye has been a model citizen since his arrival in the United States almost thirty years ago. He has been a loving husband and father and has the unequivocal support of his family and friends. While the government has attempted to paint Mr. Nshimiye as a fugitive Rwandan war criminal, who would flee to the detriment of himself, his family, and everyone who places their trust in him, his actions over the course of nearly three decades, including after he knew about the government's allegations, prove otherwise. Mr. Nshimiye is not a serious flight risk and is someone who can and should be trusted to prepare his defense to these serious allegations without the burdens of pretrial confinement.  For the forgoing reasons, as well as any further reasons that

will be presented at any future hearing, Mr. Nshimiye respectfully requests this Honorable Court

to vacate the Magistrate Judge's detention order and grant him bond in the above-captioned matter.

## COMPLIANCE WITH LOCAL RULE 7.1(a)(2)

The undersigned counsel has conferred with the government, who by and through AUSA

John McNeil, opposes the requested relief.

Respectfully submitted,

/s/ Kurt P. Kerns
Kurt P. Kerns, Kansas S.C. No. 15028
KERNS LAW GROUP
328 N. Main Street
Wichita, KS 67202
Telephone: (316) 265-5511
Email: kurtpkerns@aol.com

/s/ Maksim Nemtsev
Maksim Nemtsev, Mass. Bar No. 690826
20 Park Plaza, Suite 1000
Boston, MA 02116
Telephone: (617) 227-3700
Email: menemtsev@gmail.com
*Counsel for Defendant Eric Nshimiye*

## CERTIFICATE OF SERVICE

I hereby certify that a true and authentic copy of the above and foregoing was filed and
served electronically pursuant to the CM/ECF system on May 23, 2024, on all counsel of record.

/s/ Maksim Nemtsev
Maksim Nemtsev