UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | ) |
| | ) Docket No. 1:24-cr-10071-FDS |
| ERIC TABARO NSHIMIYE, | ) |
| | ) |
| Defendant. | ) |

## GOVERNMENT'S OPPOSITION TO DEFENDANT'S
## APPEAL OF MAGISTRATE JUDGE'S PRETRIAL DETENTION ORDER

The United States of America, by and through undersigned counsel, hereby submits this

opposition to the defendant's *Appeal of Magistrate Judge's Pretrial Detention Order* [D.31]. [1]

The Magistrate Judge in the Northern District of Ohio – the district in which the defendant was

arrested and in which he has resided for many years – held a full detention hearing after the

defendant had an extended period to prepare.  The Court found that the defendant posed a

substantial risk of flight and there were no conditions or combination of conditions which would

assure his appearance.  [D.31-1 (Hearing Transcript)].  In reaching this conclusion, the Court

recognized that the defendant faces not just prosecution in the instant case, but subsequent

removal to Rwanda for prosecution for his involvement in the 1994 genocide.   Noting that the

defendant admitted to lying and deceiving to escape Rwanda and to flee to the United States, the

Court ultimately concluded, "if he has run [from his crimes in Rwanda] his entire life, it is hard

---

[1] "[D.*]" refers to the docket in *U.S. v. Nshimiye*, 1:24-cr-10071-FDS (D.Mass.). "[DOH.*]" refers to the docket in *U.S. v. Nshimiye*, 4:24-mj-06106-CEH (N.D. Ohio). "[DJLT.*]" refers to the docket in *U.S. v. Teganya*, 17-cr-10292-FDS.

for the Court to say that he will not continue running from it, if given the opportunity." [*Id*. at 40-41].

The Magistrate Judge's decision was both well-reasoned and well-supported by the facts proffered, and there is no need for this Court to revoke or amend it.  The government respectfully requests that the instant motion be denied and the defendant remain detained pending trial.  The government also respectfully requests that if this Court  decides to amend the order that it also conclude that the defendant poses a danger to the community. [2]

### Procedural History

On March 21, 2024, the defendant was arrested in the Northern District of Ohio on a criminal complaint issued by this Court. [DOH.1; D.14]. The complaint charged the defendant with violations of 18 U.S.C. §1623(a) (perjury); 18 U.S.C. §§ 1503 and 2 (obstruction of justice/aiding and abetting); and 18 U.S.C. §1001(a)(1) (falsifying, concealing, and covering up a material fact by trick, scheme, or device). [D.1].  At his initial appearance that day, the government moved for detention on three grounds: risk of flight under 18 U.S.C. § 3142(f)(2)(a); risk of obstruction under 18 U.S.C. § 3142(f)(2)(B); and danger to the community under 18 U.S.C. § 3142(f)(1)(E). [D.30 at 3].   The government requested a short continuance to prepare for a detention hearing, and defense counsel requested several additional days to prepare.  A preliminary hearing to address probable cause, detention, and identity was set for March 29, 2024, and the defendant was detained pending that hearing. [D.14, ND Ohio docket notes].

---

[2] In addition to this opposition, the government relies on the record before the Court in the Northern District of Ohio, including the complaint affidavit, the facts proffered by the prosecution, and the arguments in support of detention. A copy of the hearing transcript has been submitted as an exhibit to the defendant's motion.  [D.31-1]. The complaint affidavit is attached as Exhibit A.  In the event the Court decides to consider evidence beyond that before the Court in the Northern District of Ohio, the government notes below additional facts which support its argument.

On March 26, 2024, a grand jury sitting in Boston indicted the defendant in a six count indictment charging him with violations of 18 U.S.C. §1623(a) (perjury); 18 U.S.C. §§ 1503 and 2 (Obstruction of Justice/Aiding and Abetting); and 18 U.S.C. §1001(a)(1) (falsifying, concealing, and covering up a material fact by trick, scheme, or device).  [D.11].  The indictment obviated the need for a probable cause determination in the Northern District of Ohio.  *See* Fed.R.Crim.P. 5.1(a)(2).

The defendant was represented in Ohio by the Federal Public Defenders Office. [D.14]. Prior to the hearing, the defendant gathered and submitted to the Court more than 60 letters of support.  [D.31-3].   On March 29, 2024, the Court held a full detention hearing and both parties proffered facts and made arguments. [D.31-1].  At the conclusion of the hearing, the Court found that the government had met its burden of demonstrating that no condition or combination of conditions would reasonably assure the appearance of the defendant, and ordered the defendant detained.  [*Id.*].

The Court issued a Warrant of Removal to this district on March 29, 2024.  [DOH.7; D.14].   On April 25, 2024, the defendant filed a "Motion and Memorandum in Support of Bond" seeking his release from custody.  [D.18].  The defendant made his first appearance in the District of Massachusetts on April 30, 2024, and the defendant was arraigned that day. [D.26]. The parties also made arguments on the defendant's bond motion that day.  *Id.*

On May 17, 2024, Chief Magistrate Judge Cabell denied the defendant's motion to reopen the detention hearing, concluding in a written order that the defendant had a full detention hearing in the Northern District of Ohio after an opportunity to fully prepare, and that he failed to present new evidence in this district as required under 18 U.S.C. § 3142(f) to reopen the

hearing.[3] [D.30].  In rejecting the motion, Chief Magistrate Judge Cabell concluded that the defendant's offer of additional surety, in the form of mortgages on the homes of friends and family, was not information unknown at the time of the detention hearing in the Northern District of Ohio and was therefore insufficient to support a motion under 18 U.S.C. § 3142(f), citing *United States v. Dillon*, 938 F.2d 1412, 1415 (1st Cir. 1991).  The defendant has not appealed Chief Magistrate Judge Cabell's decision not to reopen the detention hearing.  Instead, he only seeks a *de novo* review of the decision entered in the Northern District of Ohio on March 29, 2024.  [D.31].

## Detention Decision

Eight days after his arrest in the Northern District of Ohio the defendant opted for a full detention hearing in that district.  The defendant represented at that hearing that he had adequate opportunity to prepare. [D.30 at 4].  The parties proceeded by proffer.  *Id*.  The government proffered the facts in the complaint affidavit as well as the following additional facts:

- If convicted, the defendant would face removal to Rwanda to face charges there related to his involvement in the 1994 genocide;

- A number of the witnesses upon whom the government intends to rely at trial previously testified in the International Criminal Tribunal for Rwanda, and had been cross-examined, and found credible by fact finders[4];

---

[3] That section reads in pertinent part: "The hearing may be reopened, before or after a determination by the judicial officer, at any time before trial if the judicial officer finds that **information exists that was not known to the movant at the time of the hearing** and that has a material bearing on the issue whether there are conditions of release that will reasonably assure the appearance of such person as required and the safety of any other person and the community" (*emphasis added*).

[4] If the evidence in this matter is reopened, the government will also proffer that the witnesses in this case will also include witnesses who have testified in courts in the United States, including this Court, and those witnesses were subject to cross-examination and found credible.

- During the defendant's testimony at the Tenganya trial, he admitted under oath to providing false statements to U.S. authorities in "seeking asylum"[5] in the U.S., including where he was born, the time and place of his father's death, and where he had gone to school. These facts were relevant because the most extreme Hutus who were the driving force behind the genocide came from the defendant's true birthplace and home of Ruhengeri.

[D.31-1 at 9-11].

The defense proffered more than 60 letters of family and community support, as well as information about his long ties to the community in Ohio, information about his family, his employment, his education, his children's education, and a charitable organization he founded. He also proffered that his nephew and his wife as third party custodians. [D.31-1 at 12-16.] Moreover, both defense counsel and the Court noted that the courtroom was full to capacity during the hearing with the defendant's supporters. [*Id*. at 13; D.30 at pg. 4].

After argument, Magistrate Judge Henderson assessed each of the factors under 18 U.S.C. 3142(g). The Court concluded that a number of factors weighed in favor of release, including his family ties, employment history, length of time at his residence and in the community, and lack of criminal history. [D.31-1 at 36-37].[6] The Court went on to focus on the heart of the government's argument: that the defendant posed a substantial risk of flight because, in addition to a conviction in this case, he is exposed to removal to Rwanda to face much more serious charges there:

> The Court notes that in the government's proffer it offered that if Mr. Nshimiye were convicted, he would face removal to Rwanda. And once there, he would face charges on the conduct that is described in the indictment and in the complaint. That is a serious consequence. And that serious consequence gives him a motive

---

[5] The AUSA misspoke when he referred to "asylum" rather than "refuge." In this case the defendant sought refuge in the U.S. by applying to INS in Nairobi, Kenya, rather than seeking asylum. Asylum seekers must be present in the U.S. or at its borders when they make their claim.

[6] As noted below, the government has a very different assessment of these factors and respectfully submits that Magistrate Henderson erred in so finding.

and a reason to flee. While he may have a motive and a reason to also clear his good name, that extreme consequence is the thing that, if these allegations are taken as true, he's been running from his entire life.  And if he has run from that thing his entire life, it is hard for the Court to say that he will not continue running from it, if given the opportunity.

[*Id*. at 39-40].[7]

The Court went on to conclude that the defendant's admitted past false

statements, which he used to fraudulently enter the United States, made any current

assurances particularly unreliable:

While the Court understands that everything in the indictment and in the complaint are allegations, the Court also notes that the government proffered that at the time that he took the stand to testify on behalf of his friend he admitted to some false statements.  These false statements were about where he was born, his father's death, and where he went to school. These seemingly minor things disturb the Court as to why someone would lie about things that are seemingly minor but also things that you would never forget.  And it leads to a conclusion that you lied about them to hide something. And if he would lie about these things to hide them to get here, it is hard for the Court to say that he would not do similar acts of deception and lying and fleeing to keep himself from going back to the place that he worked hard to run away from.

[*Id*. at 40-41].   Magistrate Judge Henderson also evaluated various means of preventing

the defendant's flight and found all lacking.  *Id.*  For instance, with regard to an ankle

monitor, the Court concluded, "all that does is tell the Court and the probation officer

---

[7]  Notably, the Court reached this conclusion without having the benefit of information about a similarly situated defendant. On April 12, 2024, two weeks after the Nshimiye detention hearing, Beatrice Munyenyezi was convicted in Rwanda and sentenced to life in prison.  https://www.newtimes.co.rw/article/15960/news/crime/beatrice-munyenyezi-sentenced-to-life-imprisonment-for-genocide-crimes.   Ms. Munyenyezi is a Rwandan genocidaire who was convicted in the District of New Hampshire in 2013 of crimes similar to those the defendant faces in this case, served ten years in federal custody and then was returned to Rwanda to face justice there.  *United States v. Munyenyezi*, 781 F.3d 532, 534 (1st Cir. 2015), *cert denied*, 577 U.S. 891 (2015).  Notably, Ms. Munyenyezi was convicted in both her U.S. case and her Rwandan prosecution for conduct in Butare, the same town in which the defendant is alleged to have perpetrated his crimes as a medical student.  Moreover, the government anticipates that it will offer evidence at trial in this matter which links the defendant to the hotel and roadblock which Ms. Munyenyezi controlled during the genocide.  In the event the Court decides to consider new evidence, the government requests that the Court also consider the life sentence recently imposed on Ms. Muyenyezi in Rwanda.

6

where he is. It does not stop him from fleeing." [*Id*. at 42].   The Court also noted that if

released to family in the Northern District of Ohio, the defendant would still need to

travel to Massachusetts for court appearances: "that presents a risk that instead of going

to Massachusetts he could flee to somewhere else. And by the time anyone would notice,

he would be gone." [*Id*.].

## Legal Standard

Pursuant to 18 U.S.C. § 3145(b), a person ordered detained by a magistrate judge "may

file, with the court having original jurisdiction over the offense, a motion for revocation or

amendment of the detention order." This Court, as the court of "original jurisdiction," conducts

*de novo* review of a contested detention order. *See United States v. Tortora,* 922 F.2d 880, 883 n.

4 (1st Cir.1990); *United States v. Gennaco*, 834 F. Supp. 2d 38, 40 (D. Mass. 2011) (Gorton, J.).

However, the defendant is not entitled to a hearing as a matter of right.  *See United States v.*

*Mubarak,* 2021 WL 242049, *3 (D. Mass. 2021) (Burroughs, J.) (citing *United States v. Pierce,*

107 F. Supp. 2d 126, 127 (D. Mass. 2000) (Gorton, J.) ("Section 3145(b) of Title 18 does not

provide for a hearing as a matter of right.")). In addition, "[w]here a court examines the detention

order without taking new evidence, a degree of deference to the factual determinations of the

Magistrate tempers the independent review." *Mubarak,* 2021 WL 242049, at *3 (quoting *United*

*States v. McForbes,* 109 F. Supp. 3d 365, 367 n.2 (D. Mass. 2015) (Hillman, J.)).

While this Court's review of the detention decision is *de novo*, permitting the Court to

make new findings of fact and rulings of law, this does not mean that the defendant is afforded

an unfettered opportunity to present new material as if he were offering evidence for the first

time.  *See, e.g.  United States v. Rodriguez-Adorno*, 606 F. Supp. 2d 232, 239 (D.P.R. 2009)(on

7

*de novo* review under § 3145(b) "a district court should not hear new evidence at a detention hearing that does not qualify under section 3142(f)"); *United States v. Ford*, 455 F. Supp. 3d 512, 517–18 (S.D. Ohio 2020)(*same, collecting cases*).   While a number of courts have suggested that a district court has discretion to consider new evidence which does not rise to the standard under § 3142(f), the First Circuit's decision in *Dillion* suggests that district courts should do so rarely.   *See*, *Dillon*, 938 F.2d at 1415.   In the absence of requiring evidence to meet the standard under § 3142(f), parties would have no incentive to marshal all available evidence at the time of the initial hearing before the magistrate judge.   *Id*.; *United States v. Flores*, 856 F. Supp. 1400, 1405–06 (E.D. Cal. 1994)(§ 3142(f) encourages a party to be diligent in "bringing forth all material evidence the first time a hearing is held"); *United States v. Smith*, 2012 WL 3776868, at *4 (D. Ariz. Aug. 31, 2012) (noting the need for litigants to acquire and present readily available evidence for the original hearing).

In this case, the defendant offers new surety which he did not offer at the original detention hearing.   [D.31 at 17-18].   As noted above, Chief Magistrate Judge Cabell has already decided that the offering of additional surety does not meet the "unknown information" standard in section 3142(f), and this Court has not been asked to review that decision.   Moreover, even if the Court were to review CMJ Cabell's decision, *Dillion* is dispositive.   While this Court has discretion to consider the newly proffered surety, there is no compelling reason in this case for doing so.   As a result, the Court's review of the detention decision in Ohio is appropriately based on evidence presented in that Court.[8]

---

[8] In the event this Court decides to consider the defendant's newly proffered surety, the government respectfully requests the opportunity to examine under oath each of the persons proffering such property pursuant to 18 U.S.C. § 3142(g)(4).  In addition, the government requests that the Court impose as a condition of offering surety that each

With regard to the Court's review of the evidence presented in the Northern District of Ohio, section 3142(e) provides that a defendant may be detained pending trial if the judicial officer determines that "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community[.]" 18 U.S.C. § 3142(e). The Government bears the burden of demonstrating that the defendant poses a flight risk by a preponderance of the evidence, or that the defendant poses a danger to the community by clear and convincing evidence. *See United States v. Scott*, 2006 WL 8437926, *1 (D. Mass. 2006) (Saylor, J.).  In determining whether any conditions of release will reasonably assure the defendant's appearance and the safety of any other person and the community, the Court must consider the factors set forth in 18 U.S.C. § 3142(g), which include: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence; (3) the history and characteristics of the defendant; and (4) the nature and seriousness of the danger that the defendant's release would pose to any other person or the community.

## Argument

While the defendant argues that he has been a "model citizen" and has no propensity to flee or violate court orders, this Court should reject this superficial characterization, just as Magistrate Judge Berman did.  As outlined below, the defendant's prior false statements and deceptions indicate that he has been running from his criminal conduct in Rwanda for decades; the exposure he faces in this case, including removal to Rwanda to face justice there, give him a powerful incentive to flee or conceal himself within the United States; and the defendant's prior admitted false statements make any current promises to abide by conditions of release unreliable.

---

such person consent to the evaluation and use of that person's Department of Homeland Security Alien File to the extent that such file contains information subject to  8 C.F.R. § 208.6.

The government also submits that the defendant poses a substantial risk of obstructing justice, and thereby is a danger to the community.

1.      **The Nature and Circumstances of the Offense Weigh in Favor of Detention**

The defendant is charged in this case with committing perjury and obstruction of justice – precisely the types of crimes which make any assurances he makes to the Court today unreliable. In 2019, this Court saw Mr. Nshimiye swear an oath to tell the truth and then go on to testify that neither he nor Jean Leonard Teganya had ever been members of the MRND, and neither he nor Mr. Teganya had ever worn MRND apparel or symbols.  [D.31-2; Ex. A at pg.14-17].  In convicting Mr. Teganya, the jury necessarily rejected Mr. Nshimiye's testimony.  Because Mr. Nshimiye also testified that he and Mr. Teganya were nearly always together in the months leading up to the genocide  – studying together as medical students, eating together, and sharing the same room – it can reasonable be inferred that the jury also concluded that Mr. Nshimiye's misleading testimony was not the product of ignorance or mistake, but was the product of an intent to testify falsely.

Moreover, in calling the defendant as his witness, Mr. Teganya had to know the defendant would exculpate him by testifying falsely.  Thus, the two former best friends and classmates together sought to obstruct justice before this Court.  In light of these charges, and the facts supporting them as detailed in the complaint affidavit, there is every reason for this Court to doubt the defendant's respect for the rule of law and to conclude that any assurances he makes not to flee are unreliable.

The defendant is also charged with engaging in a decades-long scheme to conceal his membership in the MRND, his presence in Rwanda during genocide, and his involvement in the

direct and indirect persecution of others in 1994.  [D.11].  As alleged in the complaint affidavit

and Indictment, and as he admitted during his trial testimony in *Teganya*, the defendant was

admitted to this country as a refugee based on the lie that his father had been killed by the

Interahamwe during the genocide.  [Ex. A at pg. 10-11].  In fact, his father had died more than a

decade before the genocide.  [D.31-2 at  15-43]. Once in the United States, the defendant gained

lawful permanent residence and citizenship by continuing to lie and conceal the truth of his past.

[Ex. A at pg. 11-13].   He posed as a victim of the genocide rather than a supporter and

perpetrator of it. Through these lies – which start in Kenya in 1995 and continue in 1997 (lawful

permanent residence application), 2001 (naturalization application), 2019 (testimony in *Teganya*)

and March 2024 (statements to agents) – he escaped justice in Rwanda and continued to enjoy

the security of living in the United States.  [*Id*. at pg. 10-18].  The nature and circumstances of

the charged offenses argue strongly in favor of detention because they reflect a persistent, long-

term concealment and pattern of falsehoods, and little concern for the consequences of engaging

in such falsehoods.

Finally, included in the nature and circumstances of the offense, are allegations that the

defendant engaged in multiple murders of Tutsi men, women, and children.  [*Id*. at pg. 7-10].

Witnesses and victims have also alleged that he engaged in the rape of multiple women during

the genocide.  *Id*.  While these criminal acts are not elements of the offenses to be proved at trial,

they are part of the nature and circumstances of the charged offenses to be considered for

purposes of detention.

The commission of such violent acts strongly support detention.  Among other things, if

he is returned to Rwanda and convicted of these crimes, he would almost certainly be given a life

sentence.  While he may claim that he will abide with conditions of release because his wife and children are here in the United States, if the defendant's options are a life sentence in Rwanda without his family, or life with his family in a third country which has no extradition with the United States[9], he would not hesitate to do as he did in 1994: flee to an apparent safe haven.

The extraordinary efforts of Teganya to avoid being returned to Rwanda for prosecution are instructive.  The Court will recall from the evidence at the *Teganya* trial that Mr. Teganya fled from Rwanda first to Zaire (now the Democratic Republic of Congo).  [DJLT.152-153; Ex. B at 16-92].  He then fled to Kenya. [*Id.* at 16-95].  From Kenya he travelled to India on a student visa. [*Id*. at 16-96].  When that visa expired and he was about to be returned to Rwanda, he acquired a false passport and fled to Canada. [*Id.* at 16-98 through 101].  Once in Canada he sought asylum there, obtained employment, married, and began raising a family. [*Id.* at 16-102 through 105].   After 15 years living in Canada, authorities there rejected his final asylum appeal and were on the verge of returning him to Rwanda.  [*Id.* at 16-106 through 107].  Mr. Teganya first went into hiding. [*Id.*].  He then fled again, this time across the border to the United States. [*Id.*].   In so doing, he left his wife and two children behind.  Like Mr. Teganya, the defendant's powerful motive to avoid return to Rwanda greatly overtakes any family or community ties.

### 2.    The Weight of the Evidence Supports Detention

The jury's verdict in the *Teganya* case strongly supports the evidence underlying the perjury and obstruction of justice charges in this case.  As noted above, the *Teganya* jury necessarily had to reject the defendant's testimony about Teganya's membership in the MRND and his political activities before the genocide.  The verdict, coupled with the close personal

---

[9] There are many countries which do not have extradition treaties with the United States or do not enforce those treaties, including most African countries. *See* 18 U.S.C. § 3181 (listing extradition treaties).

relationship between the two men, also strongly supports the conclusion that Nshimiye intended to testify falsely and to aid in Teganya's endeavor to obstruct justice. While that verdict does not control the outcome of this prosecution, it is critical to the issue of detention because it shows that jury heard Nshimiye's sworn testimony, and then unanimously rejected it. Likewise, this Court rejected a Rule 29 motion seeking to overturn that verdict [DJLT.127], and the First Circuit affirmed the conviction in *United States v. Teganya*, 997 F.3d 424 (1st Cir. 2021).

In addition to the Teganya verdict, the complaint affidavit provides powerful evidence that the defendant engaged in a decades-long scheme to conceal his conduct before and during the genocide, as alleged in the final count of the Indictment. For instance, when confronted by prosecutors during cross-examination in *Teganya*, the defendant admitted that his father was not a victim killed by the Interahamwe during the genocide in 1994 as he stated on his refugee application. [D.31-2 at 15-37 through 48]. Rather, he admitted that his father died when was just seven years old (in 1978). [*Id*.] Similarly, he admitted during testimony in 2019 that he was born and educated in Ruhengeri – the stronghold of extremist Hutus. [*Id*.]. By contrast he claimed on his refugee application that he was born and educated in Kigali, the country's capital. [*Id*.]

In his motion, the defendant seeks to dismiss these false statements as immaterial "errors" that could have been caused by "poor translation." [D.31 at 8]. The facts belie this speculation. A person applying for refuge is required to demonstrate past persecution or a well-founded fear of future persecution based membership in a particular social group or political opinion, among other things. [D.11 at ¶18]. The defendant's central claim for refuge was "I fled my country because I was threatened with my family to be killed by the INTERAHAMWE as they have

13

killed my father during the massacres against the minority ethnic TUTSI."  [Ex.A at 10; D.31-2 at 42].  His lies about the murder of his father were central to his admission to the United States. Since his refugee application was sworn under pains of perjury, it is also strong evidence that the defendant has little trouble making materially false statements after being sworn to tell the truth.[10]

With regard to the evidence that Nshimiye was a member of the MRND and Interahamwe, the Court will note that the evidence cited in the complaint affidavit is very similar to that presented at trial during the *Teganya* case. That case resulted in conviction.  In fact, some of the same witness who knew Teganya as a member of the MRND and Interahamwe also knew Nshimiye as Teganya's best friend and fellow member of the MRND and Interahamwe.  In addition, with regard to his violent crimes in Rwanda, the complaint affidavit references interviews with at least two fellow perpetrators and at least two direct victims.  [Ex. A at pg. 6-10].  This type of eyewitness testimony from fellow perpetrators and victims was precisely the kind of evidence which persuaded the jury to convict in *Teganya*.  As a result, this Court should conclude that the evidence in this case is quite strong.

The defendant suggests that the evidence against him has been trumped up by the government in retaliation for his testimony in *Teganya*. [D.31 at 15].   He claims that the eyewitness accounts by fellow perpetrators and victims are fabricated.  *Id*.  However, the

---

[10] In the event that the Court decides to consider additional evidence with regard to detention, the government will offer an unpublished memoir written by the defendant which the government recently discovered.  In that memoir, the defendant wrote at length about the untimely death of his father and how it impacted him as a child.  [Memoir at 6-7].  He also wrote that his first application for refugee status to the U.S. in Kenya was rejected because his story in that first application was that his father had died many years before the genocide.  Without admitting to fabricating a new life narrative, he went on to write that his second application was successful.  [Memoir at 30-34].  The evidence in this case will demonstrate that the defendant's second application was successful largely because of the false claim that his father was killed in 1994 by the Interahamwe.

defendant fails to note that Teganya called 12 other defense witnesses at his trial, none of whom have been charged. Similarly, none of the defense witnesses in the trials of Prudence Kantengwa or Beatrice Munyenyezi have been prosecuted for perjury or other crimes. The defendant's reliance on generalized allegations from the ICTR proceedings in Tanzania have no application to a prosecution brought in the United States by the Department of Justice, and his argument should be rejected as spurious.[11]

### 3.     The Relevant History and Characteristics of the Defendant also Support Detention

The defendant claims he is a model citizen with no propensity to flee, citing a series of letters from family and friends. Like Magistrate Judge Berman, this Court should reject this superficial characterization. In long-term fugitive cases such as this one, a Court should not weigh traditional markers of community connection in favor of release. Rather, it is essential that these traditional markers  – a job, a spouse, children, a home, friends, community connection – are viewed through the lens of a defendant seeking to conceal a criminal past. In this case, these traditional markers demonstrate two critical characteristics of this defendant and his history: an effectiveness at adapting and blending into an entirely foreign environment[12]; and  a

---

[11] The defendant also makes the factual claim that he was never "suspected, accused, or even mentioned by the ICTR . . . nor has a single HRW investigator . . . named him as a suspect." [D.31 at 15]. He submits no affidavit supporting this factual claim and so it should be rejected without further consideration. Moreover, even if this were true, it would be meaningless. Nearly 1 million people were killed in the genocide, and estimates of perpetrators have ranged from 200,000 to more than 1 million. The ICTR prosecuted fewer than 100 leaders. There have been many convictions in the United States and elsewhere of individuals who were involved in the genocide but who were not notable enough to become targets of the ICTR or a mention in a Human Rights Watch report. Among those not targeted or mentioned are Jean Leonard Teganya, Beatrice Munyenyezi, and Prudence Kantengwa – all of whom have been convicted in the United States of crimes similar to those charged in this case.

[12] In the event the Court decides to consider new evidence, the government will offer evidence of the defendant's extensive international travel for work, including extended periods of work overseas. In his memoir, he reminisces about working in China, Brazil, India, Thailand, Chile, Mexico, South Africa, Peru, and Canada. [Memoir at 54-90].

resilience and resourcefulness over an extended period of time of projecting an image of someone who was a victim of persecution rather than a perpetrator.  These markers support detention rather than release.

Magistrate Judge Berman commented that it was if she was looking at two different men when she compared the facts in the complaint affidavit with those in the letters submitted by the defendant. [*Id.* at 36].  This is precisely what the defendant has worked to achieve through his flight from Rwanda and his decades of concealments and false statements in the United States. The defendant has cultivated a narrative of father, husband, engineer, and community supporter in part to conceal that he is man who supported and participated in one of the most brutal genocides in the modern era.  Upon close examination, this apparent dichotomy is not between two different men; it is the natural progression of a single man at different stages of his life experiencing powerfully different motivations. As a young man, the defendant was a privileged Hutu from the north of Rwanda on his way to getting a medical degree at the country's most prestigious university.  Like many Hutus of his age, he was powerfully attracted to the MRND and the notion that the Rwandan Patriotic Front (RPF) and all other Tutsis in the country posed a threat to him and his way of life.  So, as outlined in the complaint affidavit, the defendant joined his close friend and classmate Jean Leonard Teganya in participating in MRND activities before the genocide.  Once the genocide started, he, like Mr. Teganya, participated in heinous crimes against Tutsis.

When the RPF fought its way south through the country, Nshimiye fled, just like Mr. Teganya.  As a participant in crimes against Tutsis, he could not return to Rwanda after the

genocide as many innocent Hutus did.  So he made his way to Kenya[13], lied about his father being killed by the very youth militia in which he participated, and obtained the extraordinary privilege of refuge in the United States.  No fugitive could have been more fortunate than Mr. Nshimiye and he knew it.

 The most effective way for the defendant to preserve his extraordinarily good fortune was to keep a low profile and play by the rules.  With the exception of lying about and concealing his past – which continued up through March 2024 -- that is what he did once in the United States. He lied where he had to, but otherwise committed himself to a common American life to preserve his good fortune.

 This pattern of normalcy after engaging in violent conduct is unsurprising in criminals wishing to escape their pasts.  It is also indicative of a discipline which renders a defendant a high risk of flight.  For instance, Enrico Ponzo knew he had to live a quiet life as a rancher in Idaho to escape justice in Massachusetts. *See gen. United States v. Ponzo*, 853 F.3d 558, 567 (1st Cir. 2017).   So, for more than a decade, he ranched, married, raised two children and lived the most ordinary of western lives.  By the end of his ranching days, he had strong connections to that Idaho community.  But community connection, after the commission of serious crimes in Massachusetts, was a means of escape and concealment rather than a demonstration of reliability.

---

[13] In his refugee application he claimed to have fled from Rwanda on April 15, 1994, first to Tanzania and then to Kenya.  In his unpublished memoir, he tells a very different story. [Memoir at 19-27].  Nshimiye wrote that he first fled from Kigali to the northwest of Rwanda where he remained for much of the genocide.  He then wrote that he fled to Zaire, just as Teganya and many other extremist Hutus did.  He wrote that he ultimately fled from Zaire to Kenya where he applied for refuge in the United States.

Similarly, James Bulger and Catherine Greig knew they had to lead unassuming lives to avoid detection and capture.  They lived the lives of a quiet retired couple in a rented apartment near the beach in California for 15 years.  *See gen. United States v. Bulger*, 816 F.3d 137, 140 (1st Cir. 2016).  While 15 years in the same apartment demonstrated a sustained connection to the Santa Monica community, that connection was plainly a form of concealment, and no one could reasonably argue that such a community connection would support release on bond.[14]

By arguing that he has been a model citizen and claiming a nearly thirty year "law-abiding history," the defendant also dismisses the evidence that for just as long as he has worked as an engineer, or owned his home, or raised a family, he has continued to lie about and conceal his involvement in the Rwandan genocide.  His superficial characterization of his time in the U.S. fails to account for the sworn facts in the complaint affidavit, including the evidence demonstrating that he perjured himself before this Court.

The defendant also claims that he is not a risk of flight because he did not flee in the five years after he was cross-examined in *Teganya*.  This argument is unpersuasive because Nshimiye was just one of a number of defense witnesses in *Teganya* who were cross-examined and had their credibility challenged.  He was not approached by law enforcement or arrested in the weeks immediately after the trial, and so had little reason to believe he would be criminally prosecuted.  By contrast, he now has the certainty of federal prosecution in a felony indictment,

---

[14] While the defendant may argue that comparing him to defendants like Enrico Ponzo or James Bulger is hyperbole, the defendant's alleged conduct during the genocide in Rwanda is no less disturbing than Ponzo's or Bulger's criminal conduct.  The defendant sided with a genocidal political party and participated in violent crimes against Tutsis.

and it has been alleged that he engaged in murder and rape. His risk of flight now is exponentially higher than it was in the aftermath of the *Teganya* trial.

     4.     **The Defendant's Release also Poses a Danger to the Community**

While not necessary to reject the defendant's instant motion, the Court should also conclude that the defendant poses a risk to the community through obstruction of justice and witness intimidation. As noted above, there is substantial evidence in the complaint affidavit and the indictment to demonstrate that the defendant engaged in both perjury and obstruction of justice during the *Teganya* trial. He engaged in subverting the judicial process in the United States when he had far less at stake. Now that his own liberty is hanging in the balance, including removal to Rwanda, he has far greater incentive to engage in more serious forms of obstruction, including pressuring witnesses in Rwanda to change their testimony through threats or bribes.

As noted in the complaint affidavit, the core witnesses in this case reside in Rwanda and some of them were genocide survivors. The Court can readily infer that these kinds of victims are particularly vulnerable targets of intimidation and/or bribery, and, as foreign-based witnesses, they cannot rely on the protections of the United States justice system.

Moreover, there is a long documented history of witness intimidation and coercion in Rwanda arising from the Rwandan genocide. *See, e.g.* Donatien Nikuze, Witness Protection in Rwandan Judicial System, *International Journal of Engineering Research & Technology* (Vol. 2, Issue 4, April – 2013) [Witness Protection In Rwandan Judicial System (ibuka.rw)](#) ("By participating in the proceedings against the alleged perpetrators in the Rwandan domestic courts, Gacaca jurisdictions and in the ICTR, witnesses are exposed to a high risk of being targeted for

intimidation, physical harm, insults, and verbal attacks, damage to their homes or property, and harassment or murder.  According to a report from the National Public Prosecution Authority of Rwanda (NPPA), between January of 1995 to August of 2008, 120 genocide survivors and 36 witnesses were killed because of their participation in genocide trials. The rational of these murders is of former perpetrators who want to prevent witnesses from testifying against them."); Clark and Palmer, *Testifying to Genocide: Victim and Witness Protection in Rwanda* (Redress, October 2012) at pg. 23-30. REDRESS REPORT.

It is also notable that the income disparities between defendants in the United States and witnesses and victims in Rwanda are extraordinary.  It takes a fraction of the resources to unlawfully bend testimony in Rwanda as it does in the United States.  Moreover, because U.S. authorities have little ability to oversee conduct in Rwanda, obstructive conduct will likely go unpunished. 15

## Conclusion

For the reasons set forth above, the government respectfully requests that the Court decline to revoke or amend the order of detention in this matter.  In the event the Court decides to consider the surety newly offered by the defendant, the government respectfully requests the opportunity to examine those individuals under oath pursuant to 18 U.S.C. 3142(g)(4), and to offer the additional evidence as noted herein.   To the extent this Court decides to amend the order of detention, the government respectfully requests that the Court also conclude that the

---

[15] The defendant also claims that his detention would inhibit access to counsel.  [D.31 at 22-24].  However, he fails to note that detention did not pose unsurmountable hurdles to either Mr. Teganya or Ms. Munyenyezi who were both detained before trial.  Moreover, since the pandemic pretrial detention facilities have enhanced abilities to arrange confidential virtual meetings between detainees and counsel.  In addition, discovery in this case does not pose unique challenges.  It is not the case that "much of it [is] in a foreign language" as suggested by the defense.  [D.31 at 23].   The amount of discovery produced to date is not greater than in other similar cases and very little of it is in a foreign language.

defendant is a danger to the community through risk of obstruction of justice, and there are no conditions or combination of conditions which would prevent such danger.

Respectfully submitted,

JOSHUA S. LEVY
Acting United States Attorney

By:    *s/John T. McNeil*
JOHN T. McNEIL
AMANDA BECK
Assistant U.S. Attorneys

## CERTIFICATE OF SERVICE

Suffolk, ss.:                                              Boston, Massachusetts
                                                          June 5, 2024

I, John T. McNeil, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

*s/John T. McNeil*
JOHN T. McNEIL