UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| THE UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> v. <br><br> ERIC TABARO NSHIMIYE, <br><br> Defendant. | ) <br> ) <br> ) <br> ) Case No. 1:24-cr-10071-FDS <br> ) <br> ) <br> ) <br> ) <br> ) |

### ERIC NSHIMIYE'S MOTION FOR REVOCATION OF PRETRIAL DETENTION ORDER AND FOR ADMISSION TO BAIL BASED ON DUE-PROCESS CONCERNS

Defendant Eric Nshimiye respectfully moves this Honorable Court for an order granting his release on bail. He has now been incarcerated for more than fourteen months, with no definite trial date set, and the prospect of at least another year in custody—if not longer. This extended delay arises from the substantial discovery involved, the need to secure exculpatory evidence from abroad, the subsequent defense investigation required to incorporate any responsive materials, and the need to secure attendance of foreign witnesses (to the extent they are willing) at trial. Meanwhile, Mr. Nshimiye's continued incarceration has imposed severe hardships on his family—including the loss of his wife's employment due to her need to care for their ailing son. *See* Letter of Chantal Nshimiye, attached hereto as Exhibit 1. Under these circumstances, the defense respectfully submits that due process requires his release pending trial.

**I.    Background**

Mr. Nishimiye has been in custody since March 21, 2024. No firm trial date has been set. To prepare for trial, the defense must secure exculpatory evidence abroad. Absent government assistance, that evidence can be obtained only through letters rogatory – first requested on January 17, 2025 – which are still being litigated before this Honorable Court. Even if those letters issued

1

today, the delays inherent in international service, foreign responses, translation, and integrating any new material into the defense would likely add at least another year of pretrial incarceration. When considered alongside the time already served, such an extension raises grave constitutional concerns because "in many, perhaps most, cases sixteen months would be found to exceed the due process limitation on pretrial confinement." *United States v. Zannino,* 798 F.2d 544, 548 (1st Cir.1986).

Meanwhile, Mr. Nshimiye's family has been severely strained by his absence. *See* Exhibit 1. His son, Tresor, experienced a serious mental-health crisis shortly after learning of his father's incarceration, ultimately requiring emergency care at Cleveland Clinic and Mercy Hospital. Exhibit 1. He then spent approximately two months at Heartland Behavioral Health Hospital. During that time, he required continuous attention and multiple appointments with psychiatric and counseling clinics. Exhibit 1. Because of Tresor's condition, Mr. Nshimiye's wife had to stop working in December 2024 to care for him and the family has been denied Social Security disability benefits. Exhibit 1. In short, the family is in deep distress: they have no disability aid and no other means of financial support. Without Mr. Nshimiye's presence, his wife cannot fully return to work or manage her own medical follow-ups resulting from major surgery. Exhibit 1. In her words, "[i]t has all been overwhelming, to say the least." Exhibit 1.

### Prior Bail Proceedings

On March 21, 2024, Mr. Nshimiye was arrested in the Northern District of Ohio on the instant charges. On March 29, 2024, Magistrate Judge Carmen E. Henderson of the Northern District of Ohio conducted a detention hearing and ordered him held without bail, finding that he presented a serious risk of flight, and that no combination of release conditions could adequately

mitigate it. Dkt. 31-1; Dkt. 14. Before that hearing, pretrial services in the Northern District of Ohio had recommended that Mr. Nshimiye be released on a $20,000 unsecured bond.

On April 25, 2024, Mr. Nshimiye requested Chief Magistrate Judge Cabel to reopen the detention hearing, offering to post "five properties" owned by "friends and family" as collateral for his appearance bond. Dkt. 30 at 2-3; Dkt. 18. However, that motion was denied on May 17, 2025, on the grounds that the proposed collateral had been available to Mr. Nshimiye at the time of his original detention hearing. *See* Dkt. 30.

On May 23, 2024, Mr. Nshimiye appealed his detention order to the District Court, *see* Dkt. 31. On June 20, 2024, the District Court found that Mr. Nshimiye "poses a serious risk of flight were he to be release before trial in this matter" and that no "proposed conditions of release," including "home detention, electronic monitoring, surrendering his passport, waiving non-extradition rights, surety provided by himself and several friends and family, and agreeing to supervision by pretrial services", are "sufficient to reasonably assure defendant's appearance." Dkt. 43 at 8. That finding was, at least in part, based on the stated concern that the travel required between Ohio and Massachusetts for court appearances "creates a substantial risk that [Mr. Nshimiye] might take the opportunity to evade authorities while in transit." Dkt. 43 at 8. The District Court did not find that Mr. Nshimiye poses a danger. *See* Dkt. 43 at 7 ("it is unclear what, if any, danger defendant would pose to others in the community were he to be released… [t]his factor therefore supports release").

**Discovery and Letters Rogatory Requests**

Discovery in this matter has proven particularly challenging because the alleged conduct occurred in Butare, Rwanda more than thirty years ago. As a result, some records are written in a foreign language, and many remain located overseas, necessitating a foreign investigation. The

defense initially received automatic discovery on June 3, 2024 comprising 4.93 GB of data and 16,505 bates-stamped pages, some of which were not in English. After that initial production:

- **June 7, 2024:** The government produced certain interview reports from *United States v. Prudence Kantengwa*, No. 1:08-cr-10385-RGS (D. Mass.).

- **December 10, 2024:** In response to a defense request, the government produced certain immigration files belonging to Mr. Nshimiye's family members.

- **January 29, 2025:** At the defense's request, the government provided additional records from *United States v. Jean Leonard Teganya*, No. 1:17-cr-10292-FDS (D. Mass.); *United States v. Prudence Kantengwa*, No. 1:08-cr-10385-RGS (D. Mass.); and *United States v. Beatrice Munyenyezi*, No. 10-cr-00085-SM (D. N.H.).[1]

- **February 13, 2025:** The government informed the defense that it is making seven boxes of *Kantengwa* and *Munyenyezi* materials available for inspection, while transferring data from certain CDs relevant to those matters onto a hard drive.

- **March 28, 2025:** The government produced a copy of that hard drive—containing approximately 31.1 GB of data and 4,973 files—and the defense selected further documents from the boxes for copying.

Separately, on October 4, 2024, the defense sought the government's position regarding an *ex parte*, sealed application for letters rogatory. On October 24, 2024, the government indicated it would oppose the request, prompting the defense to file a Motion for Leave to Proceed Ex Parte and Under Seal for Issuance of Letters Rogatory, Dkt. 55, later that day. The government filed its opposition on November 15, 2024, Dkt. 58, and on December 17, 2024, Chief Magistrate Judge Cabell granted the defense's request, setting a January 17, 2025 deadline for the underlying Motion for Issuance of Letters Rogatory. Dkt. 58 at 14.

On December 30, 2024, the government moved for reconsideration of Magistrate Judge Cabell's prior ruling. Dkt. 63. The defense responded on January 13, 2025. Dkt. 64. Consistent

---

[1] *Kantengwa* and *Munyenyezi* became relevant to this case and the subject of the defense's requests based on the government's representation that it "anticipates that it will offer evidence at trial in this matter which links the defendant to the hotel and roadblock which Ms. Munyenyezi controlled during the genocide." Dkt. 36 at 6, n. 7.

4

with the Court's December 17, 2024 order, the defense then filed its Motion for Issuance of Letters Rogatory on January 17, 2025. On April 4, 2025, the Court denied that motion as overbroad and declared the government's reconsideration request largely moot. Dkt. 77 and 78.

At the Court's suggestion, the defense submitted a narrowed request on April 15, 2025, seeking two letters rogatory for Kenyan and Rwandan passport and travel records. Dkt. 84. The parties are now conferring about possible government assistance in obtaining those materials; the government's formal response is due May 27, 2025. To preserve its appellate rights, the defense has requested an extension to June 6, 2025, for any objections to the April 4 denial of its letters rogatory requests. Dkt. 94.[2]

Compounding potential delays is the defense's lack of any effective compulsory process – or a meaningful substitute – to secure testimony from the many witnesses residing abroad. Because there is no legal mechanism to compel their appearance in the United States, even a willing witness must first receive special permission from the State Department following significant intergovernmental coordination. At the same time, that witness must obtain exit visas and travel documents from, for example, Rwanda, requiring disclosure of the reason for their trip. This adds to the difficulty of procuring witnesses because declaring an intent to testify in a genocide-related defense case in Rwanda may risk prosecution for denying or minimizing the genocide—regardless of the content or truth of the testimony.

## II.    Argument

For over two centuries, our justice system, following the Eighth Amendment prohibition of "excessive bail," rejected concepts of preventive detention. *See, e.g., United States v. Lawrence*,

---

[2] This motion remains pending.

4 Cranch C.C. 518, 26 F.Cas. 887 (1835) (bail set for defendant who attempted to murder President Andrew Jackson because the Constitution forbade excessive bail).

> From the passage of the Judiciary Act of 1789, 1 Stat. 73, 91, to the present…, federal law has unequivocally provided that a person arrested for a non-capital offense shall be admitted to bail. This traditional right to freedom before conviction permits the unhampered preparation of a defense, and serves to prevent the infliction of punishment prior to conviction …. Unless this right to bail before trial is preserved, the presumption of innocence, secured only after centuries of struggle, would lose its meaning.

*Stack* v. *Boyle,* 342 U.S. 1, 4 (1951) (citations omitted).

In 1984, Congress enacted the Bail Reform Act, codified at 18 U.S.C. §3142, setting forth the conditions under which federal defendants can be detained pretrial. It mandated detention only if "no condition or combination of conditions will reasonably assure the appearance of the person … and the safety of any other person and the community." § 3142(e)(1). During the debate which led to the passage of the Act, the Senate was assured that 90 days of detention was the "worst case limit," and the "upper bound" of pretrial detention. *United States v. Colombo*, 777 F.2d 96, 101 (2d Cir. 1985) (internal citations and quotations omitted).

In *United States v. Salerno*, 481 U.S. 739 (1987), the Supreme Court ruled, in a case which presented a facial challenge to the Bail Reform Act "the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid," *id*. at 745 – that pretrial detention under 18 U.S.C. §3142 was a regulatory measure rather than a punitive one and therefore permissible under the Due Process Clause. *Id.* at 747.

Notably, one of the factors on which the Court relied in upholding the constitutionality of the detention provisions of the Bail Reform Act was that "the maximum length of pretrial detention is limited by the stringent time limitations of the Speedy Trial Act." *Salerno,* 481 U.S. at 747; *see*

*also United States v. Gonzales Claudio*, 806 F.2d 334, 340–41 (2d Cir. 1986) ("Nevertheless, the ninety-day period specified in section 3164(b), representing the considered view of the Congress as to the normal limit on pretrial detention, provides at least a point of reference in our consideration of the constitutional limit on such detention."). The Court left open challenges to the constitutionality of the statute as applied in a particular case, *id.* n.3, expressly "intimating no view as to the point at which detention in a particular case might become excessively prolonged, and therefore punitive, in relation to Congress' regulatory goal." *id.* at 747 n.4.

In the intervening years since *Salerno,* the number of defendants detained pretrial has increased exponentially. Prior to the passage of the Bail Reform Act, approximately 15% of federal criminal defendants were detained prior to trial.[3] By 2022, that number has more than quadrupled, and more than half (68.5% to be exact) of criminal defendants have been detained prior to trial, even though "[s]ocial science research shows that people held in jail pretrial are more likely to be convicted, to be sentenced to longer incarceration terms, or to commit new crimes post-trial compared to their released counterparts."[4]

Also, since *Salerno,* experience has shown the protection of the Speedy Trial Act against unduly prolonged pretrial detention to be largely illusory. While 18 U.S.C. § 3164 (b) requires that trials begin no later than ninety days, the numerous specific exclusions from that period set forth in §3161(h) and the ready availability of "ends of justice" continuances under §3161(h)(7)(A) often result in defendants being detained for prolonged periods, sometimes for years, prior to the

---

[3] *See* 1984 U.S.C.C.A.N. 3182, 3193 n.43, https://www.fd.org/sites/default/files/criminal_defense_topics/essential_topics/sentencing_resources/deconstructing_the_guidelines/legislative-history-of-the-comprehensive-crime-control-act-of-1983.pdf/

[4] *See* Pretrial Release and Detention in the Federal Judiciary, https://www.uscourts.gov/about-federal-courts/probation-and-pretrial-services/pretrial-services/pretrial-release-and-detention-federal-judiciary

commencement of their trials, particularly where cases are complex or, as here, international in nature.

Following the passage of the Bail Reform Act, many courts of appeals, including the First Circuit, have expressly recognized that, at some point, the duration of the pretrial detention of the defendant may cross the line separating the regulatory from the punitive and thereby violate the Due Process Clause. Indeed, the First Circuit stated that "that in many, perhaps most, cases, sixteen months would be found to exceed the due process limitations on the duration of pretrial confinement." *United States v. Zannino*, 798 F.2d 544, 548 (1st Cir. 1986) (collecting cases); *see also United States v. Gonzales Claudio*, 806 F.2d 334, 341 (2d Cir. 1986) ("Detention that has lasted for fourteen months and, without speculation, is scheduled to last considerably longer, points strongly to a denial of due process."); *United States v. Vastola*, 652 F. Supp. 1446, 1448 (D.N.J. 1987) (releasing defendant after three months of pretrial detention because anticipated detention of 1 ½ years without determination of guilt violates due process).

This Court's determination of whether continued pretrial detention violates due process must be rooted in the specific facts of the case and consider both the initial detention factors and additional due-process factors that have emerged over time. Courts generally look at the seriousness of the charges, the strength of the government's proof of flight risk or dangerousness, and the strength of the government's underlying case. *Zannino*, 798 F.2d 544, 547 (citing *United States v. Accetturo,* 783 F.2d 382, 388 (3d Cir.1986). When evaluating a claim that the duration of detention has become excessive, courts also consider the length of detention, the complexity of the case, and whether the litigation strategy of either party has "needlessly" contributed to the delay. *Id.*

### A. Seriousness of the Charges

In its bail decision, this Honorable Court found that Mr. Nshimiye's alleged conduct – though dating back decades – remains serious. Dkt. 43 at 6. To be sure, any allegations of violence weigh in favor of heightened scrutiny. Yet these charges do not carry any statutory presumption of detention; they do not involve offenses that Congress specifically identified as presumptively unbailable, and therefore they must be weighed against the attendant constitutional concerns.

Respectfully, these constitutional considerations far outweigh any concerns about flight – especially since flight concerns can be alleviated by stringent conditions of release. After all if the Second Circuit believed that the due process rights of *Ojeda-Rios*, the leader of a violent terrorist group calling itself Los Macheteros (the machete wielders) trumped the concerns of **both** flight and danger, then surely the constitutional rights of Mr. Nshimiye deserve no less protection. *See United States v. Ojeda-Rios*, 846 F.2d 167, 168 (2d Cir. 1988); *Gonzalez-Claudio*, 806 F.2d at 341 (fourteen months of detention held to be excessive). To be sure, Los Macheteros claimed responsibility for acts of terrorism including the killing of two United States servicemen on a bus and the destruction of several Puerto Rico National Guard planes. Los Macheteros had allegedly orchestrated a robbery of $7.6 million from a Wells Fargo depot. *Ojeda-Rios* was allegedly responsible for an anti-tank rocket attack on the federal courthouse in Puerto Rico and used aliases and false addresses extensively. *See United States v. Melendez-Carrion*, 820 F.2d 56, 57-58 (2d Cir. 1987). The statutory presumption of flight and danger applied to *Ojeda-Rios*. Yet, the Second Circuit found that all these factors were outweighed by constitutional considerations and ordered *Ojeda-Rios* released. *Ojeda-Rios*, 846 F.2d at 169.

Indeed, many defendants charged with similar crimes to Mr. Nshimiye have been admitted to bail under conditions that are equally available to this Honorable Court. *See e.g., United States*

*v. Gasana*, Dkt. 20-cr-00016-LM, Dkt. 1 and 18 (D.N.H) (defendant alleged of "commit[ing] numerous acts of violence, including murder, persecution, and theft" during the Rwandan genocide released on home detention and GPS monitoring condition);[5] *United States v. Ngombwa*, Dkt. 14-cr-00123, Dkt. 2 at 10-11 and Dkt. 12 (N.D. Iowa) (defendant who was previously convicted of "committing genocide and inciting others to commit genocide" in "the gacaca courts in Rwanda" released on bond); *United States v. Kantengwa*, Dkt. 08-cr-10385-RGS, Dkt. 3 and 6 (D. Mass) (defendant who was an alleged MRND member, a genocide supporter, and the wife of genocider then on trial before the ICTR was released on a $50,000 unsecured bond with travel restricted to the United States); *United States v. Kobagaya*, Dkt. 09-cr-10005-MLB, Dkt. 1 and 22 (defendant alleged to have killed and committed arson during Rwandan genocide was released on a $50,000 bond co-signed by family with travel restrictions). Most recently, in *United States v. Nsabumunkunzi*, No. 25-cr-00138-JS (E.D.N.Y.), Judge Seybert granted release on a $250,000 unsecured bond with home detention of a former Rwandan leader who was alleged to have directed and participated in killings and sexual violence against Tutsis, set up roadblocks to capture civilians, and had previously been convicted and sentenced to life in prison by a Rwandan court *in absentia*. *See id.,* Dkt. 5 at 2–3; Dkt. 12.[6]

---

[5] Highlighting the difficulty of litigating a largely international case, *Gasana* was recently dismissed by the government because of its inability to obtain testimony from a witness located in Rwanda.

[6] The two defendants that were detained pending trial are material distinguishable from Mr. Nshimiye. *Teganya*, for example, had no legal status in the United States, crossed the border surreptitiously after being denied asylum in Canada, and had a history of fleeing jurisdictions. *Teganya*, 17-cr-10292-FDS, Dkt. 64, 65, and 76. In *United States v. Munyenyezi*, 10-cr-00085-SM (D.N.H), the defendant had "ties to a network of Rwanda's either accused of being involved in the genocide or dedicated to the overthrow of the current regime in Rwanda [] who would be both capable of and motivated to facilitate her flight," a history of deceiving courts, including the ICTR during her husband's trial, and was actively assisting her husband in manipulating witness testimony. *Id.* at Dkt. 22 and 28 at 12.

**B. Strength of the Government's Proof of Flight Risk or Dangerousness**

While the government initially met its burden to show a risk of flight sufficient to justify detention, that risk must be reexamined considering changing circumstances over the past fourteen months of detention. The Court should consider whether proposed conditions of release – such as home confinement, electronic monitoring, limited travel, and robust third-party sureties – can adequately mitigate any remaining flight concerns or danger. In light of the family, community, and employment ties that have remained intact during Mr. Nshimiye's detention, continued incarceration may no longer be the "least restrictive" means of ensuring future appearances.

The defense maintains that Mr. Nshimiye does not pose an unmanageable flight risk. For approximately five years before his arrest – during which he was active in the American-Rwandan community and testified in the *Teganya* trial – he remained in the United States, fully aware of the government's allegations, the charges he might face, and the gravity of a possible conviction. His decision not to flee underscores that there are conditions capable of ensuring his appearance at trial. Moreover, his family's current financial and medical hardships illustrate an urgent need for his presence at home, *see* Exhibit 1, and the many letters from relatives, friends, and community members previously submitted to this Court further show that Mr. Nshimiye is not someone who would abandon his obligations to his family or the Court. Dkt. 18-1.

To the extent that this Honorable Court was concerned that the travel required between Ohio and Massachusetts for court appearances "creates a substantial risk that [Mr. Nshimiye] might take the opportunity to evade authorities while in transit," Dkt. 43 at 8, it can require that

Mr. Nshimiye travel between Ohio and Massachusetts only with one of his attorneys. *See United States v. Patriarca*, 776 F. Supp. 593, 595 (D. Mass. 1991) (setting such condition).[7]

### C. Strength of the Government's Case on the Merits

The government's evidence involves events from more than thirty years ago in a foreign jurisdiction. That proof depends on documents and witness statements located abroad – material whose reliability and availability are an open question. Despite all the ongoing investigations in Rwanda and the ICTR, Mr. Nshimiye's name never surfaced as even a suspect for more than 25 years. No document evidence exists to tie him to the alleged crimes. The only way for the government to prove its case is to rely on Rwandan witnesses, who operate under the limits of the laws to which they are beholden, the Rwandan law. Although the Rwandan Constitution purports to provide a freedom of speech, that speech is limited at the whim of the Rwandan government such that a Rwandan does not know if what he or she says will get them in trouble. What a Rwandan does know is that if he or she says something contrary to the "truth", *i.e.,* that all Hutus were involved in the genocide, that individual can be and most likely will be accused, if not charged with division and genocide ideology. Accusations alone can destroy their lives let alone subject them to a formal charge. Accordingly, the testimony of these witnesses against Mr. Nshimiye has not yet been tested by adversarial proceedings and any such accusations may still fail to satisfy the government's burden in this case. Regardless, "the weight of the evidence is the least important of the various factors." *United States v. Motamedi*, 767 F.2d 1403, 1408 (9th Cir. 1985) ("if the court impermissibly makes a preliminary determination of guilt, the refusal to grant release could become in substance a matter of punishment.").

---

[7] Even requiring Mr. Nshimiye to establish residency in Massachusetts would be less restrictive than detention.

### D. Length of Detention

A key factor in the due-process inquiry is "the length of the detention that has in fact occurred." *Zannino*, 798 F.2d at 547. Here, Mr. Nshimiye has already been imprisoned for more than fourteen months. Where the pretrial period extends beyond that point—and, as here, may well surpass two years given the complexities of obtaining evidence from abroad and arranging foreign witness testimony – courts must evaluate whether detention remains "regulatory" or has become punitive. Indeed, the First Circuit has indicated that such protracted confinement "would be found to exceed the due process limitations on the duration of pretrial confinement." *Zannino*, 798 F.2d at 548; *United States v. Gonzales Claudio*, 806 F.2d 334, 341 (2d Cir. 1986) ("fourteen months … points strongly to a denial of due process."); *United States v. Vastola*, 652 F. Supp. 1446, 1448 (D.N.J. 1987) (anticipated 18-month detention violates due process). Likewise, under a Sixth Amendment speedy-trial analysis, any delay exceeding a year is generally "presumptively prejudicial." *United States v. Handa*, 892 F.3d 95 (1st Cir. 2018). "[A]t some point and under some circumstances, the duration of confinement itself crosses the line between regulatory and impermissible punitive detention." *United States v. Accetturo*, 783 F.2d 382, 388 (3d Cir. 1986). That line has been or soon will be crossed in this case.

### E. Complexity of Case and Impact of the Parties' Litigation Strategies

As previously discussed, this prosecution hinges on allegations of historically remote conduct in a foreign jurisdiction, requiring substantial international discovery, translation, and coordination. Obtaining foreign evidence often take many months—or longer—to produce tangible results. Delays in obtaining, reviewing, and integrating that evidence underscores the case's complexity. But complexity alone should not be a surrogate for perpetually prolonged detention: courts must ensure it does not become a mechanism for indefinite incarceration. Indeed,

13

while it may well as a general matter take complex and international cases longer to reach the trial stage than simpler ones, it is in precisely such cases that the threat to a detained defendant's right to the effective assistance of counsel and his right to assist counsel in the preparation of his defense is at its zenith.

Finally, the Court should assess whether either party's conduct has "needlessly" prolonged the proceedings. *Zannino*, 798 F.2d at 547. Where, as the defense contends, the delays arise from legitimate investigative requirements – such as issuing letters rogatory or locating and arranging testimony from relevant witnesses – the defense should not bear responsibility for that extension of time.

Collectively, these considerations demonstrate that continuing to detain Mr. Nshimiye – beyond fourteen months already served and potentially for another year or longer – exceeds constitutional limits. Although the seriousness of the charges and the government's initial evidence of flight risk may have warranted detention at the outset, the substantial time already elapsed, the changing record on risk mitigation, and the protracted nature of foreign discovery now strongly weigh in favor of release.

Accordingly, the defense respectfully proposes that the stringent conditions initially set forth in Dkt. 31 at 17-18 – together with the added requirement that Mr. Nshimiye may only travel between Ohio and Massachusetts when accompanied by counsel, and any additional safeguards this Court deems appropriate – will more than reasonably ensure his future appearance for trial especially given Mr. Nshimiye's deep ties to his community and the urgent family needs that compel him to remain here.

### III.  Conclusion

For all the foregoing reasons, Defendant Eric Nshimiye respectfully requests this Honorable Court to grant him pretrial release. The length of his detention already exceeds fourteen months and is poised to continue for at least another year or longer due to the complexities of foreign discovery. His family faces grave hardships in his absence, and he has demonstrated that conditions far less restrictive than continued incarceration can adequately ensure his appearance. In these circumstances, continued pretrial detention would violate due process protections, requiring his release on suitable conditions that will safeguard both his constitutional rights and the interests of justice.

### COMPLIANCE WITH LOCAL RULE 7.1(a)(2)

The government, by and through AUSA Amanda Beck, opposes the requested relief.

Respectfully submitted,

/s/ Kurt P. Kerns
Kurt P. Kerns, Kansas S.C. No. 15028
KERNS LAW GROUP
328 N. Main Street
Wichita, KS 67202
Telephone: (316) 265-5511
Email: kurtpkerns@aol.com

/s/ Maksim Nemtsev
Maksim Nemtsev, Mass. Bar No. 690826
20 Park Plaza, Suite 1000
Boston, MA 02116
Telephone: (617) 227-3700
Email: menemtsev@gmail.com
*Counsel for Defendant Eric Nshimiye*

## **CERTIFICATE OF SERVICE**

      I hereby certify that a true and authentic copy of the above and foregoing was filed and served electronically pursuant to the CM/ECF system on May 23, 2025, on all counsel of record.

                                      /s/ Maksim Nemtsev
                                      Maksim Nemtsev, Mass. Bar No. 690826