UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| THE UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Case No. 1:24-cr-10071-FDS |
| | ) | |
| ERIC TABARO NSHIMIYE, | ) | |
| | ) | |
| Defendant. | ) | (REDACTED VERSION) |

**DEFENDANT ERIC NSHIMIYE'S OBJECTION AND PARTIAL APPEAL OF
MAGISTRATE JUDGE'S APRIL 4, 2025 ORDER DENYING SEVEN OF THE NINE
PREVIOUSLY REQUESTED LETTERS ROGATORY (DKT. 77)**

Defendant Eric Tabaro Nshimiye respectfully submits these objections, pursuant to Fed.

R. Crim. P. 59(a), to partially appeal the Magistrate Judge's April 4, 2025 Order (Dkt. 77) denying

Mr. Nshimiye's sealed, *ex parte* motion for issuance of letters rogatory (Dkt. 67). The Magistrate

Judge's order found that the requested letters rogatory amounted to an improper "fishing

expedition" and lacked the specificity required by Fed. R. Crim. P. 17(c) under *United States v.

Nixon*, 418 U.S. 683 (1974). The defense respectfully contends that the ruling was contrary to law

and clearly erroneous. The defense's motion and supporting materials demonstrated in extensive

detail that the letters rogatory requests are narrowly tailored to obtain specific, highly relevant

documents – including official records and transcripts – that are critical to Mr. Nshimiye's defense.

These materials are expected to be admissible under well-established exceptions to the hearsay

rule, *e.g.,* Fed. R. Evid. 803(6), (8), (16), and no alternative means exist for the defense to secure

them absent court-issued letters rogatory.

The Court has discretion and inherent authority to issue letters rogatory in aid of a criminal

defense under 28 U.S.C. § 1781 and principles of comity. Rigid application of the *Nixon* subpoena

standard should yield to the practical realities of international evidence-gathering at the pretrial

1

stage, especially where the Sixth Amendment Compulsory Process rights of the accused are at stake. The records sought here are vital to establishing Mr. Nshimiye's innocence and to undermining key government allegations. For the reasons set forth below, the Magistrate Judge's order should be set aside as clearly erroneous and contrary to law, and the requested letters rogatory should be authorized.

## I.    BACKGROUND

Eric Nshimiye's charges stem from testimony more than five years ago in *United States. v. Jean Leonard Teganya*, 17-cr-10292-FDS, and his allegedly fraudulent statements to the government in connection with immigration applications decades ago. *See* Dkt. 1. Count One through Four charge Mr. Nshimiye with perjury; Count Five charges Mr. Nshimiye with obstruction of justice; and Count Six charges Mr. Nshimiye with false statements in violation of 18 U.S.C. § 1001. The government alleges that Mr. Nshimiye lied about being an "active member in the MRND and the Interahamwe"; wearing a "hat and clothing marked with MRND insignias and colors"; his participation in "MRND rallies and other MRND political gatherings", and his overall participation in the genocide, including the "identification and killing of Tutsis" in Butare, a small town with a current population of approximately 50,000. *See* Dkt. 1 at ¶¶ 13 – 16; https://www.citypopulation.de/en/rwanda/cities/. *See generally United States v. Kantengwa*, 781 F.3d 545, 549 (1st Cir. 2015) ("The killings began shortly after President Habyarimana's plane was shot down on April 6, 1994, throwing Rwanda into turmoil and sparking the three-month genocide that would claim the lives of 700,000 to 800,000 Rwandans… [d]uring the first two weeks of the genocide, the people of Butare had largely resisted becoming involved. But on April 19, 1994, the new Rwandan president, Theodore Sindikubwabo, came to Butare and gave a speech that made clear that those who did not support his new regime would be targeted. Those loyal to

the new regime, who had already been laying the groundwork for the genocide, responded to the call to action and set up numerous roadblocks."). The underlying allegations will necessarily require the government to prove Mr. Nshimiye participated in Rwandan war crimes. This case will therefore require proof as to what happened in the small Rwandan town between April – July 1994—more than thirty years ago at a time when that country was encased in a civil war and the location and activities of Mr. Nshimiye during that period.

On October 4, 2024, the defense sought the government's position regarding an *ex parte*, sealed application for letters rogatory. On October 24, 2024, the government indicated it would oppose the request, prompting the defense to file a Motion for Leave to Proceed *Ex Parte* and Under Seal for Issuance of Letters Rogatory, Dkt. 55, later that day. The government filed its opposition on November 15, 2024, Dkt. 58, and on December 17, 2024, Chief Magistrate Judge Cabell granted the defense's request, setting a January 17, 2025 deadline for the underlying Motion for Issuance of Letters Rogatory. Dkt. 58 at 14.

On December 30, 2024, the government moved for reconsideration of Magistrate Judge Cabell's prior ruling. Dkt. 63. The defense responded on January 13, 2025. Dkt. 64. Consistent with the Court's December 17, 2024 order, the defense then filed its Motion for Issuance of Letters Rogatory on January 17, 2025. On April 4, 2025, the Court denied that motion as overbroad and declared the government's reconsideration request largely moot. Dkt. 77 and 78.

At the Court's suggestion, the defense submitted a narrowed request on April 15, 2025, seeking two letters rogatory for Kenyan and Rwandan passport and travel records. Dkt. 84. Consistent with the Court's recommendations, the parties conferred about possible government assistance in obtaining those materials as well as the other materials subject to remaining letters rogatory. The government agreed to pursue the Kenyan and Rwandan passport materials but

declined to assist with the remaining letters rogatory, the denial of which are challenged in this appeal. Mr. Nshimiye now timely objects to and appeals that ruling to the District Judge, under Fed. R. Crim. P. 59(a).

The defense respectfully seeks the Court's assistance in obtaining specific documents and records from four foreign governmental or institutional sources in France, Canada, Rwanda, and Tanzania (the ICTR). Each request is targeted to a narrow evidentiary need of the defense, not a general exploratory search. In particular, the letters rogatory, attached as Exhibits 1–7, request evidence for two distinct purposes:

First, the defense intends to prove that on April 6, 1994 – when former President Juvenal Habyarimana's was shot down – Mr. Nshimiye was on spring break visiting his brother in Kigali, the capital of Rwanda. After the genocide started, Mr. Nshimiye moved around Kigali, until traveling to his hometown of Ruhengeri where he stayed at his family's home. Mr. Nshimiye attempted to return to Butare to retrieve his belongings but was turned away due to the dangerous conditions. Subsequently, he and his family fled to the Democratic Republic of Congo (DRC) though Gisenyi (a different town in Rwanda) where he obtained a new Rwandan passport. In DRC, Mr. Nshimiye eventually made his way to a refugee camp in the Kahindo area and received a job as a pharmacy stock manager at a makeshift hospital, run by Médecins Sans Frontières (MSF), the French equivalent of Doctors Without Borders. After approximately two months at the camp, Mr. Nshimiye travelled to Nairobi, Kenya using the Rwandan passport he obtained in Gisenyi, where he received a visa from Kenyan authorities. Upon information and belief, the MSF would possess records of Mr. Nshimiye's employment, his various applications, copies of the Rwandan passport that he obtained prior to his travel to DRC, and, if produced, would conclusively demonstrate that Mr. Nshimiye was not in Butare during much, or all, of the period he is alleged to be in Butare

committing genocide. The defense respectfully believes that such records would be admissible under Fed. R. Evid. 803(6) (relating to records of a regularly conducted activity); 803(8) (relating to public records); and/or 803(16) (relating to records prepared before January 1, 1998).

Second, the defense intends to prove that Mr. Nshimiye has never been wanted or labelled as a genocide participant by witnesses and relevant government authorities prior to his testimony in the *Teganya* trial.

Butare—officially renamed Huye—known as Rwanda's "intellectual capital" housed the National University of Rwanda – a vibrant academic hub, attracting students and researchers from across the region – where Mr. Nishimiye was also a student. As a university town with a community of students and academics (including many Tutsi intellectuals), it became a key target during the violence.

Following the genocide, Rwanda created Gacaca courts – a network of community courts that tried genocide-related crimes.[1] During the Gacaca survivors, witnesses, and perpetrators mandatorily participated in the process of truth-telling and justice. In Butare, with its dense student population and influential academic community, many individuals were directly involved. This heightened local interest made the Gacaca sessions particularly visible. Butare's status as the "intellectual capital" gave local Gacaca proceedings a certain symbolic weight. Observers—both Rwandan and international—often looked to Butare to gauge how well the Gacaca system could handle complex cases and promote reconciliation in a community that prided itself on education and critical thought. Because of this, Butare's Gacaca courts became a subject of study for

---

[1]    Gacaca is a "traditional community court system" overseen by "local level elected judges to hear the trials of genocide suspects accused of all crimes except planning of genocide." https://www.un.org/en/preventgenocide/rwanda/assets/pdf/Backgrounder%20Justice%202014.pdf

researchers examining transitional justice in Rwanda. The proximity to university faculty and students also meant there was a higher likelihood of systematic documentation of what occurred during the genocide. Consequently, Butare's Gacaca records are some of the most comprehensive and detailed in the country and have been relied upon by researchers across the globe.  *See e.g.,* Clark, Phil, *The Gacaca Courts, Post-Genocide Justice and Reconciliation in Rwanda: Justice without Lawyers.* Cambridge University (2010); Longman, Timothy, *Memory and Justice in Post-Genocide Rwanda,* Cambridge University Press (2017).

Similarly, there have been other cases in other jurisdiction concerning events in Butare between April and July of 1994 overlapping with accusations against Mr. Nshimiye, including detailed witness testimony about genocide participants and their activities, including activities Mr. Nshimiye is alleged to have been involved in.  Before the ICTR and the International Residual Mechanism for Criminal Tribunals (IRMCT),[2] the following relevant cases were litigated:

- *Prosecutor v. André Rwamakuba*, ICTR-98-44C-T – "the former Minister of Primary and Secondary Education in the 1994 Interim Government" who "was charged with genocide, or alternatively, complicity in genocide, and extermination and murder as crimes against humanity for specific acts allegedly committed between 6 and 30 April 1994 in Gikomero commune and at Butare University Hospital."  https://unictr.irmct.org/en/news/andr%C3%A9-rwamakuba-not-guilty-all-charges. The relevant judgment is available at

- *Prosecutor v. Tharcisse Muvunyi*, ICTR-2000-55A-T – a "Lieutenant-Colonel in the Rwandan Armed Forces, stationed at … Butare Prefecture… convicted … [*inter alia*] for failing to take necessary and reasonable measures to prevent the killings or to punish the perpetrators of attacks at the Butare University Hospital, University of Butare, Beneberika Convent, Mukura forest, and at various roadblocks in Butare Prefecture." https://www.refworld.org/jurisprudence/caselaw/ictr/2008/en/63392

---

[2]    "The international Criminal Tribunal for Rwanda (ICTR) was established by the United Nations Security Council on 8 November 1994. The Tribunal has a mandate to prosecute persons bearing great responsibility for genocide and other serious violations of international humanitarian law committed in Rwanda between 1 January and 31 December 1994." https://www.un.org/en/preventgenocide/rwanda/assets/pdf/Backgrounder%20Justice%202014.pdf

- *Prosecutor v. Pauline Nyaramasuhuko et. al*., ICTR-98-42-T – known as the "Butare Six" the prosecution was the most notable case involving genocide activities in Butare during April – July 1994. A total of 189 witnesses testified at trial detailing the events that occurred in Butare during the relevant period. https://ucr.irmct.org/LegalRef/CMSDocStore/Public/English/Judgement/NotIndexable/ICTR-98-42/MSC19005R0000564313.PDF

- *Prosecutor v. Ildéphonse Nizeyimana*, ICTR-2000-55C-T – the case involved a former captain at the Butare military academy, who became known as the "Butcher of Butare". https://www.internationalcrimesdatabase.org/Case/131/Nizeyimana/

In France, two noteworthy cases closely resemble the charges against Mr. Nshimiye. Dr. Eugène Rwamucyo[3] and Dr. Sosthene Munyemana[4], both physicians at the same hospital where Mr. Nshimiye is alleged to have committed genocidal acts during his training, faced accusations virtually identical to those leveled against Mr. Nshimiye. Specifically, they were alleged to have manned roadblocks, incited the killing of Tutsis, and participated in the genocide at the University Hospital.

In Canada, the prosecution of Désiré Munyaneza presents another parallel. The Canadian government charged him with encouraging or directly organizing attacks against Tutsis—personally taking part in killings or directing others to do so in locations around Butare where Tutsis had sought refuge. Like Mr. Nshimiye, Munyaneza also faced allegations of multiple acts of sexual violence. Likewise, there were four cases prosecuted in Rwanda that relate to allegations of genocide in Butare and/or the University Hospital: Dr. Martin Kageruka, Cyriaque Habyarabatuma, Issac Munyagasheka, and Jean-Paul Micomyiza.

Despite the relevance of the Gacaca records, the overlapping conduct in the above cases and the conduct allegedly perpetrated by Mr. Nshimiye, the government never requested records

---

[3]    https://www.bbc.com/news/articles/cwy918gk20zo
[4]    https://www.bbc.com/news/articles/cwy918gk20zo

or the identities or statements of relevant witnesses. The production of the requested Gacaca records and materials from other relevant prosecutions is particularly important to the defense for the following reasons:

First, the targeted records are critical because they bear directly on whether the accusations against Mr. Nshimiye were only recently fabricated. As set out in the accompanying affidavit of attorney Philippe Larochelle, attached hereto as Exhibit 8 – a veteran practitioner in ICTR, Canadian, and other genocide-related proceedings – false and coordinated testimony is a recurring problem in Rwandan genocide cases. Drawing on first-hand experience in the *Mungwarere* trial (where key witnesses admitted inventing atrocities) as well as proven fabrication in *Kagaba* and several ICTR judgments, Attorney Larochelle, in his affidavit, explains how survivors, perpetrators, and certain survivor-association officials have, for political or financial motives, manufactured allegations, intimidated defense witnesses, and retrofitted their stories to implicate new defendants. This Honorable Court admitted similar testimony during *Teganya*. *See United States v. Teganya*, 997 F.3d 424, 431 (1st Cir. 2021) ("Teganya presented his own expert witness, who testified that the Rwandan government was generally considered to have coerced witnesses to testify against suspected perpetrators of the genocide.").

████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████



████████████████████████████████

████████████ The requested evidence will reveal the identities of the participants and victims whose testimony the defense expects to solicit at trial showing that Mr. Nshimiye did not engage in the conduct he is accused of. The records would also be potentially admissible as prior consistent statements in the event a witnesses' credibility is attacked on cross examination. *See* Fed. R. Evid. 801(d)(1)(B). To the extent that the government intends to call some of the witnesses identified by the requested records, the evidence may separately be used as impeachment evidence pursuant to Fed. R. Evid. 801(d)(1), 806, and 613.[5]

Put differently, if a suspect were suddenly accused of the Nicole Brown Simpson homicide three decades after the fact, the logical first step would be to examine relevant documents and statements from the original O.J. Simpson investigation directly bearing on the killer's identity and testimony and other documentary evidence would likely be admissible to rebut the new charge. The same logic requires access to the ICTR, Gacaca, and other tribunal records that already dissected the Butare-hospital and roadblock atrocities.

Second, Mr. Nshimiye intends to engage an expert historian to show that he was never previously named or implicated in any investigative, judicial, or community-based processes. By highlighting this absence of allegations—particularly within the Gacaca courts, the ICTR's records, other court proceedings and relevant witness testimonies within – the defense aims to challenge the credibility of any fresh accusations. Whether motivated by personal grievances, fear of reprisal, or perceived benefits in cooperating with authorities or prevailing narratives, the risk

---

[5]    The government has not identified any witnesses that it may seek to call at trial. Any potential witnesses' identities have been redacted by the government from discovery pursuant to the protective order in this case. Although the defense respectfully believes that the witnesses relevant to the letters rogatory, *see e.g.,* Exhibit 4, 5, 6 and 7, likely overlap with some of the witnesses the government would seek to call at trial.

of witness fabrication remains a genuine concern—one that the defense will seek to bring to the jury's attention.

In *United States v. Kantengwa*, the First Circuit explicitly recognized that historical experts offer specialized knowledge beyond a typical juror's understanding and that an expert historian may rely on out-of-court statements and secondary sources to form opinions consistent with Fed. R. Evid 703, where the expert's role involves gathering, analyzing, and synthesizing countless historical documents. 781 F.3d 545, 562 (1st Cir. 2015) (Expert "gave testimony that could explain the consistency of accounts as to this historical fact about the roadblock at Hotel Ihuriro, despite conflicting versions of other details about what happened in Butare during the genocide"). The defense has thus far consulted with an expert on the subject who reviewed his records and has not located Mr. Nshimiye as a genocide suspect. This potential expert, however, advised that he does not have all the Gacaca records from Butare or testimony from the ICTR or other jurisdictions relevant to Butare. He advised the defense that the absence of Mr. Nshimiye's name in these records is exculpatory particularly because individuals accused of genocide-related crimes could receive reduced sentences if they provided "complete confessions" or named co-perpetrators. Indeed, the system incentivized overinclusion and led to instances where people were wrongfully accused. The lack of any reference to Mr. Nshimiye in trials and confessions of others would, according to an expert on the matter, be strong evidence of his innocence. The requested records could be used by an expert historian to provide a complete picture of the events in Butare during the genocide to the jury like in *Kantengwa* and form expert opinion under Fed. R. Evid. 702. The underlying documents also likely qualify for admission into evidence under Fed. R. Evid. 803(6) and (7) (relating to records of regularly conducted activities); 803(8) and (10) (relating to public records); 803(16) (relating to statements in documents prepared before January 1, 1998).

For the above reasons, the defense sought the following letters from the Magistrate Judge:[6]

- **Exhibit 1 - France – Médecins Sans Frontières (Doctors Without Borders)** – Employment/personnel records confirming that Mr. Nshimiye was employed by MSF and resided at the MSF refugee camp in Kahindo, Democratic Republic of Congo (then Zaire) in 1994 which would show that during the same timeframe when prosecution witnesses allege Mr. Nshimiye was perpetrating atrocities in Butare, he was in fact working at a humanitarian camp across the border in the DRC.

- **Exhibit 2 – France – Ministère de la Justice and Parquet de Paris (French Ministry of Justice and Paris Prosecutor)** – Transcripts, witness statements, and investigatory records from French judicial proceedings or inquiries concerning the 1994 Butare massacre at the University Hospital and related events. The requests are narrowly drawn to statements and transcripts about the same locations and incidents at issue, *e.g.* events at the Butare University Hospital or roadblocks.

- **Exhibit 3 – Canada – Superior Court of Québec (District of Montréal)** – Court records and transcripts from Canadian proceedings that overlap with the Butare genocide allegations. In particular, Canada prosecuted one case involving atrocities in the Butare Hospital in 1994, and the defense believes that survivors and witnesses testified there regarding the very same events (such as violence at the Butare University Hospital) at issue here. The defense seeks the specific transcripts or witness statements from those Canadian proceedings that describe the Butare hospital crimes.

- **Exhibit 4 – Rwandan – Ministry of National Unity & Civic Engagement** – Archives of the local Gacaca courts concerning the Butare University Hospital and associated roadblocks. Rwanda's Ministry of National Unity oversees post-genocide justice and reconciliation records. The defense seeks the Gacaca court records or witness lists for the Butare hospital massacre or the roadblock near the Ihuriro (Munyenyezi) Hotel, to see if Mr. Nshimiye was ever identified in those contemporaneous or prior proceedings. Absence of Mr. Nshimiye's name in any of the local justice records for those notorious crimes would strongly indicate that the current accusations are a recent fabrication, surfacing for the first time decades later.

- **Exhibit 5 – Rwanda – Ministry of Justice and National Public Prosecution Authority (NPPA)** – Requesting investigatory files, witness statements, or court records in the possession of Rwanda's justice authorities regarding the Butare hospital crimes and related allegations. The Rwandan government has conducted investigations and trials of genocide perpetrators; the defense requests production of any statements from those files that overlap with the allegations against Mr. Nshimiye. Again, if no Rwandan prosecutorial files ever named Mr. Nshimiye in connection with these events, that fact is exculpatory and impeaches the credibility of the witnesses who have recently accused him.

- **Exhibit 6 – United Nations International Criminal Tribunal for Rwanda (ICTR) / International Residual Mechanism for Criminal Tribunals (IRMCT)** – Requesting

---

[6] Two requests for Mr. Nshimiye's passport in Rwanda and his visa application from Kenya, initially before the Magistrate Judge, have now been withdrawn based on the government's willingness to assist with obtaining that evidence from abroad.

certified transcripts and witness statements from ICTR trial proceedings that involved testimony and documentary evidence concerning the atrocities in Butare (specifically the Butare University Hospital, the "Munyenyezi" roadblock near the Ihuriro Hotel, and related mass killings). For example, the ICTR prosecuted certain officials (such as Minister Pauline Nyiramasuhuko and others) for the Butare massacres; numerous witnesses testified about what occurred at the hospital and roadblocks. The defense seeks these portions of those ICTR records that describe the events in question in this case. The requests are narrowly tailored to the matters overlapping Mr. Nshimiye's case and will not sweep in unrelated evidence.

- **Exhibit 7 – United Nations ICTR Office of the Prosecutor (OTP)** – Any additional witness statements, interviews, or investigative material in the OTP's possession concerning the Butare University Hospital crimes, the roadblocks in Butare, or related allegations. The OTP gathered extensive evidence on the Rwandan genocide, not all of which was filed in tribunal case records. The defense's letter rogatory asks the OTP to produce any statements by key witnesses to those events, so that the defense can compare those statements with the allegations against Mr. Nshimiye and to the extent the current accounts differ from prior witness statement. This could reveal prior inconsistent statements or the absence of any prior allegation against Mr. Nshimiye, which would be powerful impeachment material.

Each of the above requests is precise and focused. Crucially, the letters rogatory seek identifiable records tied to Mr. Nshimiye or the specific events underlying the indictment. The requests meticulously describe the particular evidence sought, including related to specified individuals that, based on all of the defense's research, would correspond to relevant evidence. For example, the defense outlined that Mr. Nshimiye's employment records would directly establish his whereabouts (outside of Butare) during the genocide and thereby negate any testimony that he was in Butare and/or committing genocide. Likewise, the requests detail foreign trial transcripts and witness statements that are related to the matters that overlap with allegations against Mr. Nshimiye. In sum, the defense presented a compelling factual basis for each request, firmly rebutting any notion that this was a speculative or exploratory venture. Indeed, the requests are based on extensive investigation and were crafted with specificity to obtain materially exculpatory evidence. Nonetheless, the Magistrate Judge denied the motion, characterizing it as a "fishing

expedition" beyond the scope of Rule 17(c). Mr. Nshimiye now asks this Court to overrule that decision and to permit him to pursue the foreign evidence necessary to present a complete defense.

## II.    STANDARD OF REVIEW

Because the Magistrate Judge's denial of the letters rogatory motion was a non-dispositive pretrial ruling, this Court reviews the decision under a "clearly erroneous or contrary to law" standard. Fed. R. Crim. P. 59(a). A Magistrate Judge's legal conclusions are not entitled to deference if they are contrary to or misapply applicable law. Here, the Magistrate Judge's refusal to issue the letters rogatory rests on a legal error – an overly rigid application of Rule 17(c) and the *Nixon* standard – and on clearly erroneous factual findings about the nature and specificity of the defense's requests. Accordingly, this Court should conduct a fresh analysis of the *Nixon* factors as applied to the defense's motion and should set aside the order denying relief.

## III.    STANDARD FOR ISSUANCE

Under the Compulsory Process Clause of the Sixth Amendment, Mr. Nshimiye, like all criminal defendants, has "the right to secure papers—in addition to testimony—[that are] material to [his defense]." *See United States v. Hubbel*, 530 U.S. 27, 55 (2000); *United States. v. Nixon*, 418 U.S. 683, 711 (1974) ("It is the manifest duty of the courts to vindicate [guarantees of the Fifth and Sixth Amendments], and to accomplish that it is essential that all relevant and admissible evidence be produced."); *United States. v. Tucker*, 249 F.R.D. 59, 65 (S.D.N.Y. 2008) ("Criminal defendants have the right 'to put before a jury evidence that might influence the determination of guilt.' To effect this right, a defendant must have the ability to obtain that evidence.") (quoting *Pennsylvania v. Ritchie*, 480 U.S. 39, 56 (1987)).

To protect this right, federal courts have the power to issue letters rogatory to secure evidence from abroad in criminal cases under 28 U.S.C. § 1781 and the judiciary's "inherent"

14

authority. *See United States v. Lee*, 723 F.3d 134, 142 n.6 (2d Cir. 2013); *United States v. Yousef*, 327 F.3d 56, 112 n.46 (2d Cir. 2003); *United States v. Mejia*, 448 F.3d 436, 445 (D.C. Cir. 2006). Such letters are "formal request[s] from a court in which an action is pending, to a foreign court" and are commonly used to facilitate the taking of evidence from non-parties located in foreign jurisdictions. *See* 22 C.F.R. § 92.54.

The First Circuit has not established a binding set of factors that the Court must evaluate in deciding whether to secure a defendant's constitutional right to evidence by issuing letters rogatory for documentary evidence abroad. Courts outside this Circuit have applied the *Nixon* and Rule 17(c) standard of relevance, admissibility, and specificity in such circumstances. *See, e.g.*, *United States v. Hoskins*, 12-cr-00238, 2015 WL 4874921, at *5 (D. Conn. Aug. 14, 2015) ("The standard for issuance of a letter rogatory is the same as if the evidence were located in the United States, and thus Defendant must satisfy the requirements of Fed. R. Crim. P. 17 and *Nixon* to obtain [documentary] evidence from [a third party] that is located abroad.") (citing *United States v. Korogodsky*, 4 F. Supp. 2d 262, 265 (S.D.N.Y. 1998)); *United States v. Weisberg*, 08-cr-347, 2010 WL 5027537, at * 2 (E.D.N.Y. Dec. 3, 2010) (noting that "[l]etters rogatory are simply a means to obtain discovery to which a party is otherwise entitled" and applying the Rule 17(c) standard to defendant's request).

The standard established in *Nixon* generally requires a defendant to show: "(1) that the documents are evidentiary and relevant; (2) that they are not otherwise procurable reasonably in advance of trial by exercise of due diligence; (3) that the party cannot properly prepare for trial without such production and inspection in advance of trial and that the failure to obtain such inspection may tend unreasonably to delay the trial; and (4) that the application is made in good faith and is not intended as a general 'fishing expedition.'" *United States v. Nixon*, 418 U.S. 683,

699-700 (1974) (internal footnote omitted). In short, a party seeking a pre-trial Rule 17(c) subpoena "must clear three hurdles: (1) relevancy; (2) admissibility; (3) specificity." *Id.* at 700; *see also, e.g., United States v. LaRouche Campaign*, 841 F.2d 1176, 1180 (1st Cir. 1988) (referring to "threshold showing of admissibility, relevancy, and specificity").[7] The relevancy and admissibility prongs of this test are satisfied if the documents sought are "arguably relevant and admissible under the Rules of Evidence." *See United States v. Libby*, 432 F. Supp. 2d 26, 31 (D.D.C. 2005) ("documents sought pursuant to a Rule 17(c) subpoena can be deemed admissible for a variety of purposes, including impeachment") (citing *Nixon*, 418 U.S. at 701); *Bowman Dairy v. U.S.*, 341 U.S. 214, 220 (1951). The specificity requirement is satisfied "if there is a 'sufficient likelihood,' demonstrated through rational inferences, that the documents being sought contain relevant and admissible evidence." *United States v. Shinderman*, 432 F. Supp. 2d 157, 160 (D. Me. 2006) (quoting *Libby*, 432 F. Supp. 2d at 31).

The threshold inquiry simply "requires the Court to assess whether the documents sought have 'any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.'" *Libby*, 432 F. Supp. 2d at 31 (quoting Fed. R. Evid. 401). It is not required that the subpoenaed materials actually be introduced into evidence, so long as the motion represents "a good-faith effort . . . to

---

[7]      Mr. Nshimiye notes that some courts have suggested that the *Nixon* requirement that the subpoenaed documents be "evidentiary" should not be applied where the Rule 17(c) subpoena is directed to a third party, as opposed to the government. *See, e.g.*, *United States v. Tucker*, 249 F.R.D. 58, 66 (S.D.N.Y. 2008) (holding that the defendant "need only show that the request is (1) reasonable, construed as 'material to the defense,' and (2) not unduly oppressive for the producing party to respond"); *United States v. Nachamie*, 91 F. Supp. 2d 552, 563 (S.D.N.Y. 2000) ("[T]he judicial gloss that the material sought must be evidentiary—defined as relevant, admissible and specific—may be inappropriate in the context of a defense subpoena of documents from third parties"). While the defense believes that, for the reasons outlined below, the *Nixon* standard is satisfied here, it alternatively contends that the requested letters rogatory should be authorized under the less stringent "material to the defense" standard.

obtain evidence." *Bowman Dairy*, 341 U.S. at 220; *see also United States v. Rajaratnam*, 753 F.
Supp. 2d 317, 320 n.1 (S.D.N.Y. 2011) ("[T]he *Bowman Dairy* court interpreted Rule 17 as neither
a discovery device to examine documents for whatever might turn up, nor as a mechanism to obtain
documents that a defendant can identify in advance, but rather a way for a defendant to examine
documents he believes to exist that would be relevant to, and therefore presumptively admissible
in, his defense.").

## IV.    ARGUMENT

### A. The Letters Rogatory Requests Were Specific, Tailored, and Grounded in Evidentiary Need – Not a "Fishing Expedition."

The Magistrate Judge erred in labeling the defense's carefully delineated requests a
"fishing expedition." Rule 17(c) subpoenas (and by extension letters rogatory) cannot be used as
a general discovery device, but they can and should be used to obtain specific evidentiary
materials. Mr. Nshimiye's requests meet this standard. Far from casting a wide net for anything
that might turn up, each letter rogatory is aimed at a particular piece of evidence or set of records
that the defense has reason to believe exists and will materially aid in the defense. As detailed
above, the defense identified by name the foreign agencies or organizations believed to hold the
evidence, described the exact records sought (by type, date, and subject matter), and articulated
the purpose for which they will be used at trial. This level of specificity and focus is the antithesis
of a "fishing expedition."

To illustrate, the defense is not seeking "any and all documents related to the Rwandan
genocide" or other sweeping categories. It is seeking, for example, employment records from a
well-known refugee camp where Mr. Nshimiye worked, and the transcripts of prior legal
proceedings addressing the same events that underlie the charges. These are discrete items that the
defense has identified through investigation as likely to exist in the custody of specific foreign

entities. Here, the letters rogatory are limited to records from circa 1994 concerning Mr. Nshimiye or the Butare events at issue – *e.g.,* documents Mr. Nshimiye himself submitted or obtained in 1994 (like his employment paperwork) and records that would have been kept in the ordinary course by the relevant entities relating to those matters. There is no open-ended request for documents outside of that scope. The defense even preemptively acknowledged that some repositories (such as the ICTR or Gacaca archives) may contain irrelevant materials, and thus limited the letters rogatory to only those portions relevant to Mr. Nshimiye's case, *e.g.,* individuals identified as having previously provided evidence regarding genocidal activity at University Hospital and related roadblocks in Butare. This deliberate tailoring was made in a good-faith effort to avoid any undue breadth.

The Magistrate Judge's contrary conclusion appears to stem from an unduly strict reading of *Nixon*. The defense readily acknowledged the *Nixon* requirements and made a detailed showing as to each request. Relevancy is plainly met: the requested documents have a direct bearing on contested facts in this case – most critically, Mr. Nshimiye's whereabouts and activities during the genocide. For example, evidence that Mr. Nshimiye was in DRC in mid-1994 would make it significantly less probable that he committed crimes in Butare, Rwanda as alleged. That meets the low threshold of relevancy under Fed. R. Evid. 401 and the *Nixon* test. Likewise, prior witness statements from foreign proceedings are relevant either as direct exculpatory evidence (if they show someone else committed the acts or that Mr. Nshimiye was not named) or as impeachment material (if the witnesses' stories have changed). Courts have recognized that documents even sought for impeachment purposes can satisfy Rule 17(c) relevancy and admissibility criteria. *See Libby*, 432 F. Supp. 2d at 31. Here, the defense specifically seeks prior statements of individuals

who were witnesses to events in Butare and will likely testify for either the government or the defense.

Admissibility is also satisfied, or at least reasonably anticipated, for the categories of documents sought. At the pretrial stage, a party need only show that the materials are arguably admissible or likely to lead to admissible evidence; absolute proof of admissibility is not required. Mr. Nshimiye's request demonstrated multiple grounds for admitting the foreign records: they are expected to be kept by sophisticated entities (such as government agencies, international organizations, and NGOs) in the course of their business or official activities, rendering them presumptively admissible as business records, public records, or as ancient records under the Federal Rules of Evidence. Specifically, business records would include organizational files like MSF's employment roster; public records would encompass government documents such as court transcripts; and ancient documents would cover original 1994-era documents that are now over 20 years old. In addition, Rule 807's residual exception could apply in the interests of justice if needed. Importantly, as noted, even if certain records might ultimately be used only for impeachment or rebuttal, that is a valid basis to deem them admissible under *Nixon*. For instance, an ICTR transcript could be used to impeach a government witness if it contains a prior inconsistent statement, or a Canadian judgment could be used as extrinsic evidence to rebut a claim made by a witness. The bottom line is that the defense has made a plausible showing of admissibility for each category of item sought, which is all that *Nixon* demands at this juncture.

Finally, as to specificity, the defense's requests were as specific as possible given the nature of the evidence and the fact that the identities of Mr. Nshimiye's accusers have purposely been withheld from discovery. The defense is not in a position to provide exact Bates numbers or titles of foreign documents it has never seen, but specificity does not require such hyper-technical detail.

19

It requires that the subpoena (or here, the letter rogatory) "'provide the subpoenaed party or other party having standing with enough knowledge about what documents are being requested so as to lodge any objections on relevancy or admissibility.'" *Libby*, 432 F. Supp. 2d at 32. The defense readily meets this bar by pinpointing narrow classes of documents. For example, Letters Rogatory Exhibit 1 seek only documents that Mr. Nshimiye would have submitted or obtained in 1994 related to his employment. This is a clear-cut description: it limits the request to Mr. Nshimiye's own records in a specific year. Likewise, the remaining letters (the French, Canadian, Rwandan justice, and ICTR sources) are confined to statements and transcripts from proceedings addressing the Butare University Hospital crimes and related allegations that overlap with Mr. Nshimiye's case. This approach is highly specific in context – it tells the foreign authority exactly which events and individuals to focus on.

In sum, the defense's letters rogatory requests satisfy all three *Nixon* criteria of relevancy, admissibility, and specificity. The characterization of them as a "fishing expedition" is unwarranted. A "fishing expedition" implies a request that is speculative and unfocused – *i.e.*, hoping to catch evidence of unknown value by trawling through a wide sea of material. Here, by contrast, the defense has baited the hook with precision: it identified the specific evidence it expects to reel and provided concrete reasons to believe those records contain exculpatory or impeaching information. This targeted approach is exactly how a defendant properly uses Rule 17(c) and letters rogatory – to secure evidence material to the defense that is otherwise beyond reach. The Magistrate Judge's contrary finding was clear error given the uncontroverted specificity and relevance of these requests.

**B.  The Evidence Sought Is Highly Relevant and Vital to the Defense, and Its Production Is Essential to a Fair Trial.**

The second major flaw in the Magistrate Judge's ruling is the apparent underestimation of how critical these foreign records are to Mr. Nshimiye's defense. The requested evidence goes to the heart of the case: whether Mr. Nshimiye was even present at the time and place of the alleged crimes, and whether the accusations against him have emerged from genuine memory or from ulterior motives. Denying the defense the opportunity to obtain this evidence severely prejudices Mr. Nshimiye's ability to present his theory of innocence. As noted, Mr. Nshimiye's defense is that he did not participate in the genocide atrocities in Butare as alleged, and that he was in fact elsewhere (outside Rwanda) for much of the relevant time. The contemporaneous documents – like employment records – are objective evidence that can either prove or disprove that alibi-like contention. If MSF records place him at a refugee camp in Zaire helping victims rather than creating them, that directly refutes the prosecution's narrative. Few forms of evidence could be more relevant or probative in a case like this than official documents pinpointing the defendant's location. Such records are also intrinsically reliable. They are contemporaneous and routine records, unlikely to be falsified especially if obtained directly from the foreign custodian. Thus, not only are they admissible as discussed above, but their persuasive value to a jury could be considerable. It would be manifestly unjust to prevent the defense from even attempting to obtain these exculpatory records, especially when they are uniquely in the hands of foreign entities and cannot be otherwise accessed.

Furthermore, the transcripts and prior statements from foreign proceedings are crucial to impeach the credibility of the government's witnesses, who allege Mr. Nshimiye's involvement in horrific acts. The entire prosecution case rests on witness testimony about events 30 years ago. There is no physical or forensic evidence tying Mr. Nshimiye to these crimes; it is essentially a

swearing contest about historical events. In such circumstances, the defense must be given leeway to gather material that could shed light on the truthfulness and accuracy of those witnesses. Prior inconsistent statements, omissions, or contradictions by other witnesses are classic impeachment fodder—and here the defense has a strong basis to suspect that such inconsistencies exist. Imagine multiple survivors testifying in the late 1990s and 2000s about the Butare hospital massacre, naming various perpetrators, but never naming Mr. Nshimiye – only for those same people to name him decades later after he had the temerity to testify for a fellow accused. Uncovering such a scenario could entirely change the trajectory of this trial: it would support a defense argument that Mr. Nshimiye has been falsely accused in retaliation or due to mistaken identification. The Supreme Court has long held that the right to compulsory process and due process entitles a defendant to secure and present evidence that is "vital" to his defense *Washington v. Texas*, 388 U.S. 14, 16 (1967). Here, the vitality of the evidence is evident: it could affirmatively establish innocence and undermine the prosecution's key allegations. Denying such evidence imperils Mr. Nshimiye's right to a fair trial.

### C. The Defense Has No Alternative Means to Obtain the Requested Evidence, Contrary to Any Suggestion of "Other Access."

In denying the letters rogatory, the Magistrate Judge also appeared to suggest that the defense might have (or should seek) alternative means of obtaining this evidence, short of a formal international request. That suggestion is not grounded in reality. Mr. Nshimiye has no viable way to compel production of the foreign evidence absent this Court's issuance of letters rogatory. Other than the two letters that have been withdrawn because of the government's agreement to assist with gathering that evidence, the government has rejected the defendant's requests for assistance. Unlike the prosecution, which can avail itself of government-to-government channels such as Mutual Legal Assistance Treaties or direct inter-governmental requests, the defense is a private

party with no authority to invoke treaty mechanisms on its own. Most of the countries involved here do not allow foreign criminal defendants to simply request documents through informal means. Similarly, the ICTR/IRMCT, as a UN tribunal, will not release confidential witness statements or protected information to a private individual without a court's involvement;[8] they expect requests to come via judicial authority for good cause shown. MSF, as a humanitarian NGO, is under no obligation to respond to a defense lawyer's letter asking for files. In short, informal solicitation is not a realistic option.[9]

Moreover, while the government could potentially assist in obtaining some foreign evidence, it has shown limited willingness in this regard and indeed has opposed the requests at issue. The only formal mechanism available to a defendant to obtain evidence from abroad is a letter rogatory – essentially a court's request to the foreign authority, acting out of comity, to provide the documents or testimony. That is exactly what Mr. Nshimiye sought. Without the letters rogatory, the defense is left empty-handed with respect to these crucial records. The Magistrate Judge's suggestion that alternate access exists is thus clearly erroneous. The defense has diligently investigated and identified where the evidence likely is; now it needs this Court's help to actually retrieve it. The unavailability of other means strongly favors granting the letters rogatory.

It also bears emphasizing that issuing the letters rogatory will not unduly burden any party or unduly delay the case. The letters rogatory process is admittedly slow, but the defense has already prepared the documents and identified procedures to streamline their transmittal. For instance, Canada allows letters rogatory to be sent directly through a local attorney without diplomatic channels, and the defense has enlisted Mr. Larochelle (a Canadian attorney) for that

---

[8] In response to one of its requests to the ICTR, the government was offered unredacted, relevant witness statements, an offer that was, upon information and belief, never accepted. *See* Exhibit 9.
[9] Indeed, those informal efforts have proven unsuccessful.

purpose. France requires translation and direct submission to the Ministry of Justice, which the defense has already arranged. Rwanda may require retention of local counsel, which the defense is prepared to do immediately. In short, the defense has shown itself ready to execute these requests promptly once approved. The foreign authorities, in turn, are likely to respond within a few months. Thus, granting the letters rogatory now will enable the defense to obtain the evidence in time for a trial that has not yet been scheduled. Conversely, denying the letters means this evidence will never be obtained, and the jury will be asked to decide Mr. Nshimiye's fate without hearing evidence that could conclusively refute the charges or disprove key witness claims. Such an outcome is incompatible with the truth-seeking function of a trial and with Mr. Nshimiye's Sixth Amendment rights.

**D. The Court Has Discretion and Authority to Issue Letters Rogatory in Aid of the Defense, and the *Nixon* Standard Should Not Be Rigidly Applied to Defeat Legitimate Foreign Evidence Requests.**

Letters rogatory are a well-recognized tool in both civil and criminal proceedings to seek assistance from foreign courts in obtaining testimony or documents. This Court unquestionably has the authority – whether viewed as derived from 28 U.S.C. § 1781(b)(2) or from the Court's inherent powers – to issue letters rogatory on behalf of a criminal defendant. Numerous courts have affirmed that the decision to issue letters rogatory lies within the discretion of the trial court. *See, e.g., United States v. Mason*, 919 F.2d 139 (4th Cir. 1990) (per curiam) (district court has discretion to issue letters rogatory in criminal case); *United States v. Jefferson*, 594 F. Supp. 2d 655, 675 (E.D. Va. 2009) (recognizing court's authority to issue letters rogatory for overseas evidence in a bribery prosecution). In this case, the Magistrate Judge did not deny the motion for lack of authority or discretion; rather, he did so based on the content of the requests (*i.e.,* the *Nixon* analysis). But in applying *Nixon* so rigidly, the Magistrate Judge failed to give effect to the

fundamental purpose behind letters rogatory and the Sixth Amendment: ensuring that a defendant can obtain material evidence, even if it lies beyond U.S. borders.

This Court should take a more pragmatic and rights-sensitive approach. To be sure, courts often analogize letters rogatory to Rule 17(c) subpoenas and thus import the *Nixon* standards. The defense here has no quarrel with the idea that relevancy, admissibility, and specificity must be considered. However, these standards must be applied in a commonsense and flexible manner when dealing with foreign evidence and pretrial investigative efforts. The Supreme Court in *Nixon* itself cautioned that what is required is a showing of 1) relevancy; (2) admissibility; (3) specificity, but it did not mandate that a defendant know with certainty the contents of a document in advance. Such certainty is often impossible when the evidence is in another country's files. A hyper-technical insistence that the defense prove in advance exactly what each foreign document will say and exactly how it will be introduced at trial would defeat the very ability to obtain new evidence. It would essentially confine Rule 17(c) to only those documents whose contents are already known – a nonsensical Catch-22 for a defendant seeking exculpatory proof.

When the evidence in question resides overseas, there is an additional reason not to apply *Nixon* in an overly stringent fashion: international comity and the foreign authorities themselves serve as a check on overbroad requests. Unlike a domestic subpoena (which compels production under threat of court sanction), a letter rogatory is a request that a foreign court execute the gathering of evidence. The foreign sovereign will review the request and decide whether, and to what extent, to comply. If a request is truly too broad or objectionable, the foreign authority can refuse it or narrow the scope of production. Thus, as one court noted, the fact that the foreign entities "will ultimately decide about specific documents they choose to produce" mitigates concerns about undue intrusion. *United States v. Van Avermaet*, No. 2024 WL 3835320, at *3

(D.D.C. Aug. 15, 2024) (internal citations and quotation omitted). In other words, issuing the letter rogatory does not guarantee the defense a windfall of irrelevant material; it merely opens a channel for the defense to ask for evidence, subject to the foreign court's oversight. This reality should give U.S. courts comfort to grant letters rogatory in appropriate cases, knowing that any sensitive issues (like a foreign nation's confidentiality or burden) will be handled by that nation's legal processes. Here, we have no reason to believe that foreign authorities would view the defense's request as improper. Indeed, many of the requested records (trial transcripts) are the kind routinely provided in judicial cooperation.

At its core, the question before this Court is one of fairness and the search for truth. Mr. Nshimiye stands accused of grave crimes, but he maintains his innocence and has proffered a plausible factual basis that he was wrongly accused. The evidence to either corroborate or refute his claims lies beyond our borders. The Court has the power to help him get it. There is no countervailing harm in doing so: the government's case would suffer no legitimate prejudice from the defense obtaining authentic foreign records except that the truth might weaken the prosecution's narrative, which is not a cognizable prejudice. The Magistrate Judge's denial effectively shuts the door on evidence that could illuminate the truth. That outcome is contrary to the spirit of Rule 17, the purpose of compulsory process, and the judiciary's truth-seeking mission. Rule 17(c) is not meant to be a straitjacket preventing a defendant from obtaining anything not already in hand. Here, the evidentiary material sought is manifestly relevant and usable at trial; thus Rule 17(c) should be applied to enable its production, not to bar it.

In sum, this Court should exercise its discretion to issue the letters rogatory. The Magistrate Judge's contrary decision arose from an unduly rigid view of the *Nixon* test and a failure to appreciate the unique considerations of international evidence gathering. When properly viewed,

the defense's motion was well within the bounds of what the law permits – even encourages – to ensure a fair trial. Mr. Nshimiye has made the required showing for each request, and granting those requests will advance the interests of justice by allowing critical evidence to be produced.

## V.    CONCLUSION

For the foregoing reasons, Mr. Nshimiye respectfully asks this Court to sustain his objections, set aside the Magistrate Judge's Order (Dkt. 77) denying the letters rogatory motion and issue the seven letters rogatory attached to this request, enabling the defense to transmit them to the respective foreign authorities forthwith. Such an order will ensure that Mr. Nshimiye is afforded his full right to compulsory process and a fair opportunity to obtain evidence vital to his defense. In a case of this gravity – involving allegations of participation in genocide – the Court's assistance in securing all materially relevant evidence is essential to the proper administration of justice. Mr. Nshimiye should not be forced to stand trial without access to evidence that could decisively prove his innocence and disprove the accusations against him.

Respectfully submitted,

/s/ Kurt P. Kerns
Kurt P. Kerns, Kansas S.C. No. 15028
KERNS LAW GROUP
328 N. Main Street
Wichita, KS 67202
Telephone: (316) 265-5511
Email: kurtpkerns@aol.com

/s/ Maksim Nemtsev
Maksim Nemtsev, Mass. Bar No. 690826
20 Park Plaza, Suite 1000
Boston, MA 02116
Telephone: (617) 227-3700
Email: max@mnpc.law
*Counsel for Defendant Eric Nshimiye*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and authentic copy of the above and foregoing was served on all registered parties, via ECF.

/s/ Maksim Nemtsev
Maksim Nemtsev, Mass. Bar No. 690826