# DECLARATION OF PHILIPPE LAROCHELLE

1.  My name is Philippe Larochelle. I am a Canadian lawyer, having obtained my license to practice in Quebec, Canada in 1998. My firm is called Larochelle Avocats, 338, rue St-Antoine Est, office 300, Montreal (Qc), H2Y 1A3.  I attach a recent version of my Curriculum Vitae and a list of my publications.[1]

2.  A large part of my practice since 2001 has involved acting in cases relating to Rwanda and allegations of involvement in the genocide, which I detail below. I was also involved in the representation of persons before the International Criminal Court and the Special Tribunal of Lebanon.  I am currently involved in the representation of an accused before the International Residual Mechanism for Criminal Tribunals ("IRMCT"), in Arusha, Tanzania.

3.  I have worked at the International Criminal Tribunal for Rwanda ("ICTR") since 2001.  I initially worked as a legal assistant but then was instructed as co-counsel on two cases, those of Callixte Nzabonimana and Jérôme-Clément Bicamumpaka.  I have worked on both of those cases at trial and on the appeal for Nzabonimana. I have also worked on the review cases of Eliezer Niyitegeka and Gérard Ntakirutimana before the IRMCT, and represented a man accused of contempt before the IRMCT, Mr. Jean-de-Dieu Ndagijimana.

4.  Before the IRMCT I also perform some pro bono work for M. André Ntagerura, who was acquitted of all charges before the ICTR in February 2004, and for whom I am assisting in trying to find a relocation country following his acquittal.  I am also assisting Dominique Ntawukuriryayo in seeking a release for humanitarian grounds.

5.  In Canada I have also undertaken several Rwanda immigration cases, including representation of Leon Mugesera and Telesphore Dereva, again relating to alleged involvement in the Rwandan genocide. Between 2013 and 2016, I represented Mr. Jacques Mungwarere for his criminal trial in Ottawa, Ontario, as the lead lawyer. Mr. Mungwarere faced trial in Canada on allegations of involvement in the Rwandan genocide.

---

[1] Curriculum Vitae, Philippe Larochelle.

6. I have provided statements and/or testified in several cases in Canada (the Rutayisire case), in Sweden (the Jean-Paul Micomisa case), in the UK and in Holland (the Mpambara case).

7. I am also asked by the counsels of Mr. Nshimiye is to provide my opinion on examples of Rwanda Genocide cases where false evidence was manufactured to secure a wrongful genocide conviction, and the identification of material that may help confirm or dispel the possibility that the evidence against Mr. Nshimiye has been fabricated.

8. In this respect, I understand that my role as an expert is to be impartial and undertake to provide an objective opinion free of bias.

9. I don't have first-hand knowledge about the allegations against Mr. Nshimiye, and I was not present in Rwanda during the genocide, therefore I do not intend to offer an opinion about whether or not Mr. Nshimiye was involved during the 1994 Rwandan genocide, and what was his role, if any, before and during the genocide.

10. I have been provided with the indictment issued against Mr. Nshimiye on 24 April 2024, for perjury detailing the allegations against Mr. Nshimiye. I have discussed the conduct that Mr. Nshimiye is accused of committing with his counsel. Based on that information, I understand that Mr. Nshimiye is alleged to have lied in Mr. Léonard Teganya's trial (1) about his involvement, before the 1994 genocide, in trainings and gatherings with the *Interahamwes*, the notorious MRND militia, and (2) about his direct participation in some murders, rapes and the manning of roadblocks near the Butare University Hospital.

11. After 24 years of involvement in various capacity in Rwandan cases, my sincere opinion is that there is a regular occurrence of manufactured evidence in Rwanda Genocide cases that has the potential to distort the truth and deceive the factfinder in these cases.

12. In my opinion that there is a variety of reasons which explain the prevalence of manufactured evidence, for survivors of the genocide, the willingness to falsely accuse people of genocide can be rooted for example in vengeance against targeted individuals or their family, it can also be rooted in economic reasons, in that survivors may be at risk of losing benefits if they refuse to incriminate certain individuals, at other times individuals and groups are falsely targeted to

facilitate their expropriation and the acquisition of their lands and houses. For perpetrators of the genocide, the false accusations will often be part of confessions obtained by local prosecutors, in which the perpetrators will secure lenient sentences in exchange for confessions that falsely include other perpetrators.

13. Other factors which explain false evidence is the current political climate. For political reasons, the Rwandan authorities maintain a certain version of the 1994 genocide, which absolves them from the commission of any crime at the time. There are, understandably, very strict laws against the denial of the 1994 Genocide in Rwanda, but these laws are often used by the authorities to push and maintain their version of events and dissuade anyone from disputing that version. The international Rwanda genocide caselaw is an important showcase for the Rwandan authorities, through which they maintain important connections with western countries, and ultimately facilitate their staying in power, despite their well-known autocratic tendencies.

14. In that environment, it is important to stress that individuals are very reluctant to openly refute the false accusations which may be conveyed through the international cases. Many Individuals who have done so in the past have been themselves targeted by false accusations, or persecuted, in Rwanda and abroad.

**Selected examples of Rwanda Genocide cases involving fabrication of evidence**

**<u>JACQUES MUNGWARERE</u>**

15. Jacques Mungwarere faced trial in Canada on allegations of complicity in the Rwandan genocide. The proceedings against Mr. Jacques Mungwarere began in November 2009 and resulted in his acquittal on all charges on 5 July 2013, in circumstances where there had been coordinated fabrication of evidence by prosecution witnesses. The Crown did not appeal.[2] I have been involved in the defence for Mr. Mungwarere and as such have knowledge of the following matters.

---

[2] *R. c. Jacques Mungwarere*, 2013 ONCS 4594 (CanlLii).

16. In order to adduce evidence demonstrating the fabricated nature of the case against Mungwarere, the defence team, composed of three lawyers and three investigators, spent numerous months in Rwanda before and during the trial, which began on 28 May 2012. Over 500 potential witnesses were met and 27 were selected to testify for the defence. Three of these defence witnesses were detainees. Several defence witnesses were allowed to testify with pseudonyms, in view of the fact that there had been an intimidation campaign by some of the Crown's witnesses in the area where the crimes were alleged to have been committed.

17. In the case of Mungwarere the only defence witnesses for whom assistance was given from the Rwandan authorities were those witnesses who were in detention in Rwanda Prisons. Defense witnesses who were not in detention in Rwanda made it clear to me and my colleagues at every stage that they did not want any representative of the Rwandan authorities to know that they were potentially giving evidence for the defense, out of genuine fear for the consequences for themselves and their families were their cooperation with the defense to be disclosed. We therefore went to considerable lengths to protect their identities and to call them in circumstances where their identity would not be revealed. In each case all arrangements for the giving of the evidence and the travel, equipment and locations were arranged by me or one of the defense team. The arrangements were made without any support or assistance from the Rwandan authorities.

18. All the defense witnesses called in this way made it clear that they had significant fears for their safety if their identity was to become known to the Rwandan Authorities. In effect the defense investigator and I had to move various witnesses out of Rwanda and into Uganda in order to ensure they could give evidence in a safe environment and in a way that enabled them to speak freely without fear of being intercepted or threatened by Rwandan authorities.

19. In addition to the above issues in calling and presenting defense witnesses we had a number of other major issues to confront in our case.

20. There was clear evidence that one prosecution witness, witness No.103, directly threatened people on the list of defense witnesses. In fact, it was established that this witness was also the architect and main witness in the collective fabrication of evidence against Mungwarere. Those

threats were made publicly in Rwanda. On occasion, as a result, some of our witnesses were so scared that they were no longer prepared to testify notwithstanding that they had previously indicated that they were willing to provide their exculpatory evidence for the defense.

21. Witness No.112, another prosecution witness, recanted and gave clear evidence about the false testimony he and others had fabricated together against Mr. Mungwarere. Witness No.112 was found to be credible by the judge in our case. This witness was able to give the evidence at great personal risk to himself and in the face of intimidation. I later learnt that, shortly before we could interview him before trial, he was being transported by Canadian prosecution liaison persons to the office of Jean Bosco Siboyintore, of the Genocide Fugitive Tracking Unit, in Kigali.

22. One of the Canadian lawyers on the Crown Prosecutor team in the case was Martin Lagassé. Mr. Lagassé also disclosed to me during the trial that Mr. Siboyintore had the telephone number of one the main prosecution witnesses involved in the fabrication of evidence (Witness No. 103) on speed dial. Mr. Lagassé felt duty-bound to disclose this disturbing fact to me.

23. Indeed, that direct connection indicated a link between the central prosecution authorities and witnesses in foreign cases.

24. Through discussions with Mr. Boucher during trial, he made it clear that the admission of witness No.112 that he had also fabricated evidence with the same individuals against Gérard and his father Elizaphan Ntakirutimana both convicted by the ICTR, rendered these convictions somewhat unsafe. He therefore cooperated with me, after Mungwarere's acquittal, in seeking and obtaining a variation of the witness protection/anonymity orders to enable the testimony of witness No.112 to be provided to the ICTR in an effort to assist in reviewing the convictions of the Ntakiturimanas (father and son previously convicted at the ICTR), due to the overlapping evidence in the cases. I pursued that application at the ICTR on behalf of Mr. Ntakirutimana. The request for review was eventually denied by a Review Chamber of the IRMCTD, which, contrary to the Canadian Judge, did not believe witness No. 112's recantation.

25. After the acquittal of Mr. Mungwarere, some of the prosecution witnesses retaliated against the Defence witnesses, and with the assistance of the authorities, sued them for genocide denial and other reasons before the Rwandan Courts.

26. During the trial, one of the Defence witness, Enos Kagaba, related the circumstances of his trial, after having been removed from the United States.

27. There was evidence in the Mungwarere trial that the case against Enos Kagaba had been completely fabricated, by the same witnesses who testified against Mungwarere.

28. Once returned to Rwanda, Mr. Kagaba had to wait for several years before being brought before a Court. Once there, the Court had the first defence witness, a relative of Kagaba, arrested before he could take the stand, and he was immediately sent to jail. Other witnesses decided not to testify, because of the chilling effect of what had happened to the first witness.

29. Mr. Kagaba was then convicted for genocide, and his conviction upheld in appeal. For the first witness who was supposed to testify for the Defence, his conviction was reversed on appeal.

30. The evidence presented during Mungwarere's defence also outlined the fact that there had been false evidence provided in many of the ICTR cases. For example, evidence indicated that many witnesses had given false evidence against Gerard Ntakirutimana and Eliezer Niyitegeka.

31. Before his trial in Canada, a trial before the Gacaca was held *in absentia* in Rwanda against Mungwarere, at the end of which he was convicted and sentenced to life imprisonment in isolation.

32. Witness No. 112 was involved in that judgement against Mungwarere, and confirmed that it was based on false evidence, procured by some of the same witnesses that testified against him in the Canadian case.

**JÉRÔME-CLÉMENT BICAMUMPAKA**

33. I represented Mr. Bicamumpaka between 2001 until his acquittal on 30 September 2011 before the International Criminal Tribunal for Rwanda.

34. Mr. Bicamumpaka was the Minister of Foreign Affairs during the genocide, and as such he was outside of the country for most of that period.

35. His absences from the country were established by his diplomatic passport, radio interviews, United Nations Security council minutes, and statements of persons he had meetings with during his missions outside Rwanda.

36. Nevertheless, the Prosecutor brought scores of witnesses who made allegations of murders, rapes and incitement to genocide during specific events in the period where Mr. Bicamumpaka was absent of the country.

37. During the trial of Bicamumpaka trial, one Prosecution witness, who had testified in at least four trials before the ICTR wrote to the President of the ICTR to seek forgiveness for having provided false evidence in these ICTR cases.

38. A long statement was obtained from that witness, in which he details how witnesses in Rwandan prisons are encouraged and trained to make false genocide allegations against the authorities that were in place before and during the genocide. A redacted version of that statement has been made public and is here enclosed.[3]

39. International standards of due process are not respected by Rwandan authorities or through the criminal justice system, particularly in cases of alleged participation in the 1994 genocide. Arbitrary arrest and detention, false charges and the fabrication of evidence, as well the cruel and inhumane treatment of detainees are all common practice.

40. There has been growing international recognition that persons accused in Rwanda of participating in the 1994 genocide will be at significant risk of, minimally, denial of due

---

[3] ICTR-99-50-T; *"Audition D'Un Témoin"*, 8 Fevrier 2008.

process, and likely worse including ill-treatment and lengthy imprisonment under inhuman and degrading conditions.

41. In addition to the cases above, I note also that witnesses before the International Criminal Tribunal for Rwanda have admitted to fabricating evidence and giving false testimony to authorities in Canada during the trial of Désiré Munyaneza. The witness, describing crimes from Butare, the area where the criminal conduct of Mr. Nshimiye is alleged to have taken place, stated that he was bribed and threatened by influential figures in the *Ibuka* association.

### There has been at least one other instance of fabrication of evidence related to the Rwandan genocide before United States Courts

42. In the case of Kagaba, brought before the United States Courts and decided in 2003, the Judge concluded, at pages 63-69, that the Government presented fabricated Rwandan evidence to the Court, and the Judge in that case was particularly troubled by the fact that this evidence made its way before US tribunals.

43. Some aspects of that case are very similar to that of Mr. Nshimiye. The Judge remarks for example that the Government witnesses falsely alleged that Mr. Kagaba was involved and had a leadership role in political party meetings and activities (p. 62 and 65).

44. The Judge also noted that the Rwandan witnesses did not mention Mr. Kagaba until a "rather late date" (pp. 65-66).

45. In his concluding remarks on the credibility of the Government evidence, the Judge mentions that some fabricated stories, which the Government sought to withdraw from the record, gave significant credence to Mr. Kagaba's claim that the evidence against him was fabricated (p. 70).

46. The fact that manufactured evidence has already been presented to US courts in the past dictates to take seriously the possibility that evidence has been fabricated in this case too.

### There are already indications that evidence has been fabricated in relation to the Butare events.

47. When looking for example at the Judgment issued in the Niyiramasuhuko and al. ICTR judgment, on 24 June 2011 (ICTR-98-42-T), one sees strong indicia of fabrication concerning the events that took place in Butare during the genocide.

48. At paragraphs 334 to 338 of that Judgment, the Court summarizes the evidence of QA, a witness who admitted having lied to the investigators of the ICTR, and to the Canadian policemen who were investigating the case of Désiré Munyaneza.

49. The witness explains that he was encouraged to lie against one of the Butare accused, Kanyabashi, by influential figures within the administration of *Ibuka,* a Tutsi survivor Association, including one person who was also the *conseiller* of Ngoma secteur, the area where many of the allegations against Mr. Nshimiye are located.  QA also explains how policemen went to his home to prepare the false testimony he was about to deliver in the Canadian case of *Munyaneza.*

50. The evidence of QA on the topic of fabrication of evidence can be found within a whole section of the Niyiramasuhuko and al. ICTR judgment of 24 June 2011 (ICTR-98-42-T) which deals with allegations that evidence is fabricated, inter alia, through the *Ibuka* Association.

51. At paragraphs 200 to 384 of the Niyiramasuhuko and al. ICTR judgment of 24 June 2011 (ICTR-98-42-T), the Court summarizes the evidence of numerous witnesses who testified about the alleged fabrication of evidence that took place in Butare.

**There are already indications that evidence has been fabricated in relation to Mr. Nshimiye.**

52. Despite his alleged involvement as a prominent leader who raped Tutsi women and killed innocent Tutsi civilians, the name of Mr. Nshimiye does not appear on ANY of the Judgments where the Butare events are examined, at the ICTR, in the USA, in Canada in Rwanda or in France.

53. Research on the internet also bring further indications that the allegations against Mr. Nshimiye are manufactured.  For example, on 14 May 2020, the Rwandan CNLG (*Commission Nationale*

*de Lutte contre le Génocide* or National Commission for the fight against genocide) published a list of "Doctors and nurses who perpetrated the genocide against the Tutsi"[4], which included the name of Léonard Teganya, but not that of Mr. Nshimiye.

54. Such an omission could be plausible if Mr. Nshimiye played an unimportant role during the genocide, but simply does not accord with the Government's current allegations, and makes it more likely that the evidence against Nshimiye was manufactured.

55. In my opinion, these sudden allegations of Mr. Nshimiye being a key Genocide perpetrator, when his name has never surfaced over the course of 30 years in various trial and investigations, constitute a very strong indication that the evidence against him is recently fabricated. It is for that reason that it is crucial to obtain the earlier material such as the local Rwanda trials and Gacaca records or the material from the ICTR.

## I.   What material can facilitate the detection of fabricated evidence, and reduce the risks of wrongful conviction?

56. In my experience, the best way to expose the fabrication of evidence is to locate in past judgments reference to the witnesses, victims and perpetrators that are mentioned in the evidence against Mr. Nshimiye. These references will be found in past Gacaca records and other Rwandan local casefiles, and at the ICTR, which has collected volumes of statements, documentary evidence and testimonies on the events of the 1994 Genocide and their victims, as well as on the perpetrators, their sponsors and their accomplices

57. Very often, fabrication of evidence will be exposed by the fact that over time, fabricating witnesses will create different versions of the same crimes and crimes scenes, and will change the witnesses, victims and perpetrators on these crime scenes.

58. To identify these variations, once the judgments where these crime scenes have been identified and obtained, one needs to have access to the evidence generated in these other trials, mainly

---

4

the statements and testimonies where the crimes alleged against Mr. Nshimiye have been alleged and discussed.

59. This evidence, which will come from the same or different witnesses, will reveal possible variation over time about the crimes, their victims and their perpetrators, and will facilitate the identification of possible fabrication.

60. With that in mind, I have set out to find the best sources of material to identify possible fabrication of evidence against Mr. Nshimiye.

61. The first and immediate request that should have been made to the IRMCT is to obtain a copy of all the Government's witnesses' statements and testimonies to the ICTR. These statements and testimonies, when they exist, offer a far more complete picture of these witnesses' knowledge.

62. The crimes allegedly committed by Mr. Nshimiye during the genocide include rapes, murders, distribution of weapons at roadblocks near the University, supervision of roadblocks, manning roadblocks, and criminal activities at the Butare University Hospital, attacks on Tutsi patients, search and selection of Tutsi patients.

63. The best and primary source of information is to be found at the ICTR, as this jurisdiction has issued several judgments on the exact same crimes alleged against Mr. Nshimiye. In fact, it is very likely that the witnesses making allegations against Mr. Nshimiye have testified in these ICTR cases, but under different pseudonym. These changes of pseudonym, combined with the fact that the witnesses evidence vary over time, makes it very difficult to locate them in ICTR, or foreign cases.

A) ICTR Cases

64. Numerous cases of the International Criminal Tribunal for Rwanda contain information about the crimes alleged against Mr. Nshimiye. So far I have identified the *Muvunyi* case (ICTR-2000-55A-T), first instance judgment issued on 12 September 2006, the *Rwamakuba* case (ICTR-98-44C-T), first instance judgment issued on 20 September 2006, the *Niyiramasuhuko*

*and al.* case (ICTR-98-42-T) first instance judgment issued on 24 June 2011, the *Nizeyimana* case (ICTR-2000-55C-T), first instance judgment issued on 19 June 2012.

**A.1**    **Prosecutor v. Muvunyi, 12 September 2006, ICTR-2000-55A-T.**

65. Mr. Muvunyi was charged with leading attacks on the Tutsi refugees at the University Hospital. He was also charged with having attacked Tutsi lecturers and students at the University, and to have committed rapes.

66. The attacks on wounded refugee at Butare University Hospital is covered at paragraphs 224 to 261 of the Judgment. The attacks on Tutsi lecturers and students of the University is covered at paragraphs 292 to 303 of the Judgment, and the rapes and sexual violence by soldiers and Interahamwes are covered at paragraphs 378 to 409 of the Judgment.

67. The evidence supporting or undermining these charges was adduced by Prosecution witnesses XV, YAP, AFV, YAK, NN, YAA, KAL, QY, TM, YAI and CCP, as well as Defence witnesses MO73 and MO30.

68. Witnesses XV (paras. 225-229), YAP (paras. 230-238) and AFV (para. 239) are all witnesses who worked at the Butare University Hospital and described the events that happened there during the genocide.

69. Witnesses YAK (paras. 240-244), YAA (paras. 246-247), MO73 (paras. 248), MO30 (para. 249), all spent some time, as refugees or otherwise, at the Butare University Hospital during the genocide.

70. Witnesses KAL (paras. 292-296) and NN (paras. 297-299) abducted and killed students at the Butare University.

71. Witness QY, 17 years old tutsi woman in 1994, describes three events of rapes, including some in the forest, during the genocide (paras, 386-393).

72. For these reasons, it is necessary to obtain from the case record of the *Muvunyi* trial the complete transcriptions, public and closed sessions of Prosecution witnesses XV, YAP, AFV,

YAK, NN, YAA, KAL, QY, TM, YAI and CCP, and of Defence witnesses MO73 and MO30, the exhibits that were filed during their testimonies as well as all the statements of these witnesses in possession of the Prosecutor of the ICTR (today the IRMCT).

**A.2      Prosecutor v. Rwamakuba, 20 September 2006, ICTR-98-44C-T**

73. At paragraphs 159 to 205, the Trial Chamber assesses the evidence according to which André Rwamakuba was involved in the crimes committed at the Butare University Hospital during the 1994 genocide.

74. These allegations were supported by Prosecution witnesses ALV, ALW, GIO, HF, RJ and XV and opposed by Defence witnesses 5/7, 5/13, 5/15, 5/16, 9/17 and 9/29.

75. Witnesses XV (paras. 169-175), ALV (paras. 180-182), ALW (paras. 183-184), GIO (paras. 185-186), HF (paras. 187-190) and RJ (paras. 191-194) were all refugees at the Butare University Hospital and all described in detail the criminal actions of André Rwamakuba during the genocide at the Butare University Hospital, some very similar to those alleged against Mr. Nshimiye, for example, ALW claimed that Mr. Rwamakuba was removing drips from Tutsi patients.

76. For the Defence, some witnesses testified to the effect that they did not see Mr. Rwamakuba at the Butare University Hospital during the genocide. For the Defence, witnesses 5/16, 5/7 and 5/15 were all employees of the Butare University Hospital in April and May 1994.

77. It appears that none of the witnesses that testified against Mr. Rwamakuba and described the crimes he committed during the genocide at the Butare University Hospital were believed. It may very well be the case that these witnesses tried to manufacture evidence against Mr. Rwamakuba.

78. When reading the relevant section of the Rwamakuba Judgment, it appears that the Defence counsels in that case were able to have access to judgments from Rwanda concerning the events that happened at the Butare University Hospital, and that there was an important amount of contradictions between the contemporaneous version of the Prosecution witnesses in

Rwamakuba and the evidence they had given in these earlier cases, which seemed to concern many doctors from the Butare University Hospital.

79. For examples, the judgment mentions the cases of Gatera (eg. Exhibits D71 and D72), Twagirayezu (eg. Exhibit D73), Mukabandora (eg. Exhibit D74) Sahera (eg. exhibits D59 and D60) Kageruka case (eg. Exhibits D139A, B and C) Misago (eg. Exhibits D145A, B and C).

80. It will be important to stress upon the Prosecutor of the IRMCT the importance of obtaining these documents, which are crucial in assessing the level of fabrication in the present case.

81. For these reasons, it is necessary to obtain from the case record of the *Rwamakuba* trial the complete transcriptions, public and closed sessions of Prosecution witnesses ALV, ALW, GIO, HF, RJ and XV and Defence witnesses 5/7, 5/13, 5/15, 5/16, 9/17 and 9/29, the exhibits that were filed during their testimonies as well as all the statements of these witnesses in possession of the Prosecutor of the ICTR (today the IRMCT).

**A.3     Prosecutor v. Niyiramasuhuko and al., 24 June 2011, ICTR-98-42-T**

82. Some of the accused in this case, Pauline Niyiramasuhuko and her son Shalom Ntahobali, together with Minister André Rwamakuba, accused in a different case, were charged with having gone to the Butare University Hospital during the genocide to select, kidnap and kill tutsis, an allegation identical to that made against Mr. Nshimiye in the instant case.

83. These allegations are assessed at paragraphs 2104 to 2142 of the Judgment. They are supported by Prosecution witnesses QY, RE, SS, FAP and SD, and opposed by Defence witnesses Alexandre Bararwandika, H1B6 and WCNMC.

84. Prosecution Witnesses QY (paras. 2112-2116), RE (paras. 2117-2118), SS (paras. 2119-2120), FAP (paras. 2121-2122) and SD (paras. 2123-2124), as well as Defence witness WCNMC (paras 2135-2137) were all refugees or spent some time at the Butare University Hospital during the genocide.

85. Defence witnesses Alexandre Bararwandika (paras. 2125-2129) and H1B6 (paras. 2130-2134) both worked at the Butare University Hospital in April, May and June 1994, and described in detail what happened at that location during the genocide.

86. The allegations regarding the Butare University Hospital were not retained by the Trial Chamber (paras. 2138-2142), which could constitute a further indication that these allegations are also fabricated in the present case.

87. Mr. Nshimiye is alleged to have committed crimes at Butare University Hospital during the period covered by the testimony of these witnesses.

88. Having access to that material is necessary to assess whether the witnesses against Mr. Nshimiye are fabricating evidence.

89. For these reasons, it is necessary to obtain from the case record of the *Niyiramasuhuko* and al. trial the complete transcriptions, public and closed sessions of Prosecution witnesses QY, RE, SS, FAP and SD, and Defence witnesses Alexandre Bararwandika, H1B6 and WCNMC, the exhibits that were filed during their testimonies as well as all the statements of these witnesses in possession of the Prosecutor of the ICTR (today the IRMCT).

**A.4        Prosecutor v. Nizeyimana 19 June 2012, ICTR-2000-55C-T**

90. Mr. Nizeyimana was charged before the ICTR for crimes similar to those alleged against Mr. Nshimiye, at the same location and for the same period. During his trial there were allegations according to which he committed killings and imposed sexual violence against female students at Butare University Hospital between mid-April and mid-May 1994 (paragraphs 317-420), that along with soldiers, gendarmes and Interahamwes he participated in the removal and killings of Tutsi patients and *Medecins Sans Frontières Staff* (paragraphs 889-937). The judgment also discusses the killings of civilians, including at the Butare University Hospital, by one Fulgence Niyibizi (paragraphs 951-1009). Section 9.1 of the Judgement assesses the evidence relating to some rapes that took place at the Butare University Hospital, namely those of witness **MKA** and others (paragraphs 1010-1027), that of witness **ZBL** (paragraphs 1028-1038) and that of witness **DCO** (paragraphs 1039-1051).

15

91. The victims of rapes, **MKA, ZBL** and **DCO** are all Tutsi females who sought refuge at the Butare University Hospital during the period when Mr. Nshimiye is alleged to commit horrendous crimes on this site. Their initial statements and testimonies were made years, sometimes decades before they or other witnesses started incriminating Mr. Nshimiye in these crimes. Their memories at the time, being much closer to the events, are also much better and much reliable than those of witnesses adding the name of Mr. Nshimiye for the first time three decades after the genocide.

92. Amongst the witnesses that testified in the *Nizeyimana* trial one will find University students such as **ZCB** (paragraphs 319-327), **Jules Kayibanda** (paragraphs 328-334), **Martin Mukeshimana**, a medical student like Mr. Nshimiye (paragraphs 340-342), **ZML02** (paragraphs 343-347), **Martin Mutarutinya** (paragraphs 3348-350), **Joseph Ngezahayo** (paragraphs 351-355), **Deogratias Basesayabo** , a medical intern at the Butare University Hospital (paragraphs 909-914), **Vincent Nsabimana,** also a medical intern at Butare University Hospital (paragraphs 915-919).

93. For example, at paragraphs 385-386 of the *Nizeyimana* judgment, witnesses **ZCB** and **Jules Kayibanda**, students at the University, describes a scene where **ZCB** and 20 other students were taken away from the University by soldiers, and were being beaten on the way by soldiers and students affiliated with the MRND and the CDR. This evidence is strikingly similar to what is alleged against Mr. Nshimiye. Having access to that evidence will allow a useful testing of the consistency and coherence of the allegations against Mr. Nshimiye.

94. In addition to the three victims of rape **MKA, ZBL** and **DCO,** other witnesses present include people working at the Butare University Hospital such as **MAL06** (paragraphs 356-358), or people who otherwise spent some time at the Butare University Hospital, such as **ZBH** (paragraphs 407-410), **Rony Zachariah** (paragraphs 891-897), who also testified in the Teganya case, **Marie-Paule Spielman** (paragraphs 893-903) who was working with Medecins sans Frontières at the Butare University Hospital, **ZT** who was bringing food to the Presidential guards present at the Butare University Hospital (paragraph 906), **ZW**, a patient there (paragraph 907), **YAP,** a worker going there on a daily basis until 22 June 1994 (paragraph

908, 972-973), **MAL01**, a nurse there (paragraph 920-922), **ZAL**, a worker there (paragraphs 953-955),

95. For these reasons, it is necessary to obtain from the case record of the *Nizeyimana* trial the complete transcriptions, public and closed sessions of Prosecution witnesses ZCB, Jules Kayibanda, BDE, AZM, ZT, Anaclet Dufitumukiza, ZAP, ZBH, Rony Zachariah, Marie-Paule Spielmann, ZBL, ZW, YAP, ZAL, MKA and DCO and Defence witnesses Martin Mukeshimana, ZML02, Martin Mutarutinya, Joseph Ngezahayo, MAL06, BEJ01, OUV03, Deogratias Basesayabo, Vincent Nsabimana, and MAL01, the exhibits that were filed during their testimonies as well as all the statements of these witnesses in possession of the Prosecutor of the ICTR (today the IRMCT).

96. In my opinion, the material from these four ICTR cases is essential to attempt to ward off attempts at successfully fabricating evidence against Mr. Nshimiye. By having a careful look at these judgements, we were able to identify the portions of these judgements dealing with evidence supporting crimes identical to those alleged against Mr. Nshimiye. By obtaining the statements of these witnesses, their testimonies and the exhibits that were used to cross-examine them, it will be possible to assess the allegations made against Mr. Nshimiye aided by the recollection of dozens of witnesses to the events Mr. Nshimiye is accused of.

97. What is publicly available are just summaries. But this is not enough. What can be identified from these judgments are the pseudonyms of the witnesses who described these crimes, their victims and their perpetrators, to the investigators that collected their statements and the judges that heard their testimony. However, these judgments are limited summaries of large amounts of evidence which are not publicly available, and which can only be obtained through governmental requests to the ICTR (today the IRMCT) Prosecutor. The likely outcome of reviewing these materials is the same crimes are described, without Mr. Nshimiye participating in them.

98. These judgments do not reveal the full content of the statements or testimonies that were rendered on the crimes and crime scenes were Mr. Nshimiye is alleged to have been involved. To get a full picture of what the ICTR holdings may reveal about Mr. Nshimiye's involvement

in the genocide, it is also necessary to make a cooperation request to the IRMCT Prosecutor that points directly to Mr. Nshimiye himself, the crime scenes where he is alleged to have participated in the genocide, and to his alleged co-perpetrators, accomplices, and victims.

99. It is possible for example that some of the witnesses have given statements to the ICTR investigators, but never testified there, It is also possible that they have given statements or testimonies that covers the different crimes alleged against Mr. Nshimiye, but that these have not been mentioned in their testimonies, or retained by the Trial Chambers.

100.    For this reason, it is also necessary to make a request to the IRMCT Prosecutor that identified directly the alleged crimes, co-perpetrators, accomplices and victims of Mr. Nshimiye.

101.    To obtain the ICTR evidence where these people or sites are mentioned, it is necessary to make a specific request to the IRMCT Prosecutor that are in the letters rogatory requests describing in detail the relevant individuals and sites at issue.

**Cooperation from the Rwandan authorities**

102.    The crimes alleged against Mr. Nshimiye, their victims, perpetrators and witnesses have also been the subject of judicial activity in Rwanda. I understand that at least some witnesses against Mr. Nshimiye have testified or provided statements in the Gacaca or regular courts of Rwanda.

103.    Therefore, the same information should be sought through a cooperation request from Rwanda, to obtain all Gacaca and regular court material where relevant evidence was presented.

Signed under the pains and penalties of perjury, this 6 June 2025

Philippe Larochelle

# Philippe Larochelle

338, rue St-Antoine Est, bureau 300
Montreal (Quebec) H2Y 1A3

| | |
|---|---|
| Phone: | +1(514) 814-8841/ Office: +1(514) 866-3003/ |
| e-mail: | philippe.larochelle@gmail.com / plarochelle@larochelleavocats.com |
| Birth date: | April 6th, 1973 |
| Birthplace: | Granby, Canada |
| Citizenship: | Canadian |

| E D U C A T I O N |
|---|

| | |
|---|---|
| September 1997 - April 1998 | **Quebec Bar School**<br>Sworn in: December 21st 1998. |
| September 1994 - May 1997 | **Laval University, University of Western Ontario**<br>L.L.B. |
| January 1993 - April 1994 | **Laval University**<br>Diploma in Political Science |

| E L E C T I O N   E X P E R I E N C E |
|---|

| | |
|---|---|
| March 2023 – May 2023 | **Member of the Appeal Panel**<br>March 2023 Timiskaming First Nation Election Appeal |
| April 2022-July 2022 | **Election President**<br>July 2022 Innu Nation of Matimekush-Lac John Election |

| P R O F E S S I O N A L   E X P E R I E N C E |
|---|

| | |
|---|---|
| 2025- | **INTERNATIONAL CRIMINAL COURT** |

Lead counsel, Defence team of Edmond Beina, case ICC-01/14

| | |
|---|---|
| 2023-2025 | **INTERNATIONAL CRIMINAL COURT** |

Lead counsel, Defence team of Maxime Mokom, case ICC-01/14-01/22

**Philippe Larochelle**

2

---

2019-2021            **MECHANISM FOR INTERNATIONAL CRIMINAL TRIBUNALS**

Lead Counsel, Defence team of Jean de Dieu Ndagijimana, case MICT-18-116-PT.

Since February 2018       **MECHANISM FOR INTERNATIONAL CRIMINAL TRIBUNALS**

Lead Counsel, Defence team of Dominique Ntawukulilyayo, case MICT-13-34-ES.

Since January 2018         **LEGAL CONSULTANT for LAWYERS WITHOUT BORDERS**

Missions in Haïti, Mali and Mozambique to devise strategic litigation plans in collaboration with local lawyers and civil society actors.

Since January 2010         **LAROCHELLE AVOCATS (www.larochelleavocats.com)**

Founder of a civil and criminal litigation boutique, in Montreal, Canada.

2015-2018            **MECHANISM FOR INTERNATIONAL CRIMINAL TRIBUNALS**

Lead Counsel, Defence team of Eliezer Niyitegeka, case MICT-12-16-R.

2013-2016            **SPECIAL TRIBUNAL FOR LEBANON**

Co-Counsel, Defence team of Hussein Hassan Oneissi, case STL-11-01.

2015                **INTERNATIONAL CRIMINAL COURT**

Co-Counsel, Defence team of Narcisse Arido, case ICC-01/05-01/13.

2001-2014            **INTERNATIONAL CRIMINAL TRIBUNAL FOR RWANDA**

2009-2014: Co-Counsel, Defence team for Callixte Nzabonimana, case ICTR-98-44D-T. 2001-2009: Legal Assistant (2001-2007) and Co-Counsel (2007-2009), Defence team for Jérome-Clément Bicamumpaka, case ICTR-99-50-T .

2011-2012            **INTERNATIONAL CRIMINAL COURT**

**Philippe Larochelle**                                                              3

---

-Consultant, Defence team for Callixte Mbarushimana during Appellate proceedings, case ICC-01/04-01/10.

2006-2007                    **OGILVY RENAULT L.L.P., Montreal**

-Advocate in the litigation group.

2003-2004                    **GOLDSTEIN, FLANZ & FISHMAN, Montreal**

-Advocacy work in Bankruptcy and Commercial matters before Quebec Courts.

2001-2006                    **PHILIPPE LAROCHELLE, avocat**

-Civil and Criminal litigation.

2000                         **EMBASSY OF CANADA, Abu Dhabi**

-Acting Education Officer, International Trade Division.

| **T E A C H I N G / S Y M P O S I U M S** |
| --- |

Summer school on International Justice : *Les travers de la justice internationale au Rwanda et au Liban*, with Vincent Courelle-Labrousse, 28 May 2015, Québec city, Canada.

Second International Meeting of Defence Offices, Panelist, 15-16 December 2014, The Hague, The Netherlands.

Leiden Summer School on International Criminal Law, 2014: *The rights of the accused*, 30 June 2014, The Hague, The Netherlands

International symposium of the École des Hautes Études Internationales: *Analyse contemporaine des conflits en Afrique*. Presentation: *Rwanda: 20 ans d'impunité pour le Front Patriotique Rwandais*, 20-22 March 2014, Quebec city, Canada.

Symposium: *Changer la société par le droit: Peut-on faire justice devant les Tribunaux Nationaux pour les plus grandes violations des droits humains.* Presentation: *Manipulation des faits et génocide rwandais, quelles conséquences pour les juridictions locales? Leçons à tirer de l'affaire R. c. Mungwarere,* 5 October 2013, Quebec city, Canada..

Symposium: *20 ans de Justice Pénale Internationale: devoir d'inventaire.*Presentation: *Retour aux juridictions nationales: Un procès au Canada, l'affaire Mungwarere*, 16 May 2013, Paris, France.

Third International Defence Conference on International Criminal Law: *Justice Pénale Internationale, Justice pour qui?* Presentation: *Politique Canadienne: Enjeux criminels ou d'immigration*, 29 September 2012, Montreal, Canada.

Laval University Symposium: *Procédure et Preuve en Droit international pénal*, DRT-6115, January-April 2012, Quebec City, Canada.

**Philippe Larochelle**                                                            4

Symposium: *Coopération Judiciaire Internationale et Européenne*. Presentation: *L'extradition en droit canadien: Considérations théoriques et pratiques*, École de formation professionnelle des Barreaux de la Cour d'appel de Paris, 7 September 2009, Paris, France.

| | O T H E R |
|---|---|
| 2016- | **MEMBER OF THE EXECUTIVE COMMITTEE OF THE INTERNATIONAL HUMANITARIAN LAW JEAN PICTET COMPETITION**<br><br>Organisation and management of the Jean Pictet competition. Participations in 1998, 1999, 2009. |
| 2005- | **LAWYERS WITHOUT BORDERS, Nigeria**<br><br>Consulting and training in Nigeria, Mali, Mozambique and Haïti. |
| September-October 2008 | **MP CANDIDATE FOR THE GREEN PARTY OF CANADA**<br><br>Riding of Hochelaga, 40th General Election. |
| July 2002 | **NATIONAL UNIVERSITY OF IRELAND, Galway**<br><br>Summer School on the International Criminal Court |
| 1998, 2000, 2001, 2003 | **RENE CASSIN MOOT COURT COMPETITION,**<br><br>Participant, Coach and Jury member. |
| March 1999 | **COUR DE CASSATION, Paris, France.**<br><br>Internship. |
| May 1998 | **INTER-AMERICAN HUMAN RIGHTS MOOT COURT COMPETITION, Washington, D.C., U.S.A.**<br><br>Member of the Quebec Bar School Team. |

| P U B L I C A T I O N S |
|---|

"Génocide rwandais. Quelle vérité judiciaire?", Chapter three of *Justice et droits de l'Homme – Les enjeux de la médiation internationale,* under the direction of Philippe Greciano, Mare & Martin, 2014.

**Philippe Larochelle**                                                           5

"The Heart of Dark Jurisprudence", in *Justice Belied : The Unbalanced Scales of International Criminal Justice*, Baraka Books, Montreal, 2014.

"We were Sailing into Uncharted Waters: Flaws in the Application of Canada's *Crimes Against Humanity and War Crimes Act*", in collaboration with Marc Nerenberg, *Revue québécoise de droit international*, 27.2(2014), p. 135.

"Gérard, Énos et Jacques, une fable rwandaise", *La Revue Nouvelle,* 1-2015.

"Balancing the Right of Migrants and International Criminal Law: The Case of Alleged Rwandan War Criminals under Canadas Immigration Laws", in collaboration with Sébastien Chartrand, *La Revue du Barreau Canadien,* Vol. 93(2015), p. 1.

"Mécanisme pour les tribunaux pénaux internationaux" et "Outrage", entries in *Dictionnaire encyclopédique de la justice pénale internationale*, sous la direction de Olivier Beauveallet, Berger-Levrault, 2017.