**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>ERIC TABARO NSHIMIYE, a/k/a Eric Tabaro Nshimiyimana,<br>Defendant. | No. 24-cr-10071-FDS |

**ORDER ON DEFENDANT'S MOTION TO REVOKE PRETRIAL DETENTION ORDER AND FOR ADMISSION TO BAIL BASED ON DUE PROCESS CONCERNS**

CABELL, Chief U.S.M.J.

**I. Introduction**

Defendant Eric Tabaro Nshimiye has been in custody since March 2024 on charges of four counts of perjury, one count of obstruction of justice, and one count of falsifying, concealing, and covering up a material fact. The backdrop for the charges is the defendant's purportedly active role in the 1994 genocide and persecution of Tutsis in Rwanda. The defendant contends that his continued detention constitutes a violation of his rights under the Fifth Amendment's Due Process Clause, and he moves for his release on bail. (D. 95). For the reasons explained below, the court will deny the motion.

## II. Legal Standard

"[T]he constitutional limit to the length of pretrial detention" is assessed "on a case by case basis." *United States v. Phim*, Criminal No. 23-10199-NMG, 2024 WL 2748345, at *2 (D. Mass. May 29, 2024) (citation and internal quotation marks omitted). "The primary factors guiding the determination" are: (1) "the seriousness of the charges"; (2) "the strength of the government's proof that defendant poses a risk of flight or a danger to the community"; (3) "the strength of the government's case on the merits"; (4) "the length of the detention that has in fact occurred"; (5) "the complexity of the case"; and (6) "whether the strategy of one side or the other has added needlessly to that complexity." *United States v. Zannino*, 798 F.2d 544, 547 (1st Cir. 1986) (citation omitted); *accord Phim*, 2024 WL 2748345, at *2 (listing same factors) (citation omitted). The parties dispute whether these factors support release or continued detention. As discussed below, the court finds that they do not support a finding of a due process violation or the defendant's release.

## III. Analysis

### A. Seriousness of the Charges

First, the charges are undeniably serious and grave. Most notably, the defendant allegedly took an active role in the 1994 genocide and persecution of Tutsis in Rwanda. (D. 1-1, ¶ 15). In particular, he reportedly was directly involved in the murder of

2

Tutsis, including women and children.  (D. 1-1, ¶ 17); *see Zannino*, 798 F.2d at 547 ("[T]he charges against Zannino are of the gravest order, including predicate acts of murder and conspiracy to commit murder.").

**B.   Strength of Government's Proof of Risk of Flight**

Next, the government's proof that the defendant poses a risk of flight is strong.  At the Ohio detention hearing, the parties proceeded by way of proffer.  The government represented, without objection, that the defendant, if convicted, would face removal to Rwanda and charges related to his involvement in murders and rape anent the Rwandan genocide.  (D. 22-1, p. 10).  That alone provides a strong incentive to flee.  Further, the government attorney, having spoken with his counterpart in this district, represented "that many of the witnesses against the defendant have previously testified in an international court for Rwanda sitting in Tanzania" and were found credible.  (D. 22-1, p. 10).

Further still, the affidavit proffered by the government attorney at the detention hearing described a fellow perpetrator witnessing the defendant's use of a machete and a spiked club to murder a fourteen-year-old Tutsi boy.  (D. 1-2, ¶ 18, Northern District of Ohio, No. 4:24-mj-06106-CEH).[1]  The affidavit included a picture of the perpetrator pointing to the location of the

---

[1] This is the same affidavit filed in this case.  (D. 1-1).

3

murder. Per the same affidavit, another witness saw the defendant capture a Tutsi tailor and, along with several others, beat and hack the tailor to death. (D. 1-2, ¶ 19, Northern District of Ohio, No. 4:24-mj-06106-CEH). The foregoing evidence supports the charge in the indictment that the defendant subsequently concealed material facts that he witnessed genocidal acts by others and participated in the persecution of others because of their membership in a particular social group. (D. 11, ¶ 45). Importantly, the strength and impactful nature of this proof makes a conviction on this charge more likely, which, in turn, further incentivizes the defendant to flee.

**C.   Strength of Government's Case on the Merits**

Next, the government would appear to have a relatively strong case on the merits, which in turn weighs against finding a due process violation based on the defendant's continued detention. *See e.g., United States v. Cooper*, No. 3:16-cr-60-M, 2018 WL 1916983, at *12 (N.D. Tex. Apr. 4, 2018) (noting increase in "strength of the government's case against [defendant]" as weighing in favor of continued detention). As background, counts one through four for perjury are each based on the defendant's denial of facts under oath during his testimony in *United States v. Teganya*, Crim. No. 17-10292-FDS. The defendant's denials in each count are as follows:  (1) denying that his roommate at the University of Butare wore certain clothing (count one); (2) denying

4

that he was in Butare after the plane carrying Hutu President Juvenal Habyarimana was shot down in April 1994 (count two); (3) denying that he was a member of the youth militia of Mouvement Revolutionaire National pour le Develppement ("MRND) known as the Interahamwe (count three); and (4) denying that he participated in the genocide (count four).  (D. 11).

As proof, the government provided an affidavit by a special agent with the Department of Homeland Security that each of the above four denials was a false or perjurious statement.  (D. 1-1, ¶ 35) (The defendant made perjurious statements under oath that his roommate wore certain clothing and displayed a flag in his room.); (D. 1-1, ¶ 15) ("After the genocide started in Butare," the defendant "searched for, and exposed, Tutsis" at the University of Rwanda *in Butare* and in other locations *in Butare*.); (D. 1-1, ¶ 38) (The defendant "falsely denied being in Butare during the genocide."); (D. 1-1, ¶ 14) (While a student at the University in Butare, the defendant "was an active member in the MRND and the Interahamwe."); (D. 1-1, ¶ 17) (During the genocide, the defendant was "directly involved in the murder of Tutsis, including women and children.").

To be sure, the government's case will depend in large part on the fact-finder's assessment of the credibility of the anticipated witnesses and, if he were to testify, the defendant himself.  And if the defendant were to testify and be found

5

credible, it would lessen the strength of the government's case on the merits. Nevertheless, on balance and at this juncture, the government's case on the merits appears relatively strong.

D. **Length of Detention**

Next, the length of detention thus far, now sixteen months, weighs decidedly, albeit not overwhelmingly, in favor of finding a due process violation. *See Zannino*, 798 F.2d at 548 ("assum[ing] that in many, perhaps most, cases, sixteen months would be found to exceed the due process limitations on the duration of pretrial confinement"); *cf. United States v. Daniels*, No. 98-30040-MAP, 2000 WL 1611124, at *4 (D. Mass. Oct. 5, 2000) (noting there is "no magic to the sixteen month period" due in part to need to assess detention "case by case"). But the significance of the length of this time-period is tempered by the fact that the defendant has brought about much of the delay. *See Zannino*, 798 F.2d at 548 ("Delays, for example, that the defendant caused would not raise a problem." (quoting *United States v. Theron*, 782 F.2d 1510, 1516 (10th Cir. 1986))).

First and foremost, the defendant waited from April to late October 2024 to seek letters rogatory, which itself is a lengthy process. S*ee generally HDMI Licensing Adm'r, Inc. v. Availink, Inc.*, Case No. 22-cv-06947-EKL, 2025 WL 799036, at *10 (N.D. Cal. Mar. 13, 2025) (stating, albeit in context of defendant waiting until after close of fact discovery, that there was nothing in

6

plaintiff's responses to discovery that impeded defendant "from seeking letters rogatory much earlier during the fact discovery period"). More, the defendant undoubtedly recognized the need for letters rogatory because the charged conduct encompassed his conduct in Rwanda.[2]

Second, the government is not responsible for the length of the detention. To be sure, the discovery the government produced is voluminous. Yet, the government produced the bulk of that discovery early, specifically, on June 3, 2024, when it produced 4.93 gigabytes of data, including 53 folders with 568 files. The government's prompt and early production on the same day the court entered a protective order ensured that the defendant had an adequate time to review the material. More to the point, the early production facilitated a review of discovery that this court finds would not extend the length of detention. What is more, and in light of the early production, it was not the fault of the government that the defendant ultimately took more than a year to review the discovery.[3]

---

[2] To delve deeper, seven of the nine letters rogatory the defendant eventually proffered amounted in the undersigned's view to a fishing expedition and lacked specificity. (D. 77). In May 2025, the defendant withdrew the requests for the two remaining letters rogatory because the government was obtaining the information for him in a more expedited fashion. (D. 97, 107). At this juncture, the defendant's argument that the letters rogatory process will likely add *another* year of pretrial incarceration is therefore speculative and unconvincing. (D. 95, p. 2).

[3] The defendant continually represented he was reviewing discovery from early June 2024 to at least June 3, 2025. (D. 37, 46, 49, 52, 57, 71, 74, 88, 100). As an aside, during that time, the government invited defense counsel to inspect

7

### E. Complexity of Case and Impact of Litigation Strategies

Lastly, the complexity of the case does not unduly favor release or detention but rather stands in equipoise. On the one hand, this is not a multi-defendant case or a complicated RICO conspiracy prosecution. It involves six counts against a single defendant. Further, the indictment recites the purportedly false testimony at issue in the four perjury counts. On the other hand, the case hinges on conduct occurring decades ago in a foreign country and involves obtaining evidence located in other countries. The parties do not elaborate on their litigation strategies so that factor also does not convincingly weigh in favor of release or continued detention.

As a final matter, the court acknowledges the unfortunate consequences and distress the defendant's continued detention has imposed on his family. But even considering these consequences as a factor, a consideration of all the pertinent factors on balance militates against a finding of a due process violation and in favor of continued detention.

---

eleven boxes of discovery produced to the defendants in two similar prosecutions, namely, *Unites States v. Prudence Kantengwa*, No. 08-cr-10385-RGS (D. Mass.), and *United States v. Beatrice Munyenyezi*, No. 10-cr-00085-SM (D.N.H.). (D. 71). Defense counsel promptly reviewed that material in late March. The government also produced 650 pages culled from these cases.

## IV. Conclusion

For the foregoing reasons, the motion to revoke the pretrial detention order and for admission to bail based on due process concerns (D. 95) is **DENIED**.

                                              /s/ Donald L. Cabell
                                    DONALD L. CABELL, Chief U.S.M.J.

DATED:  July 23, 2025